FILED

**CALLAHAN & BLAINE, APLC**
Daniel J. Callahan (Bar No. 91490)
Marc P. Miles (Bar No. 197741)
Kristy A. Schlesinger (Bar No. 221850)
Robert S. Lawrence (Bar No. 207099)
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
(714) 241-4444 / (714) 241-4445 [Fax]

**KNOBBE, MARTENS, OLSON & BEAR LLP**
John B. Sganga, Jr. (Bar No. 116211)
Lynda Zadra-Symes (Bar No. 156511)
2040 Main Street, Fourteenth Floor
Irvine, California 92614
(949) 760-0404 / (949) 760-9502 [Fax]

Attorneys for Petitioners
MONSTER ENERGY COMPANY and
MONSTER BEVERAGE CORPORATION

2013 OCT 16  PM 4:48

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY:_____

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

ED CV 13 - 01888

MONSTER ENERGY COMPANY, )
and MONSTER BEVERAGE )
CORPORATION )
)
Petitioners, )
)
v. )
)
HRHH HOTEL/CASINO, LLC, a )
Delaware Limited Liability company, )
HRHH IP, LLC, a Delaware Limited )
Liability Company; and DOES 1-50, )
inclusive, )
)
Respondents. )
)
_____ )

CASE NO.:     R (DTBx)

**PETITION TO CONFIRM
ARBITRATION AWARD AND
ENTER JUDGMENT**

*PETITION TO CONFIRM ARBITRATION AWARD*

## PETITION TO CONFIRM ARBITRATION AWARD
## AND ENTER JUDGMENT

Petitioners Monster Energy Company and Monster Beverage Corporation (collectively, "Monster") will, and hereby do, Petition the Court to confirm of the Final Arbitration Award issued by Hon. Edward A. Panelli (Ret.) on August 16, 2013, and in support thereof allege as follows:

### I.   Parties

1.   At all relevant times, Petitioner Monster Energy Company (f/k/a Hansen Beverage Company) has been and is a corporation duly organized and existing under the laws of the State of Delaware, and qualified to do business in California, with its principal place of business in Corona, California.

2.   At all relevant times, Petitioner Monster Beverage Corporation has been and is a corporation duly organized and existing under the laws of the State of Delaware, and qualified to do business in California, with its principal place of business in Corona, California.

3.   Petitioner is informed and believes and thereon alleges that at all relevant times Respondent HRHH Hotel/Casino, LLC has been and is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Las Vegas, Nevada.

4.   Petitioner is informed and believes and thereon alleges that at all relevant times Respondent HRHH IP, LLC has been and is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Las Vegas, Nevada.

*PETITION TO CONFIRM ARBITRATION AWARD*

## II.   Jurisdiction

5.      This petition to confirm an arbitration award is brought pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9. This Court has subject matter jurisdiction pursuant to 28 U.S.C §§ 1331 and 1338 as this petition seeks to confirm an arbitration award arising out of a demand for arbitration seeking declaratory relief with respect to trademark rights and unfair competition joined with a substantial and related claims under the trademark laws, including Respondent's counterclaim for false advertising under §43(a) of Lanham Act.

6.      This Court has personal jurisdiction over HRHH Hotel/Casino, LLC and HRHH IP, LLC (collectively, "Hard Rock") to confirm the arbitration award because they have agreed to submit to the jurisdiction of this Court by way of their Agreement with Monster, and this Court is within the judicial district in which the arbitration was conducted and in which the arbitration award was made. 9 U.S.C. § 9; *see* Declaration of Marc P. Miles ("Miles Dec."), Ex. A, Binding Letter of Intent, ¶8(c).

## III.   Venue

7.      Venue is proper in this judicial district pursuant  28 U.S.C. §1391(b) and 1391(c) because Hard Rock is subject to personal jurisdiction of this judicial district by way of the agreement with Monster and the underlying arbitration related to trademark rights.

## IV.   The Dispute

8.      On November 6, 2009, Monster entered into a Binding Letter of Intent ("LOI") with Hard Rock related to the sale of the REHAB trademark to Monster. To further confirm the transfer in ownership of the REHAB mark and brand, Monster and Hard Rock entered into a Supplement to Binding Letter of Intent ("Supplement"), effective December

*PETITION TO CONFIRM ARBITRATION AWARD*

31, 2009, and executed a separate and distinct Trademark Assignment, which was recorded at the USPTO. *Id*, Ex. A.

9.     The LOI included a provision requiring the parties to submit their disputes to binding arbitration. The applicable provision, Section 8(c), required that "[a]ny dispute, controversy or claim arising out of or relating to the letter of intent or the breach or termination hereof shall be settled by binding arbitration conducted by JAMS/Endispute ("JAMS") in accordance with JAMS Comprehensive Arbitration Rules and Procedures (the "Rules"). *See* Miles Dec., Ex. A, Letter of Intent.

10.     On May 22, 2012, Monster filed a Demand for Arbitration with JAMS in which it sought declaratory relief as to the parties' respective rights and obligations regarding the REHAB trademark, and brought claims for breach of contract, intentional and negligent interference with contractual relations, intentional interference with prospective economic advantage, and unfair business practices. *See* Miles Dec., Ex. B, Demand for Arbitration.

11.     In response, on August 12, 2012, Hard Rock filed its Answer to Arbitration Demand and Counterclaims, asserting causes of action for breach of contract, breach of covenant of good faith and fair dealing, false advertising under §43(a) of Lanham Act, and declaratory relief regarding ownership of the REHAB trademark. *See* Miles Dec., Ex. C, Answer to Arbitration Demand and Counterclaims.

## V.   **The Arbitration and Award**

12.     Section 8(c) of the LOI provides for binding arbitration of any and all disputes arising out of or relating to the letter of intent before a single arbitrator at JAMS in Orange County, California. *See* Miles Dec., Ex. A, Letter of Intent.

13.     Section 8(c) of the LOI specifically provides that "[j]udgment upon any award

rendered may be entered in any court having jurisdiction thereof." *Id.*

14.     In 2012, shortly after Monster made the final installment of its $5 million payment to Hard Rock for the purchase of the REHAB trademark under the LOI, Hard Rock made a variety of specious allegations regarding its purported future ownership of the REHAB trademark and falsely claimed that Monster had breached the LOI.

15.     Monster sought to protect its rights and resolve the disputes between the parties by filing a Demand for Arbitration with JAMS Orange County in May 2012, as it had a right to do under the LOI. *See* Miles Dec., Ex. B., Demand for Arbitration. Hard Rock agreed to arbitration and filed its Answer with JAMS Orange County in September 2012, and concurrently asserted its own Counterclaims.  Shortly thereafter, the parties selected the Honorable Edward A. Panelli (Retired California Supreme Court Justice) to serve as the sole arbitrator.

16.     Following the exchange of discovery and resolution of various discovery disputes, the parties filed their Opening Arbitration Briefs on March 26, 2013. The Arbitration Hearing itself took place April 1-11, 2013, and included nine days of testimony and argument, during which time the arbitrator heard testimony from 18 witnesses. Following the close of evidence, the parties submitted comprehensive Post-Arbitration Briefs on May 1, 15 and 24, 2013.  *See* Miles Dec., Ex. D., Final Award.

17.     On or about June 14, 2013, the Arbitrator issued an Interim Award finding that Monster was the prevailing party on its claims and in defense of Hard Rock's counterclaims. Having found Monster was the prevailing party, the Arbitrator invited briefing on the issue of Monster's recovery of attorneys' fees and costs. *Id.*

18.     On August 16, 2013, after full briefing by the parties on the issue of attorneys' fees and costs, and after consideration of the parties' briefs, testimony of witnesses,

*PETITION TO CONFIRM ARBITRATION AWARD*

documentary evidence and arguments of counsel, the Arbitrator issued his Final Award. *Id.*

19.    Justice Panelli's Final Award was made in accordance with the terms and conditions of the LOI and is proper in all respects.

20.    In ruling on all claims, the arbitrator found that Hard Rock had breached the contract between the parties, including the covenant of good faith and fair dealing, by selling all of its rights in the REHAB trademark for beverages to Monster, and then – after receiving payment on the sale – attempting to reacquire the rights to the REHAB mark for beverages by filing trademark applications in the United States and abroad. *Id.* The Arbitrator award $30,000 in damages to Monster and against Hard Rock on the breach of contract claim. *Id.*

21.    In addition to denying all of Hard Rock's Counterclaims, the Arbitrator issued the following Final Award and Order for declaratory relief:

(1)    Monster acquired by assignment all rights, title and interest that HRHH [Hard Rock] possessed in the trademark Rehab for all beverages;

(2)    Monster is the unequivocal and unconditional owner of the Rehab beverage trademark (Reg. No. 3353473) having acquired by assignment all rights, title and interest that HRHH possessed in the trademark Rehab;

(3)    HRHH's assignment of the trademark Rehab for all beverages, including the registered trademark (Reg. No. 3353473), was in perpetuity and is not limited by time;

(4)    Monster's ownership of the Rehab beverage trademark (Reg. No. 3353473) is not limited by type of beverage;

(5)    Monster may use its Rehab beverage trademarks alone and/or in connection with its other trademarks or any other marks;

(6)    Monster has complied with all of its contractual obligations to Hard Rock Hotel & Casino;

(7)    Monster has fully performed all obligations for the assignment and purchase of the Rehab trademark, and any dispute concerning other components of the LOI and Supplement has no effect on, and is

*PETITION TO CONFIRM ARBITRATION AWARD*

independent and separate from, the binding, separate and fully performed and completed sale of the Rehab trademark.

(8)     HRHH is precluded from using Rehab trademarks for beverages.

*See* Miles Dec., Ex. D, Final Award.

22.     In his Final Award, the Arbitrator also ordered Hard Rock to pay Monster's attorneys' fees and costs in the amount of $1,470,069.41, plus all JAMS arbitration fees incurred in connection with the Motion for Costs. *Id.*

23.     No application has been made in any court by Hard Rock for either correction or vacation of the arbitral award.

## VI.     **Prayer**

WHEREFORE Monster prays for an order confirming the Arbitrator's Final Award in its entirety and for judgment consistent therewith in favor of Monster and against Hard Rock to be entered as follows:

(1)     The Arbitrator's Final Award rendered on August 16, 2013, in the matter of the arbitration between Monster and Hard Rock is confirmed in its entirety.

(2)     Hard Rock breached the contract with Monster, including the covenant of good faith and fair dealing, by selling all of its rights in the Rehab trademark for beverages, and then after receiving payment on the sale, attempting to reacquire the rights to the Rehab mark for beverages by filing trademark application in the United States and abroad. Monster is entitled to $30,000 in damages for having to oppose Hard Rock's improper trademark applications.

(3)     Declaratory judgment in favor of Monster and against Hard Rock declaring that:

(a)    Monster acquired by assignment all rights, title and interest that Hard Rock possessed in the trademark Rehab for all beverages;

(b)    Monster is the unequivocal and unconditional owner of the Rehab beverage trademark (Reg. No. 3353473) having acquired by assignment all rights, title and interest that Hard Rock possessed in the trademark Rehab;

(c)    Hard Rock's assignment of the trademark Rehab for all beverages, including the registered trademark (Reg. No. 3353473), was in perpetuity and is not limited by time;

(d)    Monster's ownership of the Rehab beverage trademark (Reg. No. 3353473) is not limited by type of beverage;

(e)    Monster may use its Rehab beverage trademarks alone and/or in connection with its other trademarks or any other marks;

(f)    Monster has complied with all of its contractual obligations to Hard Rock Hotel & Casino;

(g)    Monster has fully performed all obligations for the assignment and purchase of the Rehab trademark, and any dispute concerning other components of the LOI and Supplement has no effect on, and is independent and separate from, the binding, separate and fully performed and completed sale of the Rehab trademark; and

(h)    Hard Rock is precluded from using the Rehab trademark for beverages.

(4)    All of Hard Rock's counterclaims are denied and judgment on each of them is entered in favor of Monster in all respects.

*PETITION TO CONFIRM ARBITRATION AWARD*

(5)     Monster is the prevailing party in the arbitration proceeding and is entitled to recover $1,210,721 in attorneys' fees and $259,348.41 in costs, for a total of arbitration attorneys' fees and costs in the amount of $1,470,069.41.

(6)     Hard Rock shall pay to Monster the total sum of $1,500,069.41 in arbitration damages, attorneys' fees and costs.

(7)     In addition, Hard Rock shall pay to Monster attorneys' fees and costs (according to proof) associated with confirming the Arbitration Award and obtaining a court judgment.

(8)     Prejudgment interest.

(9)     Such other relief as the Court may deem just and proper.

Dated:  October 16, 2013          Respectfully submitted,

CALLAHAN & BLAINE APLC

By: _____
          Daniel J. Callahan
          Marc P. Miles
          Kristy A. Schlesinger
          Robert S. Lawrence
        Attorneys for Petitioners
        MONSTER ENERGY COMPANY, and
        MONSTER BEVERAGE CORPORATION

# EXHIBIT A

10



**HANSEN BEVERAGE COMPANY**

**Mark Hall**
**President – Monster (DSD) Division**

550 Monica Circle, Suite 201
Corona, CA 92880
Phone: 951/739-6200
Fax: 951/739-6210

### BINDING LETTER OF INTENT
Monster Energy Drink Proposal for Hard Rock Hotel and Casino

November 5, 2009

Randy Kwasniewski
Hard Rock Hotel & Casino
President and Chief Operating Officer
4455 Paradise Road
Las Vegas, NV 89169

Dear Randy:

This binding letter of intent sets forth certain statements and intentions of Monster Beverage Company, a division of Hansen Beverage Company, a Delaware corporation ("MONSTER"), and Hard Rock Hotel & Casino ("HRH") (collectively, MONSTER and HRH are referred to herein as the "parties" and each a "party") relating to Monster Energy® becoming the exclusive energy drink partner of HRH (the "Transaction").

This binding letter of intent may not contain all the essential terms with respect to the Transaction, and the parties acknowledge that they may be required to further negotiate certain aspects of this Transaction pursuant to a separate agreement as well as other points beyond the scope of this binding letter of intent. The parties hereby agree that notwithstanding the fact that this binding letter of intent may not include all necessary terms and conditions, this letter of intent shall be binding and each of the parties agrees to be bound with respect to each of the matters herein, unless and until, and to the extent only, superseded by supplemental agreements with respect the Transaction, as necessary.

Monster Energy® will be the exclusive energy drink partner of Hard Rock Hotel & Casino in Las Vegas, Nevada (the "HRH Vegas"). The effective date of this Transaction will be ~~January 1, 2010~~ (the "Effective Date"). The term of this letter of intent and the Transaction will be for 5 years from the Effective Date (the "Term").

*DECEMBER 31, 2009*

*NB*

\\

Mr. Kwasniewski
November 5, 2009
Page 2 of 8

## 1.    HRH VEGAS WILL RECEIVE THE FOLLOWING BENEFITS:

### A.  Marketing Support/Pouring Rights:

- **Total amount of up front financial support**            **$1,250,000**
  ($500,000 to be paid on execution of this letter of intent,
  and remaining $750,000 to be paid on the Effective Date.)

- **Additional financial support to be paid over 5 years**    **$1,000,000**

  - The additional financial support to be paid out
    as follows:

    1. One (1) major MONSTER event each year
       for five (5) years (the "Monster Event")        $700,000
       (approximately $140,000 per event/per year)

    2. Volume incentives based on total cases sold      $300,000
       (Incentives will be based on hitting specific
       case goals per year for 5 years)
       a. 18,000 cases = an additional               $20,000
       b. 21,000 cases = an additional               $20,000
       c. 25,000 cases = an additional               $20,000
       **d. Total per year available**               **$60,000**

    3. HRH will exclusively sell all MONSTER products that may be
       agreed from time to time, in 8.3 ounce packages, at all HRH
       Vegas Nightclubs, restaurants, service bars, catering (events),
       conventions, room service, pool and in-room locations.
       Additionally, Monster Hitman Energy Shooter will be available
       in-room locations.

    4. HRH will sell various MONSTER products in 16 oz sizes, or
       such other package sizes that may be agreed from time to time,
       in the HRH Vegas convenience stores and retail locations.

### B.  Rehab:

Additionally, MONSTER will acquire the Rehab Recovery Supplement brand ("Rehab")
from HRH as outlined below:

- **Up Front payment to HRH**            **$750,000**
- **Royalty fee**                        **3% of net wholesale price**

Mr. Kwasniewski
November 5, 2009
Page 3 of 8

    a. The royalty fee will be paid up to a total amount of $4,250,000 in the aggregate;

    b. The fee will terminate once the $4,250,000 aggregate payment is achieved;

    c. HRH will assign to MONSTER all right, title and interest in Rehab, including but not limited to all formulations, trademarks, tradedress and any and all other rights, including contract rights, associated with Rehab.

Rehab Brand elements:

- MONSTER will work with HRH to develop the Rehab in whatever form Monster determines is commercially viable for the market place;

- MONSTER will consult with HRH regarding the direction of the Rehab brand, packages, etc.;

- MONSTER will work within it's current distribution network to recommend the appropriate route to market for the brand;

- MONSTER will produce the current Rehab brand in it's can form;
    o MONSTER will sell that package to HRH Vegas for their Las Vegas property;

    o MONSTER will sell this package to HRH Vegas at a preferred pricing rate that will be mutually agreed upon.

- Notwithstanding the foregoing, HRH shall have the right to repurchase the Rehab brand (and all rights associated therewith) from MONSTER for $1.00, if, after two years following the commencement date of the repositioned Rehab brand sales by MONSTER, MONSTER has not sold at least 100,000 cases of the Rehab brand product.

C. Rooms:

- MONSTER will commit to reserve and occupy 200 room nights per year for 5 years at HRH Vegas (1000 room nights total) at hotel's best preferred rates. Such rooms shall be included as part of, and offset against, the Monster Event commitment in Section 1.A. above and/or in connection with any other MONSTER sponsored events and/or programs.

Mr. Kwasniewski
November 5, 2009
Page 4 of 8

2.     **MONSTER WILL RECEIVE THE FOLLOWING BENEFITS:**

- **Monster Energy® brands and Rehab will be the exclusive energy drink of the HRH Vegas.**

  o No other competitive brands can be carried, sold or promoted at the property at any time (including third party events, private parties, promotions or any other outside party or event); and *↳ to the public JW*

  o Competitive brands are defined as any beverage in a can, bottle, on the gun or in any form that advertises, brands, markets or promotes itself as an energy drink or that provides energy, is positioned as an energy drink, or provides any attributes similar to energy, including but not limited to Red Bull, Rockstar, Muscle Milk, Monster Milk, Sobe, Full Throttle, Adrenaline Rush, Relentless, Burn, Vault, No Fear, Nos, Amp, Sparks, Tilt, Zip Fizz, 5-Hour Energy, Vitamin Water-Energy, Mountain Dew, and Arizona Tea-Energy.

- High visibility for Monster Energy® brand products at all points of distribution including all restaurants, backbars, standards, pools, bars, lounges, clubs, in room, conference/convention services or anywhere else beverages are sold;

  o Visibility will include, but not be limited to MONSTER cans and bar mats placed behind all bars. Coolers, MONSTER signage and other MONSTER visibility items will be placed as needed and mutually agreed upon.

  o MONSTER will provide and HRH will place MONSTER countertop coolers in highly visible places in all bars and restaurants, subject to space limitations. *Vodka only JW*

- 2 cans of Monster Green and 2 cans of Monster Blue to be given with ~~all~~ bottle service orders;

- Menu placement on all menus, menu boards, table tents, or anywhere else beverages are identified at HRH Vegas:

  o Shall be listed with alcohol as a cocktail;

  o Monster and Vodka shall be featured at all HRH outlets and venues; and

  o Shall be listed in the non alcohol section as a stand alone beverage;

- $3000 in trade out for food at any HRH restaurant per year;

14

Mr. Kwasniewski
November 5, 2009
Page 5 of 8

- 5 complimentary bottle service nights per year. Would consist of 1 bottle per night for 5 nights;

- Use of 1 "Celebrity Suite" each year without rental fee per year/each year;

- Use of sky box/suite at the Joint for entertainment 3 times/nights per year each year (no rental fee or ticket fee); and

- Preferred room rate for all MONSTER employees and business partners throughout the Term.

3.    **MONSTER EVENT:**

- MONSTER will undertake commercially reasonable efforts to activate the Monster Event described in Section 1.A. above, which the parties contemplate will be 1 consumer driven program with HRH Vegas:

  o  Event to be determined at a later date; and

  o  Event will be mutually agreed upon

4.    CONFIDENTIALITY; NO EXPLOITATION.   Each party will, and will cause its representatives to, keep confidential any information obtained from the other parties in connection with this Transaction except as is required by law or regulation to be disclosed, but only to the extent necessary and only for the purpose required. Notwithstanding the foregoing, the provisions of this Section shall not apply to information that (i) is or becomes generally available to the public through no breach of either party; (ii) is or was received by either party from a third party who was authorized to provide such information; (iii) is approved for release in writing by the parties; (iv) is or was independently developed by such party; (v) is required to be disclosed pursuant to a subpoena or other court order or applicable law; or (vi) is disclosed in connection with any arbitration or litigation regarding this letter of intent.  If the Transaction is not consummated, each party will return to the other party any confidential materials, or will certify in writing that all such materials have been destroyed.

5.    SUPPLEMENTAL AGREEMENT.  Upon the acceptance of this letter of intent by HRH, the parties hereto shall identify any other supplemental transaction agreement(s) or items necessary for the Transaction and commence negotiation of the terms of any required supplemental agreements with respect to the Transaction (each, a "Supplemental Agreement") including but not limited to any agreements required in connection with acquisition of the Rehab brand by MONSTER.  Any Supplemental Agreement shall be in a form customary for transactions of this type and shall include, in addition to those matters specifically set forth in this letter of intent, customary representations, warranties, indemnifications, covenants, agreements and conditions.

15

Mr. Kwasniewski
November 5, 2009
Page 6 of 8

6.     PRE-CLOSING COVENANTS.   In connection with the consummation of the Transaction, and even before execution and delivery of any Supplemental Agreement, if required, the parties hereto will cooperate with each other and proceed, as promptly as reasonably practicable, to seek to obtain consents and approvals required in order to consummate the Transaction, to the extent required.

7.     TERMINATION.  This letter of intent may be terminated only (i) by mutual written consent of MONSTER and the HRH.   Upon termination of this letter of intent in accordance with the terms hereof, the parties shall have no further rights or obligations hereunder, except with respect to those matters that explicitly survive any such termination.

8.     MISCELLANEOUS

        a.  Costs and Expenses.  Each party hereto will pay all of its own costs and expenses incurred at any time in connection with the letter of intent, the negotiations or consummation of the Transaction, including legal fees, broker's fees, finder's fees, fees of financial advisors and accountants and expenses of its representatives, whether or not the Transaction is consummated.

        b.  Governing Law.  The terms of this letter of intent and all other matters relating to this letter of intent shall be governed by the laws of the State of California, without regard to the conflicts of law provisions thereof.

        c.  Arbitration.  Any dispute, controversy or claim arising out of or relating to this letter of intent or the breach or termination hereof shall be settled by binding arbitration conducted by JAMS/Endispute ("JAMS") in accordance with JAMS Comprehensive Arbitration Rules and Procedures (the "Rules").  The arbitration shall be heard by one arbitrator to be selected in accordance with the Rules in Orange County, California.  Judgment upon any award rendered may be entered in any court having jurisdiction thereof.  Within seven (7) calendar days after appointment the arbitrator shall set the hearing date, which shall be within ninety (90) calendar days after the filing date of the demand for arbitration unless a later date is required for good cause shown and shall order a mutual exchange of what he/she determines to be relevant documents and the dates thereafter for the taking of up to a maximum of five (5) depositions by each party to last no more than two (2) business days in aggregate for each party.  Both parties waive the right, if any, to obtain any award for exemplary or punitive damages or any other amount for the purpose or imposing a penalty from the other in any arbitration or judicial proceeding or other adjudication arising out of or with respect to this letter of intent or any breach hereof, including any claim that said letter of intent, or any part hereof, is invalid, illegal or otherwise voidable or void.  In addition to all other relief, the arbitrator shall have the power to award reasonable attorneys' fees and costs to the prevailing party.  The arbitrator shall make his or her award no later than seven (7) calendar days after the close of evidence or the submission of final briefs, whichever occurs later.  The decision of the arbitrator shall be final and conclusive upon all parties.

16

Mr. Kwasniewski
November 5, 2009
Page 7 of 8

     d.  <u>Entire Agreement</u>. With respect to the Transaction contemplated hereby, this letter of intent constitute the entire agreement between the parties and supersede all prior oral or written agreements, understandings, representations and warranties, and dealings between the parties on the subject matter hereof.

     e.  <u>Amendment</u>.  This letter of intent may be amended or modified only by a writing executed by each of the parties.

     f.  <u>Counterparts</u>.  This letter of intent may be executed in one or more counterparts, each of which will be deemed to be an original copy of this letter of intent and all of which, when taken together, will be deemed to constitute one and the same instrument.

*[Next Page Is Signature Page]*

Mr. Kwasniewski
November 5, 2009
Page 8 of 8

*[Signature Page]*

Please sign and date this letter of intent in the space provided below to confirm the mutual agreements set forth in the Binding Provisions and return a signed copy to MONSTER by the close of business (5:00 pm PDT) on November 6, 2009.

Very truly yours,

MONSTER BEVERAGE COMPANY, a division of Hansen Beverage Company

By: _____
Name: _____
Its: _____

ACCEPTED AND AGREED as to the
Binding Provisions as of the 6 day of November, 2009
by:

HARD ROCK HOTEL & CASINO
HRHH HOTEL/CASINO, LLC

By: _____
Name: DEAN BOSWELL
Its: CFO

**SUPPLEMENT TO BINDING LETTER OF INTENT:**
**ACQUISITION OF RIGHTS IN REHAB RECOVERY SUPPLEMENT BEVERAGE**

This Agreement is effective as of December 31, 2009 (the "Effective Date"), by and between HRHH IP, LLC, a Delaware limited liability company ("HRH"), and MONSTER BEVERAGE COMPANY, a division of HANSEN BEVERAGE COMPANY, a Delaware corporation ("MONSTER").

WHEREAS, HRH and MONSTER entered into a Binding Letter of Intent dated November 5, 2009 (the "LOI") whereby MONSTER will acquire the Rehab Recovery Supplement brand from HRH, including all trademark rights and manufacturing and distribution rights.

WHEREAS, this Agreement supplements the LOI.

NOW, THEREFORE, for good and adequate consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   Definitions. For purposes of this Agreement, the following terms have the following meanings:

a)   "HRH Vegas" means the Hard Rock Hotel & Casino in Las Vegas, Nevada, including all hotel rooms, bars, restaurants (excluding those restaurants operated by third parties pursuant to a lease from HRH), pool areas, room service, retail stores and other facilities on the premises and all events taking place at the premises.

b)   "Trademarks" means the marks REHAB®, REHAB RX and ℞ehab℞ whether in block letters or in the stylized form currently used by HRH in connection with a recovery supplement beverage, including all goodwill associated therewith, and all common law rights, trade name rights, causes of action, and the right to recover for past infringement other than against Fuze Beverage, LLC or its successors, and including U.S. Trademark Registration No. 3353473 for the mark REHAB and any other applications or registrations for any of the Trademarks covering beverages in International Class 5 or 32.

c)   "REHAB Product" means a recovery supplement beverage sold under any of the Trademarks.

2.   Purchase and Assignment of the REHAB Product. HRH hereby assigns and sells to MONSTER all rights, title, and interest in and to the REHAB Product, including:

a)   the Trademarks, together with the goodwill symbolized by the Trademarks concurrent with the transfer of certain tangible assets as indicia of said goodwill, and including any and all trademark registrations and applications that HRH may own for the Trademarks; provided, however, that MONSTER expressly recognizes and agrees that its acquisition is limited to the Trademarks and goodwill symbolized by the Trademarks for use limited to beverages, including energy drinks, nutritional supplement beverages and recovery supplement beverages.

b)   [*intentionally omitted*];

c)   all rights, including all trade dress rights and all copyrights, in the artwork and designs on the packaging for the REHAB Product and in all advertising and promotional material previously developed for the REHAB Product;

d)   all rights to manufacture and distribute the REHAB Product; and

e)   the domain name liquidrehab.com.

19

3.     No Assumption of Liabilities.  This Agreement does not transfer, MONSTER does not assume, and MONSTER expressly disclaims any and all liabilities existing prior to execution of this Agreement, costs, debts, claims and obligations of HRH or its predecessor in title of rights relating to the REHAB Product.

4.     Further Documents.  HRH will execute and deliver to MONSTER such other documents and instruments as MONSTER may reasonably request to more effectively vest title to the REHAB Product in MONSTER, including the recordable Trademark Assignment attached hereto as Exhibit A.  Upon reasonable advance notice, HRH will provide to MONSTER, such records and other evidence in HRH's possession, if any, as may be required and available to establish, record or maintain the rights acquired by MONSTER in the REHAB Product under this Agreement, and it shall cooperate as reasonably necessary in the prosecution and maintenance of any registration of the Trademarks.

5.     Reservation of Rights.  The parties acknowledge that HRH operates a weekly poolside party event at the HRH Vegas which HRH promotes under the marks **Rehab** X and "Rehab Sundays at the Pool."  HRH owns U.S. Trademark registrations for the marks **Rehab** X Sundays at the pool. and **Rehab** X for "seasonal poolside party held weekly with food, drinks and entertainment" and utilizes the marks and trade dress in merchandise and a television series. MONSTER acknowledges that HRH will continue to use these marks in connection with such weekly poolside event, merchandise and television series and promotion of these activities.  MONSTER covenants that, after the effective date of this Agreement, none of MONSTER or its owners, officers, or affiliates, will use the Trademarks or trade dress in connection with goods or services other than for beverages, including energy drinks, nutritional supplement beverages and recovery supplement beverages.

6.     Payment for the REHAB Product Rights.

       a)     In consideration of the rights being assigned to MONSTER for the REHAB Product, MONSTER has paid to HRH an up front payment of $750,000.

       b)     As additional consideration, MONSTER will pay to HRH a royalty of three percent (3%) of the net wholesale price of the REHAB Product sold by MONSTER up to a maximum royalty of $4,250,000.  If and when the total royalty fee paid to HRH under this Agreement reaches $4,250,000, the royalty fee will terminate. MONSTER will not owe any royalty to HRH based on REHAB Product sold at the net wholesale price to HRH or its affiliates.

7.     Option to Repurchase REHAB.  HRH shall have the right to repurchase all rights in the REHAB Product for One Dollar ($1.00) if, after two years from the date MONSTER first sells the repositioned REHAB Product, MONSTER has not sold at least 100,000 cases of the REHAB Product.

8.     Representations and Warranties.  HRH represents and warrants to MONSTER that:

       a)     HRH has the full right and legal authority to enter into and fully perform this Agreement in accordance with its terms;

       b)     this Agreement, when executed and delivered by HRH, shall be its legal, valid and binding obligation enforceable against HRH in accordance with its terms, except to the extent that enforcement may be limited by bankruptcy, insolvency, or other similar laws affecting creditor rights generally;

       c)     HRH has not previously granted and will not grant any rights to any third party that are inconsistent with the rights granted to MONSTER herein and has not entered into any license or other agreement, oral or written, with any third party which conflicts with or otherwise limits the rights granted to MONSTER herein;

2

d)     HRH has the right and power to assign all rights in the REHAB Product, including the Trademarks, recipes, trade dress and artwork to MONSTER;

e)     to the best of HRH's knowledge, there is no claim by any third party that any of the Trademarks is invalid or infringes the rights of any third party; and

f)     That to the best of HRH's knowledge, there are no encumbrances upon, or liens or security interests against or in the Trademarks.

9.     Indemnification. HRH agrees that it shall indemnify and hold harmless, MONSTER, its parent and their respective subsidiaries and affiliates, directors, officers, agents, attorneys, and employees from and against any and all liabilities, claims, suits, actions, damages, losses, costs and expenses, including reasonable attorneys' fees and costs, arising, directly or indirectly, from (i) any agreements between HRH and/or FUZE Beverage, LLC and any third party concerning the manufacture, promotion, distribution or sale of the REHAB Product; (ii) the manufacture, packaging, promotion, sale, distribution and use of the REHAB Products by or for HRH or Fuze Beverage, LLC and/or use of the Trademarks, prior to the date of this Agreement, including, but not limited to any defect in the REHAB Product, or personal injury to any third party by the use of the REHAB Product; (iii) infringement of any rights of any person or entity by the manufacture, packaging, promotion, sale, distribution, possession or use of the REHAB Product prior to the date of this Agreement; (iv) any and all claims that may be brought by any seller, distributor or other entity in possession of REHAB Products which claims arose from activities occurring prior to the date of this Agreement; and (v) any breach arising out of, related to, or in connection with any of HRH's representations or warranties contained in this Agreement.

10.     Term and Termination. The term of this Agreement begins on the Effective Date and ends on December 31, 2014. This Agreement may be terminated only by mutual written consent of MONSTER and HRH.

11.     Additional Terms. This Agreement is a supplement to the LOI and hereby incorporates the following sections of the LOI: Section 4 ("Confidentiality") and Section 8 ("Miscellaneous"). In the event of any inconsistency between the terms of this Agreement and the LOI, such inconsistency will be governed by the terms of this Supplemental Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Supplemental Agreement to be effective as of the date first written above. This Agreement will be signed in duplicate, each copy of which shall be deemed an original.

HRHH IP LLC                                HANSEN BEVERAGE COMPANY

By: _Richard Szymanski_                    By: _____

Name: _Richard Szymanski_                  Name: _Hilton H. Schlosberg_

Title: _Vice President_                    Title: _Vice Chairman & President_

Date: _____             Date: _April 14, 2010_

8684381
030910

3

EXHIBIT A

TRADEMARK ASSIGNMENT

[Attached]

8684381
030910

4

## TRADEMARK ASSIGNMENT

This Trademark Assignment is effective as of December 31, 2009, by and between HRHH IP, LLC, a Delaware limited liability company ("ASSIGNOR"), and Hansen Beverage Company, a Delaware corporation ("ASSIGNEE").

NOW, THEREFORE, for good and adequate consideration, the receipt and sufficiency of which is hereby acknowledged, ASSIGNOR is the owner of the trademark REHAB for energy drinks and fruit beverages in International Class 32 (the "Trademark"), and all good will related thereto, and registration number 3,353,473 of the Trademark issued by the U.S. Patent and Trademark office (the "Registration") and hereby assigns and sells to ASSIGNEE all rights, title, and interest as ASSIGNOR may possess in and to the Trademark, the Registration and the related trade dress including REHAB®, REHAB RX and **Rehab X** , whether in block letters or in any stylized form, in connection with a recovery supplement beverage, including all goodwill associated therewith, and all common law rights, trade name rights, causes of action, and the right to recover for past infringement, and including the Registration and any other applications or registrations for any of such trademarks covering beverages in International Class 32.

HRHH IP, LLC

By: _____
Richard Szymanski
Vice President

Hansen Beverage Company

By: _____

8482091
020110

23

# EXHIBIT B

24



**THE RESOLUTION EXPERTS**

# Demand for Arbitration Before JAMS

## TO RESPONDENTS: **HRHH HOTEL/CASINO, LLC and HRHH IP, LLC**

<small>(Name of the Party on whom Demand for Arbitration is made)</small>

(Address)   4455 Paradise Road

(City)  Las Vegas            (State)  Nevada            (Zip)  89169

(Telephone)  (702) 693-5000      (Fax)              (E-Mail)

Representative/Attorney (if known):

<small>(Name of the Representative/Attorney of the Party on whom Demand for Arbitration is made)</small>

(Address)

(City)            (State)            (Zip)

(Telephone)        (Fax)            (E-Mail)

## FROM CLAIMANT (Name):  **MONSTER ENERGY COMPANY**

(Address)  550 Monica Circle, Suite 201

(City)  Corona            (State) California      (Zip)  92880

(Telephone)        (Fax)            (E-Mail)

Representative/Attorney of Claimant (if known): Callahan & Blaine / Knobbe, Martens, Olson & Bear

<small>(Name of the Representative/Attorney for the Party Demanding Arbitration)</small>

(Address)  3 Hutton Center Drive, 9th Floor   / 2040 Main Street, 14th Floor

(City) Santa Ana / Irvine        (State)  California      (Zip) 92707 / 92614

(Telephone) 714-241-4444 / 949-721-282  (Fax)        (E-Mail) mmiles@callahan-law.com

Lynda.zadra-symes@knobbe.com

## NATURE OF DISPUTE

Claimant hereby demands that you submit the following dispute to final and binding arbitration (a more detailed statement of the claim(s) may be attached):

### SEE ATTACHED STATEMENT OF CLAIM

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows (cite location of arbitration provision & attach two (2) copies of entire agreement).

### BINDING LETTER OF INTENT, DATED NOVEMBER 5, 2009; SECTION 8(C)

Effective 10/20/2011
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2011 JAMS. All rights reserved.



### THE RESOLUTION EXPERTS

# Demand for Arbitration Before JAMS

## CLAIM & RELIEF SOUGHT BY CLAIMANT

Claimant asserts the following claim and seeks the following relief (include amount in controversy, if applicable):

**SEE ATTACHED STATEMENT OF CLAIM**

## RESPONSE

Respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules.  Send the original response and counter-claim to the claimant at the address stated above with two (2) copies to JAMS.

## REQUEST FOR HEARING

JAMS is requested to set this matter for hearing at:   **ORANGE COUNTY, CALIFORNIA**

<div align="center">(Preferred Hearing Location)</div>

## ELECTION FOR EXPEDITED PROCEDURES (COMPREHENSIVE RULE 16.1)

By checking this box ☐ Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter.  Respondent shall indicate not later than 7 days from the date this Demand is served whether it agrees to the Expedited Procedure.

Signed (Claimant):  _[signature]_       Date:  **May 22, 2012**

<div align="center">(may be signed by an attorney)</div>

Print Name:  **Marc P. Miles, Callahan & Blaine, APLC**

**Please include a check payable to JAMS for the required initial, non-refundable $400 per party deposit to be applied toward your Case Management Fee and submit to your local JAMS Resolution Center.**

Effective 10/20/2011
Resolution Centers Nationwide  •  1.800.352.5267  •   www.jamsadr.com
(c) copyright 2011 JAMS.  All rights reserved.



## THE RESOLUTION EXPERTS®

# Demand for Arbitration Before JAMS

## COMPLETION OF THIS SECTION IS REQUIRED FOR CLAIMS INITIATED IN CALIFORNIA

A. Please check here if this ☐ IS or ☒ IS NOT a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e):

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

    1)    The contract is with a consumer party, as defined in these standards;

    2)    The contract was drafted by or on behalf of the non-consumer party; and

    3)    The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

    1)    An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;

    2)    An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;

    3)    An individual with a medical malpractice claim that is subject to the arbitration agreement; or

    4)    An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.

B. If this is an EMPLOYMENT matter, Claimant must complete the following information:

Effective January 1, 2003, private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

Annual Salary:

    ☐ Less than $100,000        ☐ More than $250,000

    ☐ $100,000 to $250,000      ☐ Decline to State

C. In California, consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information.

Effective 10/20/2011
Resolution Centers Nationwide • 1.800.352.5267 • www.jamsadr.com
(c) copyright 2011 JAMS. All rights reserved.



J-1

**CALLAHAN & BLAINE, APLC**
Daniel J. Callahan (Bar No. 91490)
Marc P. Miles (Bar No. 197741)
Kristy A. Schlesinger (Bar No. 221850)
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
(714) 241-4444 / (714) 241-4445 [Fax]

**KNOBBE, MARTENS, OLSON & BEAR LLP**
John B. Sganga, Jr. (Bar No. 116211)
Lynda Zadra-Symes (Bar No. 156511)
2040 Main Street, Fourteenth Floor
Irvine, California 92614
(949) 760-0404 / (949) 760-9502 [Fax]

Attorneys for Claimant, MONSTER ENERGY COMPANY

# ARBITRATION BEFORE THE

# JUDICIAL ARBITRATION AND MEDIATION SERVICE

| | |
|---|---|
| MONSTER ENERGY COMPANY, | JAMS REFERENCE NO.: |
| Claimant, | Statement of Claim: |
| v. | 1. Breach of Contract |
| | 2. Declaratory Relief |
| HRHH HOTEL/CASINO, LLC, a Delaware Limited Liability company, HRHH IP, LLC, a Delaware Limited Liability Company; and DOES 1-50, inclusive, | 3. Intentional Interference with Contractual Relations |
| | 4. Negligent Interference with Contractual Relations |
| | 5. Intentional Interference with Prospective Economic Advantage |
| | 6. Negligent Interference with Prospective Economic Advantage |
| Respondents. | 7. Unfair Business Practice |

Claimant MONSTER ENERGY COMPANY alleges against Respondents HRHH HOTEL/ CASINO, LLC, HRHH IP, LLC, and DOES 1-50, and each of them, as follows:

## GENERAL ALLEGATIONS

1.   This arbitration is necessary to prevent the bad faith attempt by Respondents HRHH HOTEL/CASINO, LLC and HRHH IP, LLC (collectively, "Hard Rock") to improperly acquire rights in the REHAB brand, which it sold outright to MONSTER

1    ENERGY COMPANY ("Monster") in 2009 for $5 million, and to remedy and stop further
2    interference by Hard Rock with Monster's lawful efforts to develop and benefit from the
3    REHAB brand.  The sale was memorialized in a written purchase agreement and included
4    Monster paying part of the purchase price over time.
5            2.      This year, around the time Monster made its final payment under the
6    agreement and after Monster has spent millions of dollars developing its MONSTER REHAB
7    brand around the world, Hard Rock made the outrageous claim that the agreement (by which
8    Hard Rock assigned "all rights title and interest in" the REHAB brand), was not an
9    assignment but a mere license that Hard Rock intended to terminate.
10           3.      Further evidencing its bad faith, Hard Rock also asserted a litany of supposed
11   breaches of the parties' agreement.  For example, Hard Rock raised specious objections to
12   Monster's use of the REHAB brand on products that also bore Monster's other marks.  Hard
13   Rock made these allegations despite the fact that it tasted the products and saw the drink cans
14   and/or designs before Monster publically launched its drinks.  Hard Rock was aware for more
15   than a year of Monster's development and extensive use of the REHAB brand in connection
16   with its beverages, but it never objected until recently.  Hard Rock also made these claims
17   despite accepting millions of dollars from Monster for the sale of the very same products
18   about which Hard Rock now complains.  Hard Rock even sells, and has long sold, Monster's
19   MONSTER REHAB beverages throughout its Las Vegas hotel property, and has participated
20   in Monster's efforts to market MONSTER REHAB drinks.  Monster has also applied to
21   register the REHAB and MONSTER REHAB trademarks, and other REHAB mark
22   variations, around the world.  Monster filed the first of those applications in 2010.  Hard
23   Rock has not objected to any of them.  Further, in the United States and Europe, Monster's
24   MONSTER REHAB marks have been registered unopposed by Hard Rock.
25           4.      Moreover, Hard Rock made the absurd claim that Monster has not met its
26   obligations to hold one or more events at Hard Rock's hotel in 2012, despite the fact that
27   several months remain in 2012 and Monster is in discussions with Hard Rock to hold two
28   such events later this year.

*Arbitration Statement of Claim*

5.  Hard Rock's spurious claims have forced Monster to seek a resolution through arbitration.

## THE PARTIES

6.  At all relevant times, Claimant MONSTER ENERGY COMPANY f/k/a Hansen Beverage Company has been and is a corporation duly organized and existing under the laws of the State of Delaware, and qualified to do business in California, with its principal place of business in Corona, California.

7.  Claimant is informed and believes and thereon alleges that at all relevant times Respondent HRHH HOTEL/CASINO, LLC has been and is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Las Vegas, Nevada.

8.  Claimant is informed and believes and thereon alleges that at all relevant times Respondent HRHH IP, LLC has been and is a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Las Vegas, Nevada.

9.  Respondents DOES 1 through 50, inclusive, are sued herein under fictitious names. Their true names and capacities are presently unknown to Claimant. When said true names and capacities are ascertained, Claimant will amend this Claim by inserting such information. Claimant is informed and believes and thereon alleges that each of the fictitiously named Respondents is responsible in some manner for the occurrences alleged herein and Claimant's damages were proximately caused by said Respondents.

10.  Claimant is informed and believes and thereon alleges that at all times relevant, each Respondent, was the agent, servant, representative, alter ego, and/or employee of each of the other Respondents, and that in doing the things hereinafter alleged, each Respondent was acting within the course and scope of his, her or its authority as such agent, servant, representative, alter ego, and/or employee, with the permission, knowledge, consent and ratification of each of the other Respondents. Unless otherwise indicated, all Respondents are collectively referred to herein as the "Respondents."

*Arbitration Statement of Claim*

## BINDING ARBITRATION ALLEGATIONS

11.     On November 6, 2009, Monster and Hard Rock entered into a Binding Letter of Intent (as supplemented on December 31, 2009), which contains the following arbitration provision:

> Any dispute, controversy or claim arising out of or relating to the letter of intent or the breach or termination hereof shall be settled by binding arbitration conducted by JAMS/Endispute ("JAMS") in accordance with JAMS Comprehensive Arbitration Rules and Procedures (the "Rules").The arbitration shall be heard by one arbitrator to be selected in accordance with the Rules in Orange County, California. Judgment upon any award rendered may be entered in any court having jurisdiction thereof. Within seven (7) calendar days after appointment the arbitrator shall set the hearing date, which shall be within ninety (90) calendar days after the filing date of the demand for arbitration unless a later date is required for good cause shown and shall order a mutual exchange of what he/she determines to be relevant documents and the dates thereafter for the taking of up to a maximum of five (5)depositions by each party to last no more than two (2) business days in aggregate for each party. Both parties waive the right, if any, to obtain any award for exemplary or punitive damages or any other amount for the purpose of imposing a penalty from the other in any arbitration or judicial proceeding or other adjudication arising out of or with respect to this letter of intent or any breach hereof, including any claim that said letter of intent, or any part hereof, is invalid, illegal or otherwise voidable or void. In addition to all other relief, the arbitrator shall have the power to award reasonable attorneys' fees and costs to the prevailing party. The arbitrator shall make his or her award no later than seven (7) calendar days after the close of evidence or the submission of final briefs, whichever occurs last. The decision of the arbitrator shall be final and conclusive upon all parties. [Exhibit A, Binding Letter of Intent: Section 8(c).]

12.     The current dispute between the parties arises out of and relates to the Binding Letter of Intent (as supplemented) and breach thereof.  As such, the dispute is subject to binding arbitration by JAMS to be conducted in a manner according to the above-quoted agreement to arbitrate.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

13.     Monster is in the business of designing, creating, developing, marketing, and selling beverages, such as sodas, fruit juices, energy and sports drinks, smoothies, lemonades, and teas.

14.     Monster's brands are well-known throughout the United States and


*Arbitration Statement of Claim*

1   internationally—especially its MONSTER™ brand of energy drinks, which Monster
2   launched in 2002. Over the past decade, Monster has devoted substantial resources to
3   expanding its MONSTER™ product lines.  Since 2002, sales of MONSTER™ brand drinks
4   have generated about $17 billion in total worldwide retail revenue. Monster's gross sales for
5   2011 alone total $1.95 billion, with sales of MONSTER™ brand drinks representing more
6   than 90% of that amount.  Since launching the MONSTER™ brand, Monster has spent well
7   over $1.39 billion on advertising, marketing and promoting the brand.  Monster's marketing
8   strategy is not conventional in that it does not use direct television or radio advertising to
9   promote its MONSTER™ brand, but through its marketing strategy and strategic placement
10   and partnerships, the MONSTER™ brand receives substantial and extensive worldwide
11   exposure.

12         15.    HRHH HOTEL/CASINO, LLC owns and operates the Hard Rock Hotel &
13   Casino in Las Vegas, Nevada. HRHH IP, LLC is a holding company responsible for holding
14   the intellectual property associated with Hard Rock Hotel & Casino.

15         16.    Over the years, Hard Rock has held a weekly Sunday pool party at the Hard
16   Rock Hotel & Casino during the summer months called, REHAB.  This popular pool party
17   resulted in a reality show, "Rehab: Pool Party at the Hard Rock Hotel," which debuted on
18   cable television in November 2008.

19         17.    Hard Rock also attempted to develop a beverage bearing the REHAB name
20   called, Rehab Recovery Supplement.  Hard Rock's efforts included a joint venture with Fuze
21   Beverage, LLC to develop, market and sell the Rehab Recovery Supplement.  The product
22   only achieved minimal retail placements and sales.  Hard Rock and Fuze Beverage terminated
23   their arrangement and Fuze ultimately assigned and transferred to Hard Rock all of Fuze
24   Beverage's right, title and interest in the REHAB mark for beverages.

25         18.    In 2009, during discussions between Monster and Hard Rock to grant
26   Monster's products exclusivity in the energy drink category at the entire Hard Rock Hotel &
27   Casino property (i.e., only Monster's energy drinks would be sold on the property), Hard
28   Rock proposed that in addition to the product exclusivity deal, in return for payment of a

*Arbitration Statement of Claim*

purchase price of several million dollars, Hard Rock would sell to Monster the REHAB trademark. In connection with its proposal to sell (not license) the REHAB mark to Monster, Hard Rock sent Monster a document proposing that Monster would "[r]eceive [the] Rehab drink trademark." The only license Hard Rock proposed was with respect to the "Rehab trade dress" (not the REHAB trademark). But Monster insisted on a purchase of all rights, including the trade dress. There can be no doubt that it was always contemplated by the parties that Hard Rock would assign and sell all rights, title and interest in the REHAB trademark to Monster.

19.     As mentioned, on November 6, 2009, Monster and Hard Rock entered into a Binding Letter of Intent. A true and correct copy of said Binding Letter of Intent is attached hereto as Exhibit A and incorporated herein by reference.

20.     The Binding Letter of Intent contains and expressly pertains to two separate and distinct components: (1) exclusive marketing and pouring rights of Monster's beverage products at the Hard Rock Hotel & Casino for a period of five years; and (2) the sale of the REHAB trademark to Monster through an assignment of all rights, title and interests in the REHAB mark and brand relating to beverage products. Hard Rock retained the right to use the REHAB mark in association with the production and promotion of its weekly poolside event, and related merchandise and television series.

21.     To further confirm the fully-intended transfer in ownership of the REHAB mark and brand, Monster and Hard Rock entered into a Supplement to Binding Letter of Intent, effective December 31, 2009, and executed a separate and distinct Trademark Assignment, which could be recorded at the USPTO to record the transfer in title of the REHAB trademark. A true and correct copy of said Supplement to Binding Letter of Intent is attached hereto as Exhibit B and incorporated herein by reference. A true and correct copy of the executed Trademark Assignment is attached hereto as Exhibit C and incorporated herein by reference.

22.     Pursuant to the Binding Letter of Intent and the Supplement thereto, Hard Rock intended to unequivocally and forever sell, and did unequivocally and forever sell, all

rights, title and interests in the REHAB mark and brand to Monster.

> HRH [Hard Rock] will assign to MONSTER all right, title and interest in Rehab, including but not limited to all formulations, trademarks, trade dress and any and all other rights, including contract rights, associated with Rehab. [Binding Letter of Intent, Section 1B(c).]

23.    The Supplement to Binding Letter of Intent further effectuated the sale of the REHAB mark and brand to Monster, as was always contemplated by the parties.

> <u>Purchase and Assignment of the REHAB Product</u>. HRH [Hard Rock] hereby assigns and sells to MONSTER all rights, title, and interest in and to the REHAB Product, including:
>
> a) the Trademarks, together with the goodwill symbolized by the Trademarks concurrent with the transfer of certain tangible assets as indicia of said goodwill, and including any and all trademark registrations and applications that HRH may own for the Trademarks; provided, however, that MONSTER expressly recognizes that its acquisition is limited to the Trademarks and goodwill symbolized by the Trademarks for use limited to **beverages, including energy drinks, nutritional supplement beverages and recovery supplement beverages.** [Supplement to Binding Letter of Intent, Section 2(a) (emphasis added).]

24.    The Supplement to Binding Letter of Intent specifically defined the trademark Hard Rock sold to Monster as follows:

> "Trademarks" means the marks REHAB®, REHAB RX and Rehab whether in block letters or in the stylized form currently used by HRH in connection with a recovery supplement beverage, including all goodwill associated therewith, and all common law rights, trade name rights, causes of action, and the right to recover for past infringement other than against Fuze Beverage, LLC or its successors, and including U.S. Trademark Registration No. 3353473 for the mark REHAB and any other applications or registrations for any of the Trademarks covering beverages in International Class 5 or 32. [Supplement to Binding Letter of Intent, Section 1(b).]

25.    In furtherance of the Binding Letter of Intent and the Supplement thereto, Hard Rock and Monster subsequently executed an additional agreement ("Trademark Assignment") unequivocally confirming the transfer of all rights, title and interest in the REHAB mark and brand to Monster:

> NOW, THEREFORE, for good and adequate consideration, the receipt and sufficiency of which is hereby acknowledged, ASSIGNOR [HardRock] is the owner of the trademark REHAB for energy drinks and fruit beverages in International Class 32 (the "Trademark"), and all good will related thereto, and registration number 3,353,473 of the Trademark issued by the U.S. Patent and

Trademark office (the "Registration") and hereby assigns and sells to ASSIGNEE all rights, title, and interest as ASSIGNOR may possess in and to the Trademark, the Registration and the related trade dress including REHAB®, REHAB RX and whether in block letters or in any stylized form, in connection with a recovery supplement beverage, including all goodwill associated therewith, and all common law rights, trade name rights, causes of action, and the right to recover for past infringement, and including the Registration and any other applications or registrations for any of such trademarks covering beverages in International Class 32. [Exhibit C, Trademark Assignment.]

26.   On May 13, 2010, the Trademark Assignment was recorded with, and accepted by, the U.S. Patent and Trademark Office ("USPTO"), which now reflects Monster as the owner of all rights, title and interest in the REHAB trademark, as shown in Registration No. 3,353,473 for energy drinks and fruit beverages in International Class 32.

27.   Following Monster's acquisition of all rights, title and interest in the REHAB mark and brand, which was consistent with the parties' intent, Monster developed an energy tea beverage product bearing the REHAB mark.  Due to the tremendous popularity and recognition of Monster's MONSTER and 𝕄 trademarks and the time, energy and expense Monster had previously devoted to developing its MONSTER brand, Monster combined its marks along with its newly-acquired REHAB mark and created the MONSTER REHAB® brand, which as the owner of the REHAB and MONSTER brands for beverages, it had the right to do. Prior to the product's public launch in March 2011, Hard Rock management sampled the MONSTER REHAB® product and reviewed the can.  Monster then spent millions of dollars marketing and launching the MONSTER REHAB® product, which is shown below:



*Arbitration Statement of Claim*

1    Shortly after the launch of the MONSTER REHAB® drink and to this day, it is sold

2    throughout the Hard Rock Hotel & Casino. As such, Hard Rock has had actual notice of the

3    manner in which the trademark sold to Monster would be used and marketed, since the

4    infancy of the MONSTER REHAB® product.

5           28.     Monster then expended significant resources extending the MONSTER

6    REHAB® product line with additional drinks. The first line extension launched in December

7    2011, with three new drinks: (a) MONSTER REHAB® Green Tea + Energy; (b) MONSTER

8    REHAB® Rojo Tea + Energy; and (c) MONSTER REHAB® Protean + Energy.



Prior to the launch of that line extension, Hard Rock representatives sampled at least the

Green Tea + Energy and Rojo Tea + Energy drinks and saw the can designs.

           29.     This year, Monster again expanded its MONSTER REHAB® product line

with the introduction of MONSTER REHAB® Tea + Orangeade + Energy.



*Arbitration Statement of Claim*

1  Again, prior to the launch of that product, Hard Rock representatives sampled the product and
2  saw the can.

3      30.    In 2011, Monster conceived of a national consumer promotion highlighting the
4  MONSTER REHAB product that would give consumers an opportunity to enter a
5  sweepstakes to win a trip to the Hard Rock Hotel & Casino.  In summer 2011, with Hard
6  Rock's written consent, Monster arranged for a film crew and models to film at the Hard
7  Rock Hotel & Casino to generate footage for the MONSTER REHAB promotion.  In
8  addition, Monster created a poster for the promotion that prominently featured an image of a
9  MONSTER REHAB can and photos of various locations at the Hard Rock Hotel & Casino.
10 Hard Rock provided to Monster photos for use in the poster and saw the poster before the
11 promotion launched.  In early 2012, the promotion launched on the Internet and at tens of
12 thousands of retail stores across the country.

13     31.    On July 6, 2010, Monster filed for trademark registration with the USPTO for
14 the combined MONSTER REHAB® mark for goods in International Classes 5 (nutritional
15 supplements in liquid form) and 32 (beverages, namely, non-alcoholic non-carbonated drinks
16 enhanced with vitamins, minerals, nutrients, proteins, amino acids and/or herbs; non-
17 carbonated energy or sports drinks, fruit juice drinks having a juice content of 50% or less by
18 volume that are shelf-stable; all the foregoing goods exclude perishable beverage products
19 that contain fruit juice or soy, whether such products are pasteurized or not).  On April 17,
20 2012, the USPTO granted Monster the registration, and Monster is the sole and exclusive
21 owner of U.S. Trademark Registration No. 4,129,288 for the MONSTER REHAB mark.  A
22 true and correct copy of the trademark registration certificate is attached hereto as Exhibit D.
23 On August 24, 2011, Monster filed for trademark registration with the USPTO for the
24 combined MONSTER REHAB® mark for goods in International Class 30 (ready to drink tea,
25 iced tea and tea based beverages; ready to drink flavored tea, iced tea and tea based
26 beverages).  On March 13, 2012, the USPTO granted Monster the registration, and Monster is
27 the sole and exclusive owner of U.S. Trademark Registration No. 4,111,964 for the
28 MONSTER REHAB mark.  A true and correct copy of the trademark registration certificate

is attached hereto as Exhibit E.

32.   OHIM[1] has also granted Monster five registrations for the MONSTER REHAB mark:

    (a) On July 7, 2010, Monster filed for trademark registration with OHIM for the combined MONSTER REHAB® mark for goods in International Classes 5 (nutritional supplements in liquid form) and 32 (beverages, including carbonated soft drinks; carbonated and non-carbonated drinks enhanced with vitamins, minerals, nutrients, proteins, amino acids and/or herbs; carbonated and non-carbonated energy or sports drinks; fruit juice drinks having a juice content of 50% or less by volume).   On December 22, 2011, the OHIM granted Monster the registration, and Monster is the sole and exclusive owner of CTM Registration No. 009228479 for the MONSTER REHAB mark.   A true and correct copy of the trademark registration certificate is attached hereto as Exhibit F;

    (b) On August 24, 2011, Monster filed for trademark registration with the OHIM for the combined MONSTER REHAB® mark for goods in International Class 30 (ready to drink tea, iced tea and tea based beverages; ready to drink flavored tea, iced tea and tea based beverages).   On January 26, 2012, the OHIM granted Monster the registration, and Monster is the sole and exclusive owner of CTM Registration No. 010215002 for the MONSTER REHAB mark.   A true and correct copy of the trademark registration certificate is attached hereto as Exhibit G; and

    (c) On October 17, 2011, Monster filed for trademark registrations with the OHIM for three figurative marks for the MONSTER REHAB Tea + Lemonade + Energy, MONSTER REHAB Green Tea + Energy and

---

[1] The Office for Harmonization in the Internal Market ("OHIM") is the European Union agency responsible for registering trademarks and designs that are valid in all 27 countries of the European Union.

*Arbitration Statement of Claim*

MONSTER REHAB Rojo Tea + Energy designs for goods in International Classes 5 (nutritional supplements in liquid form), 30 (ready to drink tea, iced tea and tea based beverages; ready to drink flavored tea, iced tea and tea based beverages) and 32 (beverages, including carbonated soft drinks; carbonated and non-carbonated drinks enhanced with vitamins, minerals, nutrients, proteins, amino acids and/or herbs; carbonated and non-carbonated energy or sports drinks, fruit juice drinks having a juice content of 50% or less by volume). On March 21, 2012, the OHIM granted Monster the registrations, and Monster is the sole and exclusive owner of CTM Registration Nos. 010346724, 010346741 and 010346757 for the MONSTER REHAB figurative marks. True and correct copies of the trademark registration certificates are attached hereto collectively as Exhibit H.

33. Monster also owns more than 100 additional REHAB and MONSTER REHAB trademark registrations and pending applications around the world, including national registrations and applications in individual European Union member countries. Monster has spent an enormous amount of time, effort and money, including attorneys' fees and application costs, on developing its global REHAB trademark portfolio.

34. Hard Rock did not oppose a single one of the applications that led to Monster's dozens of worldwide REHAB and MONSTER REHAB registrations, whether formally with the USPTO, OHIM, or other trademark offices or informally by letter or other communication to Monster.

35. Monster has faithfully and fully performed all of its obligations under the Binding Letter of Intent and Supplement thereto. The purchase price of the REHAB mark and brand rights was $5,000,000, which was to be satisfied by an up-front payment of $750,000 at the time of the signing of the contract plus 3% of the net wholesale price of all REHAB brand products sold by Monster until the remaining $4,250,000 is paid. Monster has paid Hard Rock the full $5,000,000 for the purchase of the REHAB mark and brand.

36. The other component of the Binding Letter of Intent and Supplement thereto is

the marketing and pouring rights.  Monster has the exclusive right to have its products sold at the Hard Rock Hotel & Casino, to the exclusion of Monster's competitors.  For said exclusivity for a period of five years, Monster paid Hard Rock a $1,250,000 up-front payment and committed to pay up to an additional $1,000,000 over a five year period — $700,000 of which is comprised of Monster holding one or more events at the Hard Rock Hotel & Casino in each of the five years (valued at approximately $140,000 per year) and up to an additional $300,000 if Hard Rock meets certain sales volume targets for MONSTER products sold at the Hard Rock Hotel & Casino. For the first two years of the contract (2010 and 2011), Monster satisfied its obligation and held many events at the Hard Rock Hotel & Casino, including at least one major event. Monster also included the Hard Rock in various marketing activities. For example, the major consumer promotion mentioned paragraph 30, which included point of sale material at retailers across the nation with images of the Hard Rock Hotel & Casino.

37.    Further, in 2012, Monster has continued to hold events at the Hard Rock Hotel & Casino and is working with Hard Rock to schedule a number of events including two major events to be held later this year. As such, Monster has fulfilled all of its contractual obligations to date, and is committed to fulfilling and is fulfilling the 2012 event requirement, which requirement has not yet even matured.  In sum, Monster has held events, has scheduled events, and is attempting to schedule more events at the Hard Rock Hotel & Casino.

38.    In October 2011, BREF HR, LLC, an entity with an ownership interest in Hard Rock, submitted a Form 10 with the Securities and Exchange Commission confirming that Hard Rock sold the REHAB trademark to Monster.  That filing includes the statement: "Hard Rock acquired the ownership of the Rehab beverage trademark from Coca-Cola and later sold the trademark to Hansen/Monster as part of an energy drink sponsorship agreement. Under the Hansen/Monster agreement, Hard Rock is to be paid a royalty on sales by Hansen/Monster of the Rehab recovery beverage." (Emphasis added.)  A few months later — despite the clear and unequivocal Binding Letter of Intent, Supplement, and Trademark Assignment, the parties' subsequent course of conduct, accepting payment from Monster, and admitting in a public filing that it sold the trademark to Monster—Hard Rock suddenly

*Arbitration Statement of Claim*

1    reversed course and claimed ownership of the REHAB mark.

2          39.    In February 2012, Hard Rock surreptitiously filed a series of trademark

3    applications in the US and Europe seeking to regain an ownership interest in the US and

4    abroad on the very same marks and brand Hard Rock sold to Monster. More specifically, on

5    February 14, 2012, Hard Rock filed trademark applications in the USPTO to register the

6    marks REHAB, REHAB RX and R̃ehab in International Classes 30 (tea and coffee), 32 (fruit

7    drinks, fruit beverages, fruit juices and non-alcoholic beverages) and 33 (alcoholic

8    beverages).  On February 2, 2012, Hard Rock filed trademark applications in the Office for

9    Harmonization in the Internal Market (Trade Marks and Designs) for a Community Trade

10   Mark ("CTM") in the REHAB, REHAB RX and R̃ehab marks in the International Classes of

11   30 (tea and coffee) and 32 (energy drinks, recovery drinks, fruit drinks, non-alcoholic

12   beverages), among others.  That same day, Hard Rock also filed a similar series of trademark

13   applications in Spain for the REHAB, REHAB RX and R̃ehab marks in the International

14   Classes of 30 (tea and coffee) and 32 (energy drinks, recovery drinks, fruit drinks, non-

15   alcoholic beverages), among others.

16         40.    Hard Rock filed the foregoing applications notwithstanding the fact that at the

17   time Hard Rock sold the REHAB trademark to Monster, the parties had contemplated the

18   international expansion of Monster and the fact that any brand of beverage acquired or

19   developed by Monster would be part of that expansion.  In fact, at the time of the assignment

20   and sale of the REHAB mark, Monster had already aggressively expanded the scope of its

21   brand recognition and sales internationally, including into Europe.

22         41.    Consistent with Monster's European marketing strategy, by February 2012,

23   Monster had already launched its MONSTER REHAB product line in Europe. Hard Rock

24   was aware that Monster was engaged in selling the MONSTER REHAB product line in

25   Europe and that Monster would continue to expand its sales of the product throughout Europe

26   and globally at the time Hard Rock intentionally sought to acquire trademark registrations in

27   the REHAB, REHAB RX and R̃ehab marks in the very same International Classes which Hard

28   Rock had sold all rights, title and interest in the REHAB mark and brand to Monster and in

1    which Monster was already selling products in Europe using those marks; namely

2    International Classes of 30 (tea and coffee) and 32 (energy drinks, recovery drinks, fruit

3    drinks, non-alcoholic beverages).

4           42.    News that Hard Rock had surreptitiously sought to acquire trademark

5    registration of the REHAB mark, which had been unequivocally and forever sold and

6    assigned to Monster, shocked Monster.  Thereafter, in response to an inquiry by Monster

7    through its attorneys, in April 2012, Hard Rock's attorneys for the first time expressly stated

8    to Monster in no uncertain terms that Hard Rock was now claiming it considered the

9    assignment of the REHAB mark and brand to not be a sale to Monster, but instead merely a

10   license, and that Hard Rock anticipated somehow re-acquiring all rights, title and interest in

11   the REHAB mark and brand after five years (i.e., December 31, 2014).

12          43.    In May 2012, Hard Rock again expressed its belief that the assignment of the

13   REHAB mark and brand was not actually a sale, but instead merely a license for a five year

14   term.  In addition, Hard Rock attempted to explain the basis for its frivolous claim that

15   Monster had breached the Binding Letter of Intent and Supplement thereto by combining its

16   own Monster trademarks with the REHAB mark, such as MONSTER REHAB®, REHAB

17   THE BEAST!®, REHAB THE BEAST!WWW.MONSTERENERGY.COM®, all of which

18   are registered trademarks with the USPTO and owned by Monster.

19          44.    Monster would have never spent the enormous amount of time, energy and

20   expense in developing, producing, marketing, distributing and selling its beverage products

21   bearing the REHAB mark and brand if all of the fruit of those efforts would simply revert

22   back to Hard Rock after five years. This is particularly the case considering the fact that

23   Monster had a significant number of other marketing options and brands it was considering at

24   the time it purchased the REHAB trademark and since then.   Monster diverted those

25   resources from other projects to the REHAB product.  Monster dedicated such extensive

26   resources to developing, producing, marketing, distributing and selling its beverage products

27   bearing the REHAB mark and brand throughout the United States and the world in reliance

28   on the fact that it had forever purchased all rights, title and interest in the REHAB mark and

brand in connection with beverages.  Such rights, title and interest necessarily included Monster's right to expand its use of and rights in the REHAB mark beyond the rights Hard Rock had established when it assigned all rights title and interest in the REHAB mark to Monster.

45.     Hard Rock also suggests that Monster breached the Binding Letter of Intent and Supplement thereto by not yet holding a "major" event at the Hard Rock Hotel & Casino for 2012. Evidencing its bad faith, Hard Rock made this claim with eight months of 2012 remaining and Monster having already held, scheduled, and attempting to schedule events at Hard Rock Hotel & Casino, including at least two major events in 2012.

## FIRST CAUSE OF ACTION

### [Breach of Contract]

46.     Claimant repeats and re-pleads Paragraphs 1 through 45, inclusive, and incorporates the same herein by reference.

47.     On November 6, 2009, Monster and Hard Rock entered into a Binding Letter of Intent (the "Agreement").  A true and correct copy of the Agreement is attached hereto as Exhibit A and incorporated herein by reference. The Agreement allowed the parties to thereafter supplement it with more specific terms regarding Monster's acquisition of the REHAB mark and brand.

48.     Thereafter, Monster and Hard Rock entered into the Supplement to Binding Letter of Intent, effective December 31, 2009 (the "Supplement"). A true and correct copy of the Supplement is attached hereto as Exhibit B and incorporated herein by reference. Subsequently, Monster and Hard Rock entered into a Trademark Assignment Agreement, effective December 31, 2009 (the "Trademark Assignment").  A true and correct copy of the Trademark Assignment is attached hereto as Exhibit C and incorporated herein by reference.

49.     Monster has performed all conditions, covenants and promises required on its part to be performed in accordance with the terms and conditions of the Agreement and its Supplement, except as to those conditions and obligations which have been waived or

1    excused by operation of law or as a result of Hard Rock's breach.

2          50.    Subsequent to the execution and effective dates of the Agreement, the

3    Supplement and the Trademark Assignment, Hard Rock breached the Agreement,

4    Supplement and Trademark Assignment by, inter alia, claiming that the assignment and sale

5    of all rights, title and interest in the REHAB trademark and brand did not occur, but was

6    instead merely a five-year license to use said trademark and brand, and by demanding the

7    return of all rights, title and interest in the REHAB trademark and brand.  Hard Rock further

8    breached the Agreement and its Supplement by filing for trademark registration of the

9    REHAB, REHAB RX and Rehab marks in the USPTO for goods in Classes 30, 32, 33

10   declaring its intent to use each of the marks on all of the identified goods and claiming to own

11   the mark to the exclusion of all others in connection with those goods. Hard Rock further

12   breached the Agreement and its Supplement by filing for trademark registration of the

13   REHAB, REHAB RX and Rehab marks with OHIM for protection in the 27 member countries

14   of the European Union in the International Classes of 30, 32 and 33.  Hard Rock further

15   breached the Agreement, Supplement and the Trademark Assignment by filing for trademark

16   registration of the REHAB, REHAB RX and Rehab marks in Spain in the International Classes

17   of 30, 32 and 33.

18         51.    Separate and apart from Hard Rock having breached the express terms of the

19   Agreement, the Supplement and the Trademark Assignment, Hard Rock also breached the

20   covenant of good faith and fair dealing which is implied by law in the Agreement, the

21   Supplement and the Trademark Assignment.  Hard Rock is bound by the implied covenant to

22   not do anything deliberately to deprive Monster of the benefits of the Agreement and its

23   Supplement.  Hard Rock breached this covenant by seeking to obtain exclusive trademark

24   protection over the REHAB, REHAB RX and Rehab marks in 27 European countries in the

25   International Classes of 30 (tea and coffee) and 32 (energy drinks, recovery drinks, fruit

26   drinks, non-alcoholic beverages) after Hard Rock had expressly sold its REHAB trademark

27   and brand to Monster for all beverages. Moreover, Hard Rock knew that Monster had

28   dedicated substantial time, energy and expense in developing, producing, marketing,

distributing and selling its beverage products bearing the REHAB mark in those same International Classes throughout the United States and Europe, and that it intends to further expand sales of MONSTER REHAB products globally wherever MONSTER brand products are sold. Such conduct by Hard Rock constitutes unfair dealing in the form of a conscious and deliberate act that unfairly frustrates the agreed common purpose of the Agreement, the Supplement and the Trademark Assignment and disappoints the reasonable expectations of Monster there under. It was always contemplated by the parties that Monster would suffer such harm and loss as a result of this wrongful conduct by Hard Rock.

52.     As a result of Hard Rock's material breaches of the Agreement, the Supplement and the Trademark Assignment, as well as the breach of the implied covenant of good faith and fair dealing, Monster has suffered damages in an amount presently unascertained, but according to proof at the arbitration hearing.

## SECOND CAUSE OF ACTION

### [Declaratory Relief]

53.     Claimant repeats and re-pleads Paragraphs 1 through 52, inclusive, and incorporates the same herein by reference.

54.     An actual controversy has arisen and now exists between Monster and Hard Rock concerning their respective rights and duties as follows:

(a)     Monster contends the assignment of all rights, title and interest in the REHAB marks was a sale, whereas Hard Rock contends that it was merely a five-year license to use the marks;

(b)     Monster contends that since it purchased all rights, title and interest in the REHAB marks and brand it may incorporate and use the marks in connection with Monster's other marks, and in any manner it deems fit, whereas Hard Rock contends that the REHAB marks may not be used with Monster's other marks;

(c)     Monster contends that since Hard Rock assigned and sold all of its

*Arbitration Statement of Claim*

rights, title and interest in the REHAB marks and brand to Monster it cannot file for trademark protection of any REHAB marks for beverages of any kind, whereas Hard Rock contends that despite having sold its REHAB marks and brand to Monster, it can file new trademark applications and attempt to acquire trademark protection in the REHAB marks for beverages;

(d)     Monster contends that since Hard Rock assigned and sold all of its rights, title and interest in the REHAB marks and brand to Monster, Hard Rock is forever precluded from using the REHAB marks for beverages of any kind, whereas Hard Rock contends that it will reacquire the REHAB trademarks on December 31, 2014;

(e)     Monster contends that since Hard Rock unequivocally assigned and sold all of its rights, title and interest in the REHAB marks and brand to Monster, Hard Rock is estopped by its conduct from asserting or acquiring any right to the REHAB marks for beverages, whereas Hard Rock contends that it will reacquire the REHAB marks on December 31, 2014;

(f)     Monster contends that since it purchased all rights, title and interest in the REHAB marks and brand it may use the marks in connection with any beverage products, and in any manner it deems fit, whereas Hard Rock contends Monster may only use the REHAB marks and brand in connection with a recovery supplement beverage;

(g)     Monster contends it has met all of its obligations under the Agreement and Supplement thereto relating to holding one event per year at the Hard Rock Hotel & Casino for 2010 and 2011 and that it will satisfy its obligation for 2012 later this year, whereas Hard Rock contends that Monster has already failed to meet its one event obligation for 2012 and cannot do so later this year; and

(h)     Monster contends that it has fully performed all obligations for the assignment and sale of the REHAB marks and that any dispute concerning the

*Arbitration Statement of Claim*

1   independent marketing component of the Agreement and Supplement thereto

2   has no effect on, and is independent of, the binding nature of the separate sale

3   of the REHAB marks, whereas Hard Rock contends that any breach of the

4   independent marketing component of the Agreement and Supplement thereto

5   nullifies the assignment and sale of the REHAB marks notwithstanding

6   Monster's full performance of the independent sale and assignment of the

7   trademarks--a result that would be unconscionable.

8       55.     Monster desires a determination of its rights and duties, including without

9   limitation: (1) a declaration as to the ownership of the REHAB marks and brand; (2) a

10  declaration that Monster may use the REHAB marks and brand in connection with its other

11  marks; (3) a declaration that Hard Rock should not have filed trademark applications for the

12  REHAB marks for beverages in the US, the European Union or any other country (including

13  OHIM and Spain) and must immediately withdraw any such applications, or alternatively for

14  a constructive trust over said trademark applications and a declaration that Monster owns said

15  applications; (4) a declaration that Hard Rock is forever precluded from using the REHAB

16  marks for beverages of any kind; (5) a declaration that Hard Rock by its conduct is estopped

17  from asserting or acquiring any right to the REHAB marks for beverages; (6) a declaration

18  that Monster may use the REHAB marks and brand—on its own, or with the MONSTER

19  marks, or any other marks, in any manner Monster may choose in its sole and absolute

20  discretion—in connection with any beverage products; (7) a declaration that Monster has

21  already complied with all of its obligations to hold events at the Hard Rock Hotel & Casino

22  or that Monster has complied with said obligations to date and may still hold its required

23  event for 2012, or alternatively, in view of Hard Rock's conduct, Monster is fully excused

24  from any and all contractual obligations to Hard Rock; and (8) a declaration that Monster has

25  fully performed all obligations under the assignment and sale of the REHAB marks and any

26  dispute concerning the separate and independent marketing component of the Agreement and

27  Supplement has no effect on and is independent of the binding, separate sale of the REHAB

28  marks.

*Arbitration Statement of Claim*

56.     A declaration is necessary and appropriate at this time under the circumstances in order that Claimant may ascertain its rights and duties.  The unsettled state of affairs regarding the matters described herein will result in the unnecessary expenditure of an extraordinary amount of time, energy and expense if not now settled.

**THIRD CAUSE OF ACTION**

**[Intentional Interference with Contractual Relations]**

57.     Claimant repeats and re-pleads Paragraphs 1 through 56, inclusive, and incorporates the same herein by reference.

58.     In late 2009, Monster and Hard Rock entered into a written agreement whereby, *inter alia*, Hard Rock assigned and sold all of its rights, title and interest in the REHAB trademarks and brand to Monster.

59.     Monster has written agreements with retailers and distributors for the distribution and sale of MONSTER brand products in the United States and numerous European countries, including the distribution and sale of MONSTER REHAB product. Moreover, Monster is currently planning expansion of the MONSTER REHAB brand into additional European and other countries and is presently negotiating distribution agreements for further expansion.

60.     At all relevant times, Hard Rock knew Monster had entered into the above-described contractual relationships.

61.     On or about February 2, 2012, Hard Rock filed trademark applications with OHIM and in Spain seeking to acquire exclusive trademark rights in the REHAB, REHAB RX and Rehab marks in 27 European countries in the International Classes of 30 (tea and coffee) and 32 (energy drinks, recovery drinks, fruit drinks, non-alcoholic beverages).  On February 14, 2012, Hard Rock filed trademark applications in the USPTO to register the marks REHAB, REHAB RX and Rehab in International Classes 30 (tea and coffee), 32 (fruit drinks, fruit beverages, fruit juices and non-alcoholic beverages) and 33 (alcoholic beverages).  When it filed those applications, Hard Rock was acting in bad faith and knew

that Monster already had expended significant sums to launch and market the MONSTER REHAB brand and secure and expand its REHAB trademark portfolio and had contractual relationships with retailers and distributors to sell and distribute Monster's products in the United States and in at least some of the same 27 European counties, including its MONSTER REHAB products, which products are or may be considered International Class 30 or 32 goods.

62. Hard Rock filed the aforementioned trademark applications with the USPTO, OHIM and in Spain with the intent to harm Monster and destroy Monster's contractual relationships with retailers and distributors in the United States and European Union, undermine and deprive Monster of the benefit of the bargain in its purchase of the REHAB mark, cause confusion among distributors, retailers, and consumers, harm the MONSTER REHAB brand, and negatively affect MONSTER REHAB sales.

63. As a result of Hard Rock's wrongful conduct, Monster's retailers and distributors in the United States and European Union could cancel their contractual relations with Monster. This will result in damages to Monster, including but not limited to the loss of sales and revenue and cause serious disruption and prejudice to Monster's business and expansion into other countries. Specifically, Hard Rock's interference prejudices the expansion strategy and future marketing of and sales opportunities for the MONSTER REHAB brand and/or exposes Monster to losses, including loss of prospective economic advantage and/or contractual liability with its established distributors and retailers. It was always contemplated by the parties that Monster would suffer such harm and loss as a result of this wrongful conduct by Hard Rock.

64. As a proximate result of Hard Rock's conduct, Monster has suffered damages, and will continue to suffer damages, currently unascertainable, but according to proof at trial.

## FOURTH CAUSE OF ACTION
### [Negligent Interference with Contractual Relations]

65. Claimant repeats and re-pleads Paragraphs 1 through 64, inclusive, and



1    incorporates the same herein by reference.

2        66.    In late 2009, Monster and Hard Rock entered into a written agreement

3    whereby, inter alia, Hard Rock assigned and sold all of its rights, title and interest in the

4    REHAB trademark and brand to Monster.

5        67.    Monster has written agreements with retailers and distributors for the

6    distribution and sale of MONSTER brand product in the United States and numerous

7    European countries, including the distribution and sale of MONSTER REHAB product.

8    Moreover, Monster is currently planning expansion of the MONSTER REHAB brand into

9    additional European countries and is presently negotiating distribution agreements for further

10   expansion.

11       68.    At all relevant times, Hard Rock knew Monster had entered into the above-

12   described contractual relationships.

13       69.    On or about February 2, 2012, Hard Rock filed trademark applications with

14   OHIM and in Spain seeking to acquire exclusive trademark rights in the REHAB, REHAB

15   RX and Rehab marks in 27 European countries in the International Classes of 30 (tea and

16   coffee) and 32 (energy drinks, recovery drinks, fruit drinks, non-alcoholic beverages).  On

17   February 14, 2012, Hard Rock filed trademark applications in the USPTO to register the

18   marks REHAB, REHAB RX and Rehab in International Classes 30 (tea and coffee), 32 (fruit

19   drinks, fruit beverages, fruit juices and non-alcoholic beverages) and 33 (alcoholic

20   beverages).  When it filed those applications, Hard Rock knew that Monster already had

21   expended significant sums to launch and market the MONSTER REHAB brand and secure

22   and expand its REHAB trademark portfolio and had contractual relationships with retailers

23   and distributors to sell and distribute Monster's products in the United States and in at least

24   some of the same 27 European counties, including its MONSTER REHAB products, which

25   products are or may be considered International Class 30 or 32 goods.

26       70.    It was foreseeable that if Hard Rock applied for and was granted trademark

27   registrations in the US and/or the European Union for trademarks Monster was already using

28   on products sold and distributed in the US and/or the European Union, the retailers and

distributors who have contractual relations with Monster to sell the products containing such MONSTER REHAB marks (which are the subject of Hard Rock's improperly obtained registrations), would cease their contractual relationships with Monster regarding the MONSTER REHAB brand, which is likely to result in damages to Monster including the loss of sales and revenue. It was further foreseeable that Hard Rock's actions would render the commercial launch and expansion of the MONSTER REHAB products to additional countries and areas not feasible and render the investment in marketing of and/or lost sales and opportunities for Monster's brand in additional countries internationally unviable. Hard Rock's interference further prejudices the expansion strategy and future marketing of the MONSTER REHAB brand and exposes Monster to contractual liability with its distributors and retailers. Hard Rock's interference will result in a loss of sales and/or business opportunities, as well as damages on a broader scale with respect to the expansion and profitability potential for the MONSTER REHAB brand in additional countries.

71.    Hard Rock nevertheless filed the aforementioned trademark applications with the USPTO, OHIM and in Spain with the intent to harm Monster and destroy Monster's contractual relationships with retailers and distributors in the US and/or the European Union, undermine and deprive Monster of the benefit of the bargain in its purchase of the REHAB mark, cause confusion among distributors, retailers, and consumers, harm the MONSTER REHAB brand, and negatively affect MONSTER REHAB sales.

72.    In addition, Hard Rock's improperly filed trademark applications, if granted, will force Monster to oppose such applications in the USPTO, OHIM, Spain and any other country where Hard Rock has improperly filed trademark applications in violation of the Binding Letter of Intent and Supplement thereto, and if granted, will detrimentally affect the prospect for the MONSTER REHAB brand in those countries, as well as additional countries around the world.

73.    As a proximate result of Hard Rock's conduct, Monster's ability to capitalize on business opportunities now and in the future has been adversely affected. It was always contemplated by the parties that Monster would suffer such harm and loss as a result of this

*Arbitration Statement of Claim*

1   wrongful conduct by Hard Rock.

2       74.    Monster has therefore suffered damages, and will continue to suffer damages,

3   currently unascertainable, but according to proof at trial.

4

5   **FIFTH CAUSE OF ACTION**

6   **[Intentional Interference with Prospective Economic Advantage]**

7       75.    Claimant repeats and re-pleads Paragraphs 1 through 74, inclusive, and

8   incorporates the same herein by reference.

9       76.    In late 2009, Monster and Hard Rock entered into a written agreement

10   whereby, inter alia, Hard Rock assigned and sold all of its rights, title and interest in the

11   REHAB trademark and brand to Monster.

12       77.    Monster has written agreements with retailers and distributors for the

13   distribution and sale of MONSTER brand product in the United States, Europe and numerous

14   other countries, including the distribution and sale of MONSTER REHAB product.

15   Moreover, Monster is currently planning expansion of the MONSTER REHAB brand into

16   additional European countries and is presently negotiating distribution agreement for further

17   expansion. Due to the success of Monster's beverage products in the United States and based

18   on developed economic relationships with retailers and distributors in the European Union

19   and elsewhere, these retailers and distributors would continue to buy products from Claimants

20   in the future, but for Hard Rock improperly seeking and obtaining trademark registrations for

21   the marks already in use by Monster.

22       78.    Additionally, while Monster has already launched its REHAB products in

23   several European countries, based upon the initial success in those countries and the

24   overwhelming success of Monster's REHAB products in the United States, Monster intends

25   on selling and distributing its REHAB products in all of the countries in the European Union

26   and most other countries around the world—representing a huge potential and realistic

27   economic advantage.

28       79.    Hard Rock knew of the existence of the ongoing economic relationships

1   between Monster and its retailers and distributors in the European Union and elsewhere.  It

2   was reasonably anticipated that Monster would expand distribution and sales of its

3   MONSTER REHAB products to most other countries around the world, including the

4   European Union and elsewhere wherever MONSTER drinks were and would from time to

5   time be sold.

6       80.   Hard Rock engaged in the intentional wrongful conduct described herein for

7   purposes of disrupting Monster's potential economic advantages, with the intent to harm

8   Monster financially and to induce Monster's European retailers and distributors to cease from

9   purchasing Monster's beverage products bearing the REHAB marks and prevent those

10  retailers and distributors in the countries in which Monster is in the process of expanding into

11  from entering into contractual relationship with Monster in the first place.  It was always

12  contemplated by the parties that Monster would suffer such harm and loss as a result of this

13  wrongful conduct by Hard Rock.

14      81.   The above-described actions by Hard Rock constitute wrongful conduct and an

15  unfair trade practice, in violation of California Business and Professions Code § 17200, et

16  seq.  As a proximate result of Hard Rock's conduct, Monster has suffered damages, and will

17  continue to suffer damages, currently unascertainable, but according to proof at trial.

18

19                           **SIXTH CAUSE OF ACTION**

20              **[Negligent Interference with Prospective Economic Advantage]**

21      82.   Claimant repeats and re-pleads Paragraphs 1 through 81, inclusive, and

22  incorporates the same herein by reference.

23      83.   In late 2009, Monster and Hard Rock entered into a written agreement

24  whereby, inter alia, Hard Rock assigned and sold all of its rights, title and interest in the

25  REHAB trademark and brand to Monster.

26      84.   Monster has written agreements with retailers and distributors for the

27  distribution and sale of MONSTER brand product in the United States and numerous

28  European countries, including the distribution and sale of MONSTER REHAB product.

*Arbitration Statement of Claim*

1   Moreover, Monster is currently planning expansion of the MONSTER REHAB brand into
2   additional European countries and other countries and is presently negotiating distribution
3   agreement for further expansion.  Due to the success of Monster's beverage products in the
4   United States and based on developed economic relationships with said retailers and
5   distributors in the European Union and elsewhere, these retailers and distributors would
6   continue to buy products from Claimants in the future, but for Hard Rock improperly seeking
7   and obtaining trademark registrations for the marks already in use by Monster.

8        85.    Additionally, while Monster has already launched its REHAB products in
9   several European countries, based upon the initial success in those countries and the
10  overwhelming success of Monster's REHAB products in the United States, Monster intends
11  on selling and distributing its REHAB products in most, if not all, of the countries in the
12  European Union—representing a huge potential and realistic economic advantage.

13       86.    Hard Rock knew of the existence of the ongoing economic relationships
14  between Monster and its retailers and distributors in the European Union, and Hard Rock
15  knew at the time of the transaction, and at all material times thereafter, of the natural plans for
16  expansion of the product throughout other countries in the European Union and elsewhere
17  around the world.

18       87.    On or about February 2, 2012, Hard Rock filed trademark applications with
19  OHIM and in Spain seeking to acquire exclusive trademark rights in the REHAB, REHAB
20  RX and Rehab marks in 27 European countries in the International Classes of 30 (tea and
21  coffee) and 32 (energy drinks, recovery drinks, fruit drinks, non-alcoholic beverages).  On
22  February 14, 2012, Hard Rock filed trademark applications in the USPTO to register the
23  marks REHAB, REHAB RX and Rehab in International Classes 30 (tea and coffee), 32 (fruit
24  drinks, fruit beverages, fruit juices and non-alcoholic beverages) and 33 (alcoholic
25  beverages).  When it filed those applications, Hard Rock knew that Monster already had
26  expended significant sums to launch and market the MONSTER REHAB brand and secure
27  and expand its REHAB trademark portfolio and had contractual relationships with retailers
28  and distributors to sell and distribute Monster's products in the United States and in at least

1    some of the same 27 European counties, including its MONSTER REHAB products, which

2    products are or may be considered International Class 30 or 32 goods.

3         88.    It was foreseeable that if Hard Rock applied for and was granted trademark

4    registrations in the US and/or European Union over trademarks Monster was already using on

5    products sold and distributed throughout the US and/or European Union, the retailers and

6    distributors who have contractual relations with Monster to sell the products containing such

7    marks (which are the subject of Hard Rock's improperly obtained registrations), would cease

8    their contractual relationships with Monster.  It was further foreseeable that if Hard Rock

9    applied for and was granted trademark registrations in the European Union over trademarks

10   that Monster uses on products it plans on selling and distributing in the geographical areas of

11   the European Union not already entered, retailers and distributors in those geographic areas

12   would not purchase Monster's products bearing the REHAB marks or brand, and this would

13   negatively affect Monster's ability to sell such products in the European Union and elsewhere

14   around the world and expand its sales of this product and would result in lost opportunities

15   and damage to Monster.

16        89.    Hard Rock nevertheless filed the aforementioned trademark applications with

17   OHIM and in Spain with the intent to harm Monster and destroy Monster's potential

18   contractual relationships with retailers and distributors in the European Union, undermine and

19   deprive Monster of the benefit of the bargain in its purchase of the REHAB mark, cause

20   confusion among distributors, retailers, and consumers, harm the MONSTER REHAB brand,

21   and negatively affect MONSTER REHAB sales.  In addition, Hard Rock's improperly filed

22   trademark applications, if granted, will force Monster to oppose such applications in the

23   USPTO, OHIM, Spain and any other country where Hard Rock has improperly filed

24   trademark applications in violation of the Binding Letter of Intent and Supplement thereto.

25   Hard Rock's interference further prejudices the expansion strategy and future marketing of

26   the MONSTER REHAB brand and exposes Monster to contractual liability with its

27   distributors and retailers and is also likely to result in damages to Monster including the loss

28   of sales and revenue.  It is also likely to negatively affect Monster's ability to expand its sales

and distribution into additional countries.  It was always contemplated by the parties that Monster would suffer such harm and loss as a result of this wrongful conduct by Hard Rock.

90.     The above-described actions by Hard Rock constitute wrongful conduct and an unfair trade practice, in violation of California Business and Professions Code § 17200, et seq.  As a proximate result of Hard Rock's conduct, Monster has suffered damages, and will continue to suffer damages, currently unascertainable, but according to proof at trial.

## SEVENTH CAUSE OF ACTION

### [Unfair Business Practices]

91.     Claimant repeats and re-pleads Paragraphs 1 through 90, inclusive, and incorporates the same herein by reference.

92.     Monster is informed and believes and thereon alleges that at all times relevant Hard Rock engaged in the unlawful, unfair and/or fraudulent business acts or practices as described herein.

93.     Pursuant to California Business and Professions Code §17200 et seq., Monster requests all remedies available, including, but not limited to, disgorgement and restitution of any and all monies received by Hard Rock as a result of unfair business practices and a constructive trust imposed on the improperly-filed trademark applications at the USPTO, the OHIM and in Spain.  Monster further requests an order enjoining Hard Rock from the unfair, unlawful and/or fraudulent business practices, which are ongoing, including the filing of trademark applications for any REHAB marks in any beverage categories, and an order mandating Hard Rock withdraw the trademark applications it filed with the USPTO, OHIM, in Spain and anywhere else in the world relating to the REHAB mark for all beverages.

## PRAYER

WHEREFORE, Claimant prays for an arbitration award against all Respondents as follows:

**A.    FIRST CLAIM (Breach of Contract)**

1.    For all compensatory damages, according to proof;

2.    For any and all special, incidental and/or consequential damages, according to proof; and

3.    For an award of attorneys' fees.

**B.    SECOND CLAIM (Declaratory Relief)**

1.    For a determination of Claimant's rights and duties, including without limitation:

(a)    a declaration that Monster is the unequivocal and unconditional owner of the REHAB marks and brand;

(b)    a declaration that Monster may use the REHAB marks and brand alone and/or in connection with its other marks and/or any other marks;

(c)    a declaration that Hard Rock should not have filed trademark applications for the REHAB marks for beverages in the U.S., the European Union or any other country (including OHIM and Spain) and must immediately withdraw any such applications, or alternatively for a constructive trust over said trademark applications and a declaration that Monster owns said applications and any resulting registered marks;

(d)    a declaration that Hard Rock is forever precluded from using the REHAB marks for beverages of any kind;

(e)    a declaration that Hard Rock by its conduct is estopped from asserting or acquiring any right to the REHAB marks for beverages;

(f)    a declaration that Monster may use the REHAB marks and brand — on its own, or with the MONSTER marks, or any other marks, in any manner Monster may choose in its sole and absolute discretion — in connection with any beverage products;

-30-
57

*Arbitration Statement of Claim*

(g)     a declaration that Monster has already complied with all of its obligations to hold events at the Hard Rock Hotel & Casino or that Monster has complied with said obligations to date and may still hold its required event for 2012, or alternatively, in view of Hard Rock's conduct, Monster is fully excused from any and all contractual obligations to Hard Rock; and

(h)     a declaration that Monster has fully performed all obligations for the assignment and sale of the REHAB marks, and any dispute concerning components of the Agreement and Supplement has no effect on, and is independent and separate from, the binding, separate sale of the REHAB trademarks.

**C.     THIRD - SIXTH CLAIMS (Intentional and Negligent Interference with Contractual Relations and Prospective Economic Advantage)**

1.     For all compensatory damages, according to proof;

2.     For an order enjoining Hard Rock from the filing of trademark applications for any REHAB marks in any beverage categories; and

3.     For an order enjoining Hard Rock from selling any beverage under any and all REHAB trademarks and/or any and all brand names that incorporate any REHAB trademark, anywhere in the world.

**D.     SEVENTH CLAIM (Unfair Business Practices)**

1.     For disgorgement and restitution of any and all monies received by Hard Rock as a result of their unlawful, unfair and/or fraudulent business acts or practices;

2.     For a constructive trust imposed on the improperly-filed trademark applications at the USPTO, OHIM and in Spain, and anywhere else such trademark application have been filed;

3.     For an order enjoining Hard Rock from the unfair, unlawful and/or fraudulent

1    business practices, which are ongoing, including the filing of trademark
2    applications for any REHAB marks in any beverage categories;

3    4.    For an order enjoining Hard Rock from selling any beverage under the name
4          REHAB brand name and/or any brand name that incorporates the REHAB
5          brand name, anywhere in the world; and

6    5.    For an order mandating Hard Rock withdraw the trademark applications it
7          filed with the USPTO, OHIM and in Spain relating to the REHAB mark in all
8          beverage categories.

9

10   **E.    ALL CAUSES OF ACTION**

11   1.    For costs incurred herein;

12   2.    For attorneys' fees, as permitted by law or contract;

13   3.    For prejudgment interest at the statutory rate; and

14   4.    For such other and further relief as the Arbitrator and/or Court may deem just.

15

16                              CALLAHAN & BLAINE, APLC

17

18   Dated: May 22, 2012          By: _____
19                                    DANIEL J. CALLAHAN
                                      MARC P. MILES
20                                    KRISTY A. SCHLESINGER
                                      Attorneys for
21                                    MONSTER ENERGY COMPANY

22

23

24

25

26

27

28

-32-

*Arbitration Statement of Claim*

# Exhibit "A"

---

# Exhibit "A"



**HANSEN BEVERAGE COMPANY**

**Mark Hall**
**President – Monster (DSD) Division**

550 Monica Circle, Suite 201
Corona, CA 92880
Phone: 951/739-6200
Fax: 951/739-6210

### BINDING LETTER OF INTENT
Monster Energy Drink Proposal for Hard Rock Hotel and Casino

November 5, 2009

Randy Kwasniewski
Hard Rock Hotel & Casino
President and Chief Operating Officer
4455 Paradise Road
Las Vegas, NV 89169

Dear Randy:

    This binding letter of intent sets forth certain statements and intentions of Monster Beverage Company, a division of Hansen Beverage Company, a Delaware corporation ("**MONSTER**"), and Hard Rock Hotel & Casino ("**HRH**") (collectively, MONSTER and HRH are referred to herein as the "parties" and each a "<u>party</u>") relating to Monster Energy® becoming the exclusive energy drink partner of HRH (the "Transaction").

    This binding letter of intent may not contain all the essential terms with respect to the Transaction, and the parties acknowledge that they may be required to further negotiate certain aspects of this Transaction pursuant to a separate agreement as well as other points beyond the scope of this binding letter of intent. The parties hereby agree that notwithstanding the fact that this binding letter of intent may not include all necessary terms and conditions, this letter of intent shall be binding and each of the parties agrees to be bound with respect to each of the matters herein, unless and until, and to the extent only, superseded by supplemental agreements with respect the Transaction, as necessary.

    Monster Energy® will be the exclusive energy drink partner of Hard Rock Hotel & Casino in Las Vegas, Nevada (the "HRH Vegas"). The effective date of this Transaction will be ~~January 1, 2010~~ (the "Effective Date"). The term of this letter of intent and the Transaction will be for 5 years from the Effective Date (the "Term").

*DECEMBER 31, 2009*

*RM*

61

Mr. Kwasniewski
November 5, 2009
Page 2 of 8

## 1.     HRH VEGAS WILL RECEIVE THE FOLLOWING BENEFITS:

A.  Marketing Support/Pouring Rights:

- **Total amount of up front financial support**                    **$1,250,000**
  ($500,000 to be paid on execution of this letter of intent,
  and remaining $750,000 to be paid on the Effective Date.)

- **Additional financial support to be paid over 5 years**          **$1,000,000**

  - The additional financial support to be paid out
    as follows:
    1. One (1) major MONSTER event each year
       for five (5) years (the "Monster Event")          $700,000
       (approximately $140,000 per event/per year)

    2. Volume incentives based on total cases sold       $300,000
       (Incentives will be based on hitting specific
       case goals per year for 5 years)
       a. 18,000 cases = an additional          $20,000
       b. 21,000 cases = an additional          $20,000
       c. 25,000 cases = an additional          $20,000
       d. **Total per year available**          **$60,000**

    3. HRH will exclusively sell all MONSTER products that may be
       agreed from time to time, in 8.3 ounce packages, at all HRH
       Vegas Nightclubs, restaurants, service bars, catering (events),
       conventions, room service, pool and in-room locations.
       Additionally, Monster Hitman Energy Shooter will be available
       in-room locations.

    4. HRH will sell various MONSTER products in 16 oz sizes, or
       such other package sizes that may be agreed from time to time,
       in the HRH Vegas convenience stores and retail locations.

B.  Rehab:

Additionally, MONSTER will acquire the Rehab Recovery Supplement brand ("Rehab")
from HRH as outlined below:

- **Up Front payment to HRH**                    **$750,000**
- **Royalty fee**                                **3% of net wholesale price**

62

Mr. Kwasniewski
November 5, 2009
Page 3 of 8

    a. The royalty fee will be paid up to a total amount of $4,250,000 in the aggregate;

    b. The fee will terminate once the $4,250,000 aggregate payment is achieved;

    c. HRH will assign to MONSTER all right, title and interest in Rehab, including but not limited to all formulations, trademarks, tradedress and any and all other rights, including contract rights, associated with Rehab.

<u>Rehab Brand elements:</u>

- MONSTER will work with HRH to develop the Rehab in whatever form Monster determines is commercially viable for the market place;

- MONSTER will consult with HRH regarding the direction of the Rehab brand, packages, etc.;

- MONSTER will work within it's current distribution network to recommend the appropriate route to market for the brand;

- MONSTER will produce the current Rehab brand in it's can form;
  - ~~MONSTER will sell that package to HRH Vegas for their Las Vegas property;~~
  - MONSTER will sell this package to HRH Vegas at a preferred pricing rate that will be mutually agreed upon.

- Notwithstanding the foregoing, HRH shall have the right to repurchase the Rehab brand (and all rights associated therewith) from MONSTER for $1.00, if, after two years following the commencement date of the repositioned Rehab brand sales by MONSTER, MONSTER has not sold at least 100,000 cases of the Rehab brand product.

<u>C.  Rooms:</u>

- MONSTER will commit to reserve and occupy 200 room nights per year for 5 years at HRH Vegas (1000 room nights total) at hotel's best preferred rates. Such rooms shall be included as part of, and offset against, the Monster Event commitment in Section 1.A. above and/or in connection with any other MONSTER sponsored events and/or programs.

63

Mr. Kwasniewski
November 5, 2009
Page 4 of 8

2.      **MONSTER WILL RECEIVE THE FOLLOWING BENEFITS:**

- **Monster Energy® brands and Rehab will be the exclusive energy drink of the HRH Vegas.**

  o  No other competitive brands can be carried, sold or promoted at the property at any time (including third party events, private parties, promotions or any other outside party or event); and *to the public* AB

  o  Competitive brands are defined as any beverage in a can, bottle, on the gun or in any form that advertises, brands, markets or promotes itself as an energy drink or that provides energy, is positioned as an energy drink, or provides any attributes similar to energy, including but not limited to Red Bull, Rockstar, Muscle Milk, Monster Milk, Sobe, Full Throttle, Adrenaline Rush, Relentless, Burn, Vault, No Fear, Nos, Amp, Sparks, Tilt, Zip Fizz, 5-Hour Energy, Vitamin Water-Energy, Mountain Dew, and Arizona Tea-Energy.

- High visibility for Monster Energy® brand products at all points of distribution including all restaurants, backbars, standards, pools, bars, lounges, clubs, in room, conference/convention services or anywhere else beverages are sold;

  o  Visibility will include, but not be limited to MONSTER cans and bar mats placed behind all bars. Coolers, MONSTER signage and other MONSTER visibility items will be placed as needed and mutually agreed upon.

  o  MONSTER will provide and HRH will place MONSTER countertop coolers in highly visible places in all bars and restaurants, subject to space limitations.

*Vodka only* AB

- 2 cans of Monster Green and 2 cans of Monster Blue to be given with ~~all~~ bottle service orders;

- Menu placement on all menus, menu boards, table tents, or anywhere else beverages are identified at HRH Vegas:

  o  Shall be listed with alcohol as a cocktail;

  o  Monster and Vodka shall be featured at all HRH outlets and venues; and

  o  Shall be listed in the non alcohol section as a stand alone beverage;

- $3000 in trade out for food at any HRH restaurant per year;

Mr. Kwasniewski
November 5, 2009
Page 5 of 8

- 5 complimentary bottle service nights per year.  Would consist of 1 bottle per night for 5 nights;

- Use of 1 "Celebrity Suite" each year without rental fee per year/each year;

- Use of sky box/suite at the Joint for entertainment 3 times/nights per year each year (no rental fee or ticket fee); and

- Preferred room rate for all MONSTER employees and business partners throughout the Term.

3.     **MONSTER EVENT:**

- MONSTER will undertake commercially reasonable efforts to activate the Monster Event described in Section 1.A. above, which the parties contemplate will be 1 consumer driven program with HRH Vegas:

    o  Event to be determined at a later date; and

    o  Event will be mutually agreed upon

4.     CONFIDENTIALITY; NO EXPLOITATION.  Each party will, and will cause its representatives to, keep confidential any information obtained from the other parties in connection with this Transaction except as is required by law or regulation to be disclosed, but only to the extent necessary and only for the purpose required. Notwithstanding the foregoing, the provisions of this Section shall not apply to information that (i) is or becomes generally available to the public through no breach of either party; (ii) is or was received by either party from a third party who was authorized to provide such information; (iii) is approved for release in writing by the parties; (iv) is or was independently developed by such party; (v) is required to be disclosed pursuant to a subpoena or other court order or applicable law; or (vi) is disclosed in connection with any arbitration or litigation regarding this letter of intent.   If the Transaction is not consummated, each party will return to the other party any confidential materials, or will certify in writing that all such materials have been destroyed.

5.     SUPPLEMENTAL AGREEMENT.  Upon the acceptance of this letter of intent by HRH, the parties hereto shall identify any other supplemental transaction agreement(s) or items necessary for the Transaction and commence negotiation of the terms of any required supplemental agreements with respect to the Transaction (each, a "Supplemental Agreement") including but not limited to any agreements required in connection with acquisition of the Rehab brand by MONSTER.   Any Supplemental Agreement shall be in a form customary for transactions of this type and shall include, in addition to those matters specifically set forth in this letter of intent, customary representations, warranties, indemnifications, covenants, agreements and conditions.

WS

Mr. Kwasniewski
November 5, 2009
Page 6 of 8

6.      PRE-CLOSING COVENANTS.   In connection with the consummation of the Transaction, and even before execution and delivery of any Supplemental Agreement, if required, the parties hereto will cooperate with each other and proceed, as promptly as reasonably practicable, to seek to obtain consents and approvals required in order to consummate the Transaction, to the extent required.

7.      TERMINATION.  This letter of intent may be terminated only (i) by mutual written consent of MONSTER and the HRH.  .Upon termination of this letter of intent in accordance with the terms hereof, the parties shall have no further rights or obligations hereunder, except with respect to those matters that explicitly survive any such termination.

8.      MISCELLANEOUS

        a.  Costs and Expenses.  Each party hereto will pay all of its own costs and expenses incurred at any time in connection with the letter of intent, the negotiations or consummation of the Transaction, including legal fees, broker's fees, finder's fees, fees of financial advisors and accountants and expenses of its representatives, whether or not the Transaction is consummated.

        b.  Governing Law.   The terms of this letter of intent and all other matters relating to this letter of intent shall be governed by the laws of the State of California, without regard to the conflicts of law provisions thereof.

        c.  Arbitration.  Any dispute, controversy or claim arising out of or relating to this letter of intent or the breach or termination hereof shall be settled by binding arbitration conducted by JAMS/Endispute ("JAMS") in accordance with JAMS Comprehensive Arbitration Rules and Procedures (the "Rules").  The arbitration shall be heard by one arbitrator to be selected in accordance with the Rules in Orange County, California.  Judgment upon any award rendered may be entered in any court having jurisdiction thereof.  Within seven (7) calendar days after appointment the arbitrator shall set the hearing date, which shall be within ninety (90) calendar days after the filing date of the demand for arbitration unless a later date is required for good cause shown and shall order a mutual exchange of what he/she determines to be relevant documents and the dates thereafter for the taking of up to a maximum of five (5) depositions by each party to last no more than two (2) business days in aggregate for each party.  Both parties waive the right, if any, to obtain any award for exemplary or punitive damages or any other amount for the purpose or imposing a penalty from the other in any arbitration or judicial proceeding or other adjudication arising out of or with respect to this letter of intent or any breach hereof, including any claim that said letter of intent, or any part hereof, is invalid, illegal or otherwise voidable or void.  In addition to all other relief, the arbitrator shall have the power to award reasonable attorneys' fees and costs to the prevailing party.  The arbitrator shall make his or her award no later than seven (7) calendar days after the close of evidence or the submission of final briefs, whichever occurs later.  The decision of the arbitrator shall be final and conclusive upon all parties.

Mr. Kwasniewski
November 5, 2009
Page 7 of 8

      d.  Entire Agreement. With respect to the Transaction contemplated hereby, this letter of intent constitute the entire agreement between the parties and supersede all prior oral or written agreements, understandings, representations and warranties, and dealings between the parties on the subject matter hereof.

      e.  Amendment.  This letter of intent may be amended or modified only by a writing executed by each of the parties.

      f.  Counterparts.  This letter of intent may be executed in one or more counterparts, each of which will be deemed to be an original copy of this letter of intent and all of which, when taken together, will be deemed to constitute one and the same instrument.

*[Next Page Is Signature Page]*

Mr. Kwasniewski
November 5, 2009
Page 8 of 8

*[Signature Page]*

Please sign and date this letter of intent in the space provided below to confirm the mutual agreements set forth in the Binding Provisions and return a signed copy to MONSTER by the close of business (5:00 pm PDT) on November 6, 2009.

Very truly yours,

**MONSTER BEVERAGE COMPANY, a
division of Hansen Beverage Company**

By: _____
Name: _____
Its: _____

---

ACCEPTED AND AGREED as to the
Binding Provisions as of the 6 day of November, 2009
by:

**HARD ROCK HOTEL & CASINO**
*HRHH  HOTEL/CASINO, LLC*

By: _____
Name: _____DEAN  BOSWELL_____
Its: _____CFO_____

# Exhibit "B"

## Exhibit "B"

69

## SUPPLEMENT TO BINDING LETTER OF INTENT:
## ACQUISITION OF RIGHTS IN REHAB RECOVERY SUPPLEMENT BEVERAGE

This Agreement is effective as of December 31, 2009 (the "Effective Date"), by and between HRHH IP, LLC, a Delaware limited liability company ("HRH"), and MONSTER BEVERAGE COMPANY, a division of HANSEN BEVERAGE COMPANY, a Delaware corporation ("MONSTER").

WHEREAS, HRH and MONSTER entered into a Binding Letter of Intent dated November 5, 2009 (the "LOI") whereby MONSTER will acquire the Rehab Recovery Supplement brand from HRH, including all trademark rights and manufacturing and distribution rights.

WHEREAS, this Agreement supplements the LOI.

NOW, THEREFORE, for good and adequate consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Definitions.  For purposes of this Agreement, the following terms have the following meanings:

a)      "HRH Vegas" means the Hard Rock Hotel & Casino in Las Vegas, Nevada, including all hotel rooms, bars, restaurants (excluding those restaurants operated by third parties pursuant to a lease from HRH), pool areas, room service, retail stores and other facilities on the premises and all events taking place at the premises.

b)      "Trademarks" means the marks REHAB®, REHAB RX and Rehab X whether in block letters or in the stylized form currently used by HRH in connection with a recovery supplement beverage, including all goodwill associated therewith, and all common law rights, trade name rights, causes of action, and the right to recover for past infringement other than against Fuze Beverage, LLC or its successors, and including U.S. Trademark Registration No. 3353473 for the mark REHAB and any other applications or registrations for any of the Trademarks covering beverages in International Class 5 or 32.

c)      "REHAB Product" means a recovery supplement beverage sold under any of the Trademarks.

2.      Purchase and Assignment of the REHAB Product.  HRH hereby assigns and sells to MONSTER all rights, title, and interest in and to the REHAB Product, including:

a)      the Trademarks, together with the goodwill symbolized by the Trademarks concurrent with the transfer of certain tangible assets as indicia of said goodwill, and including any and all trademark registrations and applications that HRH may own for the Trademarks; provided, however, that MONSTER expressly recognizes and agrees that its acquisition is limited to the Trademarks and goodwill symbolized by the Trademarks for use limited to beverages, including energy drinks, nutritional supplement beverages and recovery supplement beverages.

b)      [*intentionally omitted*];

c)      all rights, including all trade dress rights and all copyrights, in the artwork and designs on the packaging for the REHAB Product and in all advertising and promotional material previously developed for the REHAB Product;

d)      all rights to manufacture and distribute the REHAB Product; and

e)      the domain name liquidrehab.com.

70

3.   <u>No Assumption of Liabilities</u>.  This Agreement does not transfer, MONSTER does not assume, and MONSTER expressly disclaims any and all liabilities existing prior to execution of this Agreement, costs, debts, claims and obligations of HRH or its predecessor in title of rights relating to the REHAB Product.

4.   <u>Further Documents</u>.  HRH will execute and deliver to MONSTER such other documents and instruments as MONSTER may reasonably request to more effectively vest title to the REHAB Product in MONSTER, including the recordable Trademark Assignment attached hereto as <u>Exhibit A</u>.  Upon reasonable advance notice, HRH will provide to MONSTER, such records and other evidence in HRH's possession, if any, as may be required and available to establish, record or maintain the rights acquired by MONSTER in the REHAB Product under this Agreement, and it shall cooperate as reasonably necessary in the prosecution and maintenance of any registration of the Trademarks.

5.   <u>Reservation of Rights</u>.  The parties acknowledge that HRH operates a weekly poolside party event at the HRH Vegas which HRH promotes under the marks "Rehab X" and "Rehab Sundays at the Pool."  HRH owns U.S. Trademark registrations for the marks "Rehab X Sundays at the pool" and "Rehab X" for "seasonal poolside party held weekly with food, drinks and entertainment" and utilizes the marks and trade dress in merchandise and a television series. MONSTER acknowledges that HRH will continue to use these marks in connection with such weekly poolside event, merchandise and television series and promotion of these activities.  MONSTER covenants that, after the effective date of this Agreement, none of MONSTER or its owners, officers, or affiliates, will use the Trademarks or trade dress in connection with goods or services other than for beverages, including energy drinks, nutritional supplement beverages and recovery supplement beverages.

6.   <u>Payment for the REHAB Product Rights</u>.

a)   In consideration of the rights being assigned to MONSTER for the REHAB Product, MONSTER has paid to HRH an up front payment of $750,000.

b)   As additional consideration, MONSTER will pay to HRH a royalty of three percent (3%) of the net wholesale price of the REHAB Product sold by MONSTER up to a maximum royalty of $4,250,000.  If and when the total royalty fee paid to HRH under this Agreement reaches $4,250,000, the royalty fee will terminate. MONSTER will not owe any royalty to HRH based on REHAB Product sold at the net wholesale price to HRH or its affiliates.

7.   <u>Option to Repurchase REHAB</u>.  HRH shall have the right to repurchase all rights in the REHAB Product for One Dollar ($1.00) if, after two years from the date MONSTER first sells the repositioned REHAB Product, MONSTER has not sold at least 100,000 cases of the REHAB Product.

8.   <u>Representations and Warranties</u>.  HRH represents and warrants to MONSTER that:

a)   HRH has the full right and legal authority to enter into and fully perform this Agreement in accordance with its terms;

b)   this Agreement, when executed and delivered by HRH, shall be its legal, valid and binding obligation enforceable against HRH in accordance with its terms, except to the extent that enforcement may be limited by bankruptcy, insolvency, or other similar laws affecting creditor rights generally;

c)   HRH has not previously granted and will not grant any rights to any third party that are inconsistent with the rights granted to MONSTER herein and has not entered into any license or other agreement, oral or written, with any third party which conflicts with or otherwise limits the rights granted to MONSTER herein;

2

d)   HRH has the right and power to assign all rights in the REHAB Product, including the Trademarks, recipes, trade dress and artwork to MONSTER;

e)   to the best of HRH's knowledge, there is no claim by any third party that any of the Trademarks is invalid or infringes the rights of any third party; and

f)   That to the best of HRH's knowledge, there are no encumbrances upon, or liens or security interests against or in the Trademarks.

9.   Indemnification.  HRH agrees that it shall indemnify and hold harmless, MONSTER, its parent and their respective subsidiaries and affiliates, directors, officers, agents, attorneys, and employees from and against any and all liabilities, claims, suits, actions, damages, losses, costs and expenses, including reasonable attorneys' fees and costs, arising, directly or indirectly, from (i) any agreements between HRH and/or FUZE Beverage, LLC and any third party concerning the manufacture, promotion, distribution or sale of the REHAB Product; (ii) the manufacture, packaging, promotion, sale, distribution and use of the REHAB Products by or for HRH or Fuze Beverage, LLC and/or use of the Trademarks, prior to the date of this Agreement, including, but not limited to any defect in the REHAB Product, or personal injury to any third party by the use of the REHAB Product; (iii) infringement of any rights of any person or entity by the manufacture, packaging, promotion, sale, distribution, possession or use of the REHAB Product prior to the date of this Agreement; (iv) any and all claims that may be brought by any seller, distributor or other entity in possession of REHAB Products which claims arose from activities occurring prior to the date of this Agreement; and (v) any breach arising out of, related to, or in connection with any of HRH's representations or warranties contained in this Agreement.

10.   Term and Termination.   The term of this Agreement begins on the Effective Date and ends on December 31, 2014.  This Agreement may be terminated only by mutual written consent of MONSTER and HRH.

11.   Additional Terms.  This Agreement is a supplement to the LOI and hereby incorporates the following sections of the LOI:  Section 4 ("Confidentiality") and Section 8 ("Miscellaneous").   In the event of any inconsistency between the terms of this Agreement and the LOI, such inconsistency will be governed by the terms of this Supplemental Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Supplemental Agreement to be effective as of the date first written above.  This Agreement will be signed in duplicate, each copy of which shall be deemed an original.

| HRHH IP LLC | HANSEN BEVERAGE COMPANY |
|---|---|
| By: _____ | By: _____ |
| Name: Richard Szymanski | Name: Hilton H. Schlosberg |
| Title: Vice President | Title: Vice Chairman & President |
| Date: _____ | Date: April 14, 2010 |

8684381
030910

3

EXHIBIT A

TRADEMARK ASSIGNMENT

[Attached]

8684381
030910

4

73

## TRADEMARK ASSIGNMENT

This Trademark Assignment is effective as of December 31, 2009, by and between HRHH IP, LLC, a Delaware limited liability company ("ASSIGNOR"), and Hansen Beverage Company, a Delaware corporation ("ASSIGNEE").

NOW, THEREFORE, for good and adequate consideration, the receipt and sufficiency of which is hereby acknowledged, ASSIGNOR is the owner of the trademark REHAB for energy drinks and fruit beverages in International Class 32 (the "Trademark"), and all good will related thereto, and registration number 3,353,473 of the Trademark issued by the U.S. Patent and Trademark office (the "Registration") and hereby assigns and sells to ASSIGNEE all rights, title, and interest as ASSIGNOR may possess in and to the Trademark, the Registration and the related trade dress including REHAB®, REHAB RX and Rehab X, whether in block letters or in any stylized form, in connection with a recovery supplement beverage, including all goodwill associated therewith, and all common law rights, trade name rights, causes of action, and the right to recover for past infringement, and including the Registration and any other applications or registrations for any of such trademarks covering beverages in International Class 32.

HRHH IP, LLC

By: _____
    Richard Szymanski
    Vice President

Hansen Beverage Company

By: _____

8482091
020110

# Exhibit "C"

# Exhibit "C"

75

## TRADEMARK ASSIGNMENT

This Trademark Assignment is effective as of December 31, 2009, by and between HRHH IP, LLC, a Delaware limited liability company ("ASSIGNOR"), and Hansen Beverage Company, a Delaware corporation ("ASSIGNEE").

NOW, THEREFORE, for good and adequate consideration, the receipt and sufficiency of which is hereby acknowledged, ASSIGNOR is the owner of the trademark REHAB for energy drinks and fruit beverages in International Class 32 (the "Trademark"), and all good will related thereto, and registration number 3,353,473 of the Trademark issued by the U.S. Patent and Trademark office (the "Registration") and hereby assigns and sells to ASSIGNEE all rights, title, and interest as ASSIGNOR may possess in and to the Trademark, the Registration and the related trade dress including REHAB®, REHAB RX and

Rehab                    , whether in block letters or in any stylized form, in connection with a recovery supplement beverage, including all goodwill associated therewith, and all common law rights, trade name rights, causes of action, and the right to recover for past infringement, and including the Registration and any other applications or registrations for any of such trademarks covering beverages in International Class 32.

HRHH IP, LLC

By: _____
    Richard Szymanski
    Vice President

Hansen Beverage Company

By: _____

8482091
020110

# Exhibit "D"

**Exhibit "D"**

77

# United States of America

## United States Patent and Trademark Office

# MONSTER REHAB

**Reg. No. 4,129,288**

**Registered Apr. 17, 2012**

**Int. Cls.: 5 and 32**

**TRADEMARK**

**PRINCIPAL REGISTER**

MONSTER ENERGY COMPANY (DELAWARE CORPORATION)
550 MONICA CIRCLE, SUITE 201
CORONA, CA 92880

FOR: NUTRITIONAL SUPPLEMENTS IN LIQUID FORM, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 3-2-2011; IN COMMERCE 3-2-2011.

FOR: BEVERAGES, NAMELY, NON-ALCOHOLIC NON-CARBONATED DRINKS ENHANCED WITH VITAMINS, MINERALS, NUTRIENTS, PROTEINS, AMINO ACIDS AND/OR HERBS; NON-CARBONATED ENERGY OR SPORTS DRINKS, FRUIT JUICE DRINKS HAVING A JUICE CONTENT OF 50% OR LESS BY VOLUME THAT ARE SHELF-STABLE; ALL THE FOREGOING GOODS EXCLUDE PERISHABLE BEVERAGE PRODUCTS THAT CONTAIN FRUIT JUICE OR SOY, WHETHER SUCH PRODUCTS ARE PASTEURIZED OR NOT, IN CLASS 32 (U.S. CLS. 45, 46 AND 48).

FIRST USE 3-2-2011; IN COMMERCE 3-2-2011.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 3,057,061, 3,353,473, AND OTHERS.

SN 85-078,405, FILED 7-6-2010.

GEOFFREY FOSDICK, EXAMINING ATTORNEY

Director of the United States Patent and Trademark Office

78

<div style="border:1px solid black">

### REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

</div>

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

<div style="border:1px solid black">

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

</div>

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:** Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at http://www.uspto.gov.

# Exhibit "E"

Exhibit "E"

80

# United States of America
## United States Patent and Trademark Office

# MONSTER REHAB

**Reg. No. 4,111,964**

**Registered Mar. 13, 2012**

**Int. Cl.: 30**

**TRADEMARK**

**PRINCIPAL REGISTER**

HANSEN BEVERAGE COMPANY (DELAWARE CORPORATION)
SUITE 201
550 MONICA CIRCLE
CORONA, CA 92880

FOR: READY TO DRINK TEA, ICED TEA AND TEA BASED BEVERAGES; READY TO DRINK FLAVORED TEA, ICED TEA AND TEA BASED BEVERAGES, IN CLASS 30 (U.S. CL. 46).

FIRST USE 2-0-2011; IN COMMERCE 2-0-2011.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 85-406,210, FILED 8-24-2011.

RONALD DELGIZZI, EXAMINING ATTORNEY



David J. Kappos

Director of the United States Patent and Trademark Office

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the
> 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is
> accepted, the registration will continue in force for the remainder of the ten-year period, calculated
> from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a
> federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an
> Application for Renewal between the 9th and 10th years after the registration date.*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between
> every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above
with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with
an extension of protection to the United States under the Madrid Protocol must timely file the Declarations
of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are
based on the U.S. registration date (not the international registration date). The deadlines and grace periods
for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.
*See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications
at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the
International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol,
before the expiration of each ten-year term of protection, calculated from the date of the international
registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration,
see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the
USPTO website for further information. With the exception of renewal applications for registered
extensions of protection, you can file the registration maintenance documents referenced above online
at http://www.uspto.gov.**

Page: 2 / RN # 4,111,964



# Exhibit "F"

Exhibit "F"

Registered / Eingetragen 22/12/2010

No 009228479

MONSTER REHAB

The President / Der Präsident

António Campinos



**OHIM – OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET**
TRADE MARKS AND DESIGNS

## CERTIFICATE OF REGISTRATION

This Certificate of Registration is hereby issued for the
Community Trade Mark identified below. The
corresponding entries have been recorded in the
Register of Community Trade Marks.

**HABM – HARMONISIERUNGSAMT FÜR DEN BINNENMARKT**
MARKEN, MUSTER UND MODELLE

## EINTRAGUNGSURKUNDE

Diese Eintragungsurkunde wird für die unten
angegebene Gemeinschaftsmarke ausgestellt. Die
betreffenden Angaben sind in das Register für
Gemeinschaftsmarken eingetragen worden.

| | |
|---|---|
| 210 | 009228479 |
| 220 | 07/07/2010 |
| 400 | 06/09/2010 |
| 151 | 22/12/2010 |
| 450 | 03/01/2011 |
| 186 | 07/07/2020 |
| 541 | MONSTER REHAB |
| 521 | 0 |
| 732 | Hansen Beverage Company<br>550 Monica Circle, Suite 201<br>Corona, California 92880<br>US |
| 740 | BIRD & BIRD LLP<br>90 Fetter Lane<br>London EC4A 1EQ<br>GB |
| 270 | EN DE |
| 511 | BG - 5 |

BG - 5
Хранителни добавки в течна форма.

BG - 32
Напитки, включително газирани безалкохолни напитки;газирани напитки, обогатени с витамини, минерали, хранителни вещества, аминокиселини и/или билки;газирани и негазирани енергийни или спортни напитки, плодови напитки, имащи 50% съдържание на сок или по-малко по обем.

ES - 5
Complementos nutritivos en forma líquida.

ES - 32
Bebidas, incluyendo refrescos carbonatados;bebidas carbonatadas y no carbonatadas mejoradas con vitaminas, minerales, nutrientes, proteínas, aminoácidos o hierbas;bebidas carbonatadas y sin carbonatar o bebidas deportivas, bebidas de zumos de frutas con contenido de zumo del 50% o menos por volumen.

CS - 5
Nutriční doplňky v tekuté formě.

CS - 32
Nápoje, včetně sycených nealkoholických nápojů;sycené a nesycené nápoje obohacené vitaminy, minerály, výživnými látkami, proteiny, aminokyselinami a/nebo bylinkami;sycené a nesycené energetické nebo sportovní nápoje, nápoje z ovocných šťáv, u nichž obsah šťávy činí 50 % objemu nebo méně.

DA - 5
Ernæringstilskud i flydende form.

DA - 32
Drikke, inklusive kulsyreholdige læskedrikke;kulsyreholdige og ikke-kulsyreholdige drikke tilsat vitaminer, mineraler, næringsstoffer, proteiner, aminosyrer og/eller urter;kulsyreholdige og ikke-kulsyreholdige energi- eller sportsdrikke, drikke med frugtsaft med et frugtindhold på 50% eller mindre i forhold til volumen.

DE - 5
Nahrungsmittelzusätze in flüssiger Form.

DE - 32
Getränke, einschließlich kohlensäurehaltige Erfrischungsgetränke;kohlensäurehaltige und nicht kohlensäurehaltige, mit Vitaminen, Mineralstoffen, Nährstoffen, Eiweißen, Aminosäuren und/oder Kräutern angereicherte Getränke;kohlensäurehaltige und nicht kohlensäurehaltige Energie- oder Sportge-

tränke, Fruchtsaftgetränke mit einem Fruchtsaftgehalt von 50 Volumenprozent oder weniger.

ET - 5
Toitainelisandid vedelikena.

ET - 32
Joogid, sh gaseeritud karastusjoogid;vitamiinide, mineraalide, toitainete, valkude, aminohapete ja/või maitsetaimedega rikastatud gaseeritud ja gaseerimata joogid;gaseer- või gaseerimata energiajoogid või isotoonilised joogid, kuni 50 mahu-% mahlasisaldusega puuviljajoogid.

EL - 5
Θρεπτικά συμπληρώματα σε υγρή μορφή.

EL - 32
Ποτά, όπου περιλαμβάνονται ανθρακούχα αναψυκτικά·αεριούχα και μη αεριούχα ποτά εμπλουτισμένα με βιταμίνες, μεταλλικά στοιχεία, θρεπτικές ουσίες, πρωτεΐνες, αμινοξέα και/ή βότανα·ανθρακούχα και μη ανθρακούχα εργογόνα ποτά ή ποτά για αθλητές, ποτά από χυμούς φρούτων με περιεκτικότα σε χυμό 50% ή λιγότερο κατ' όγκο.

EN - 5
Nutritional supplements in liquid form.

EN - 32
Beverages, including carbonated soft drinks; carbonated and non-carbonated drinks enhanced with vitamins, minerals, nutrients, proteins, amino acids and/or herbs; carbonated and non-carbonated energy or sports drinks, fruit juice drinks having a juice content of 50% or less by volume.

FR - 5
Compléments nutritionnels sous forme liquide.

FR - 32
Boissons, y compris boissons gazeuses sans alcool;boissons gazeuses et non gazeuses enrichies en vitamines, minéraux, nutriments, protéines, acides aminés et/ou herbes;boissons gazeuses et non gazeuses, énergétiques ou pour sportifs, boissons au jus de fruits dont la teneur en jus est de 50% ou moins par volume.

IT - 5
Integratori nutrizionali in forma liquida.

IT - 32
Bevande, comprese bibite gassate;bevande gassate e non gassate arricchite di vitamine, minerali, sostanze nutrienti, proteine, amminoacidi e/o erbe;bevande energetiche o sportive gassate e non gassate, bevande a base di succhi di frutta con contenuto di succo del 50% o inferiore.

LV - 5
Uztura bagātinātāji šķidrā veidā.

LV - 32
Dzērieni, tostarp gāzēti bezalkoholiskie dzērieni;gāzēti un negāzēti dzērieni, kas bagātināti ar vitamīniem, minerālvielām, barojošām vielām, proteīniem, aminoskābēm un/vai augiem;gāzēti un negāzēti enerģijas vai sporta dzērieni, augļu sulas, kurās sulas daudzums ir 50% vai mazāks.

LT - 5
Skysti mitybos papildai.

LT - 32
Gėrimai, įskaitant gazuotus gaivinamius gėrimus;gazuoti ir negazuoti gėrimai, praturtinti vitaminais, mineralais, maistinėmis medžiagomis, proteinais, amino rūgštimis ir/ar vaistažolėmis;gazuoti ir negazuoti energiniai ar izotoniniai gėrimai, vaisių sulčių gėrimai, kurių 50 % ar mažiau sudaro sultys.

HU - 5
Táplálékkiegészítők folyékony formában.

HU - 32
Italok, többek között szénsavas üdítőitalok;vitaminokkal, ásványi anyagokkal, tápanyagokkal, fehérjékkel, aminosavakkal

és/vagy gyógynövényekkel dúsított szénsavas és szénsavmentes italok;szénsavas és szénsavmentes energia- vagy sportitalok, 50 térfogat százalékos vagy annál alacsonyabb rosttartalmú gyümölcslé italok.

MT  -  5
Supplimenti tan-nutrizzjoni f'forma likwida.

MT  -  32
Xorb mhux alkoħoliku, inklużi l-luminati fexfiexa;xorb bil-gass u mingħajr gass imsaħħaħ bil-vitamini, minerali, sustanzi, proteini, aċidi amminiċi u/jew ħxejjex aromatiċi;xorb tal-enerġija fexfiexi u mhux jew xorb tal-isport, xorba tal-meraq tal-frott b'50% jew inqas tal-volum tal-kontenut tiegħu li hu meraq.

NL  -  5
Voedingssupplementen in vloeibare vorm.

NL  -  32
Dranken, waaronder koolzuurhoudende frisdranken;al dan niet koolzuurhoudende dranken verrijkt met vitaminen, mineralen, nutriënten, eiwitten, aminozuren en/of kruiden;al dan niet koolzuurhoudende energie- of sportdranken, vruchtensapdranken met een sapgehalte van 50% volume of minder.

PL  -  5
Suplementy odżywcze w formie płynnej.

PL  -  32
Napoje, w tym gazowane napoje bezalkoholowe;napoje gazowane i niegazowane wzbogacane witaminami, minerałami, substancjami odżywczymi, proteinami, aminokwasami i/lub ziołami;gazowane i niegazowane napoje energetyczne lu bdla sportowców, napoje z sokiem owocowym z 50% zawartością soku lub mniej.

PT  -  5
Suplementos nutritivos em estado líquido.

PT  -  32
Bebidas, incluindo refrigerantes gaseificados;bebidas carbonatadas e não carbonatadas enriquecidas com vitaminas, minerais, nutrientes, proteínas, aminoácidos e/ou de ervas;bebidas energéticas ou isotónicas gaseificadas e não gaseificadas, bebidas de sumo de fruta com teor de sumo em volume igual ou inferior a 50%.

RO  -  5
Suplimente nutritive în formă lichidă.

RO  -  32
Băuturi, inclusiv băuturi răcoritoare carbogazoase;băuturi carbogazoase şi necarbogazoase îmbunătăţite cu vitamine, minerale, substanţe nutritive, proteine, aminoacizi şi/sau plante;băuturi carbogazoase şi necarbogazoase pentru sportivi sau energizante, băuturi pe bază de sucuri de fructe care au un conţinut de suc de 50% sau ma puţin, în funcţie de volum.

SK  -  5
Výživové doplnky v tekutej podobe.

SK  -  32
Nápoje, menovite sýtené nealkoholické nápoje;sýtené a nesýtené nápoje s vitamínmi, minerálmi, živinami, aminokyselinami, bielkovinami alebo bylinkami;sýtené a nesýtené energetické alebo športové nápoje, nápoje s obsahom ovocnej šťavy menej ako 50%.

SL  -  5
Prehranska dopolnila v obliki tekočin.

SL  -  32
Pijače, vključno z gaziranimi brezalkoholnimi pijačami;gazirane in negazirane pijače, obogatene z vitamini, minerali, hranili, beljakovinami, aminokislinami in/ali zelišči;gazirane in negazirane energijske ali športne pijače, sadni sokovi z vsebnostjo soka 50 % ali manj.

FI  -  5

Nestemäiset ravintolisäaineet.

FI  -  32
Juomat, mukaan lukien hiilihappoiset virvoitusjuomat;hiilihappo- ja hiilihapottomat juomat, joihin on lisätty vitamiineja, kivennäisaineita, ravintoaineita, valkuaisaineita, aminohappoja ja/tai yrttejä;hiilihapolliset ja hiilihapottomat energia- tai urheilujuomat, hedelmämehujuomat, joiden mehupitoisuus tilavuudesta on 50 % tai vähemmän.

SV  -  5
Näringstillskott i vätskeform.

SV  -  32
Drycker, inklusive kolsyrade läskedrycker;kolsyrade och icke-kolsyrade drycker förstärkta med vitaminer, mineraler, näringsämnen, proteiner, aminosyror och/eller örter;kolsyrade och icke kolsyrade energi- eller sportdrycker, fruktjuicedrinkar med ett juiceinnehåll om 50% eller mindre efter volym.

# EXHIBIT "G"

## Exhibit "G"

87

Registered / Registrado 26/01/2012

No 010215002

MONSTER REHAB

The President / El Presidente

Antônio Campinos



**OHIM – OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET**
TRADE MARKS AND DESIGNS

## CERTIFICATE OF REGISTRATION

This Certificate of Registration is hereby issued for the Community Trade Mark identified below. The corresponding entries have been recorded in the Register of Community Trade Marks.

**OAMI – OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR**
MARCAS, DIBUJOS Y MODELOS

## CERTIFICADO DE REGISTRO

Se expide el presente Certificado de Registro para la Marca Comunitaria que se identifica a continuación. Las menciones y las informaciones indicadas en la marca han sido inscritas en el Registro de Marcas Comunitarias.



| | |
|---|---|
| 210 | 010215002 |
| 220 | 24/08/2011 |
| 400 | 19/10/2011 |
| 151 | 26/01/2012 |
| 450 | 30/01/2012 |
| 186 | 24/08/2021 |
| 541 | MONSTER REHAB |
| 521 | 0 |
| 732 | Monster Energy Company<br>550 Monica Circle, Suite 201<br>Corona, California 92880<br>US |
| 740 | BIRD & BIRD LLP<br>15 Fetter Lane<br>London EC4A 1JP<br>GB |
| 270 | EN ES |
| 511 | |

**BG** - 30
Готови за пиене чай, студен чай, напитки на основата на чай;Готови за пиене овкусен чай, студен чай и напитки на основата на студен чай.

**ES** - 30
Té listo para tomar, té helado y bebidas con una base de té;Té aromatizado listo para beber, té helado y bebidas con una base de té.

**CS** - 30
Hotové čaje, ledové čaje a nápoje na bázi čaje;Hotové ochucené čaje, ledové čaje a nápoje na bázi čaje.

**DA** - 30
Drikkeklar te, iste og tebaserede drikke;Drikkeklar te, iste og tebaserede drikke tilsat smag.

**DE** - 30
Trinkfertiger Tee, Eistee und Teegetränke;Trinkfertiger aromatisierter Tee, Eistee und Teegetränke.

**ET** - 30
Valmistee, jäätee ja jookidel põhinev tee;Maltsestatud valmistee, jäätee ja teejoogid.

**EL** - 30
Έτοιμο τσάι, παγωμένο τσάι και ροφήματα με βάση το τσάι;Έτοιμο τσάι, παγωμένο τσάι και ροφήματα με βάση το τσάι σε διάφορες γεύσεις.

**EN** - 30
Ready to drink tea, iced tea and tea based beverages; ready to drink flavored tea, iced tea and tea based beverages.

**FR** - 30
Thé instantané, thé glacé et boissons à base de thé;Thé aromatisé instantané, thé glacé et boissons à base de thé.

**IT** - 30
Tè, tè freddo e bevande a base di tè pronti da bere;Tè aromatizzati, tè freddo e bevande a base di tè pronti da bere.

**LV** - 30
Dzeršanai gatava tēja, ledus tēja un no tējas pagatavojami dzērieni;Dzeršanai gatava aromatizēta tēja, ledus tēja un no tējas pagatavojami dzērieni.

**LT** - 30
Paruošta arbata, šalta arbata ir arbatos gėrimai;Paruošta paskaninta arbata, šalta arbata ir arbatos gėrimai.

**HU** - 30
Készen kapható tea, jeges tea és teaalapú italok;Készen kapható ízesített tea, jeges tea és teaalapú italok.

**MT** - 30

Te, te kiesaħ u xarbiet ibbażati fuq it-te lesti għax-xorb;Te bit-togħma, te kiesaħ u xarbiet ibbażati fuq it-te lesti għax-xorb.

**NL** - 30
Kant-en-klare thee, ijsthee en dranken op theebasis;Kant-en-klare thee met smaakstoffen, ijsthee en dranken op theebasis.

**PL** - 30
Gotowa do picia herbata, mrożona herbata i napoje na bazie herbaty;Gotowa do picia herbata smakowa, herbata mrożona i napoje na bazie herbaty.

**PT** - 30
Chá, chá de beber gelado e bebidas à base de chá prontos a consumir;Chá, chá de beber gelado e bebidas à base de chá aromatizados prontos a consumir.

**RO** - 30
Ceai gata preparat, ceai rece şi băuturi pe bază de ceai;Ceai aromat gata de băut, ceai rece şi băuturi pe bază de ceai.

**SK** - 30
Hotové čaje, ľadové čaje a čajové nápoje;Hotové ochutené čaje, ľadové čaje a čajové nápoje.

**SL** - 30
Čaj, ledeni čaj in pijače na osnovi čaja, pripravljeni za uživanje;Aromatizirani čaj, ledeni čaj in pijače na osnovi čaja, pripravljeni za uživanje.

**FI** - 30
Juotavaksi valmiit teet, jääteet ja teepohjaiset juomat;Juotavaksi valmiit maustetut teet, jääteet ja teepohjaiset juomat.

**SV** - 30
Drickfärdigt te, iste och tebaserade drycker;Drickfärdigt smaksatt te, iste och tebaserade drycker.

# EXHIBIT "H"

Exhibit "H"

90



**OAMI** OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR (MARCAS, DIBUJOS Y MODELOS)
**HABM** HARMONISIERUNGSAMT FÜR DEN BINNENMARKT (MARKEN, MUSTER UND MODELLE)
**OHIM** OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET (TRADE MARKS AND DESIGNS)
**OHMI** OFFICE DE L'HARMONISATION DANS LE MARCHÉ INTÉRIEUR (MARQUES, DESSINS ET MODÈLES)
**UAMI** UFFICIO PER L'ARMONIZZAZIONE NEL MERCATO INTERNO (MARCHI, DISEGNI E MODELLI)

D113

---

# Copia Certificada ⬩ Beglaubigte Abschrift ⬩ Certified Copy
## Copie Certifiée ⬩ Copia Autenticata

> *Código de identificación ⬩ Identifizierungscode ⬩ Identification code ⬩*
> *Code d'identification ⬩ Codice di identificazione: C44FOFCNT2B7R6XTE7DB67J4ZM*

Por la presente se certifica que el documento que se adjunta es una copia conforme del certificado de registro para la marca comunitaria cuyo número y fecha de registro aparecen a continuación.
El documento original puede ser consultado en el enlace de la OAMI http://oami.europa.eu introduciendo el código de identificación indicado más arriba.

*Hiermit wird bestätigt, daß die Abschrift, die diesem Beleg beigeheftet ist, eine genaue Abschrift der Eintragungsurkunde ist, die für die Gemeinschaftsmarke mit der nachstehenden Eintragungsnummer und dem nachstehenden Eintragungstag ausgestellt wurde.*
*Das Originaldokument kann mittels Eingabe eines Identifizierungscode bei folgender Webadresse http://oami.europa.eu eingesehen werden.*

This is to certify that the attached document is an exact copy of the certificate of registration issued for the Community trade mark bearing the registration number and date indicated below.
The original document can be consulted introducing the identification code indicated above at the following OHIM web page link http://oami.europa.eu.

*Par la présente, il est certifié que le document annexé est une copie conforme du certificat d'enregistrement délivré pour la marque communautaire portant le numéro et la date d'enregistrement qui figurent ci-après.*
*Le document original peut être consulté sur le site web de l'OHMI http://oami.europa.eu en introduisant le code d'identification indiqué ci-dessus.*

Con la presente si certifica che il documento allegato è una copia conforme del certificato di registrazione per il marchio comunitario contrassegnato dal numero e dalla data di registrazione riportati sotto.
Il Documento originale può essere consultato introducendo il codice di identificazione sopra indicato, nel indirizzo http://oami.europa.eu della pagina Web della UAMI.

| Núm./Nr./No/nº/n. | Fecha/Datum/Date/Date/Data |
|---|---|
| **010346724** | **21/03/2012** |

Alicante, 22/05/2012



**Guido Fael**
Departamento de Apoyo a las Operaciones
Hauptabteilung Unterstützung des Kerngeschäfts
Operations Support Department
Département «Soutien aux opérations»
Dipartimento Supporto alle operazioni

91

Identification Code: 044P0PCN2T2BT76XYET7DB67J4ZM



Copia Certificada / Beglaubigte Abschrift / Certified Copy / Copie Certifiée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration certificate of community trade mark / Certificat
d'enregistrement de marque communautaire / Certificato registrazione di marchio comunitario

OHIM – OFFICE FOR HARMONIZATION IN THE
INTERNAL MARKET
TRADE MARKS AND DESIGNS

CERTIFICATE OF REGISTRATION

This Certificate of Registration is hereby issued for the
Community Trade Mark identified below. The
corresponding entries have been recorded in the
Register of Community Trade Marks.

OAMI – OFICINA DE ARMONIZACIÓN DEL
MERCADO INTERIOR
MARCAS, DIBUJOS Y MODELOS

CERTIFICADO DE REGISTRO

Se expide el presente Certificado de registro de la
Marca Comunitaria que se identifica a continuación.
Las menciones y las informaciones relativas a la marca
han sido inscritas en el Registro de Marcas
Comunitarias.

No 010346724

The President / El Presidente

António Campinos

CTM 010346724

Alicante, 22/05/2012

COPY

Page 1 of 4

Copia Certificada / Beglaubigte Abschrift/ Certified Copy / Copie Certifiée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration
certificate of community trade mark / Certificat d'enregistrement de marque communautaire / Certificato
registrazione di marchio comunitario

OHIM – OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET
TRADE MARKS AND DESIGNS

OAMI – OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR
MARCAS, DIBUJOS Y MODELOS

210 010346724
220 17/10/2011
400 13/12/2011

151 21/03/2012
450 23/03/2012

186 17/10/2021
541 M MONSTER REHAB PROTEAN + ENERGY
521 0
546



531 27.5.21
    27.99.13
732 Monster Energy Company
    550 Monica Circle, Suite 201
    Corona, California 92880
    US
740 BIRD & BIRD LLP
    15 Fetter Lane
    London EC4A 1JP
    GB
270 EN ES
511 BG - 5
    Хранителни добавки в течна форма.

BG - 30
Готови за пиене чай, студен чай, напитки на основата на чай;Готови за пиене ароматизирани чайове, Студени чайове и напитки на основата на чай.

BG - 32
Безалкохолни напитки,Енергийни напитки, енергийни напитки с чай, енергийни напитки със сок, Спортни питиета,И плодови напитки, имащи 50% съдържание на сок или по-малко по обем;Всички горепосочени, обогатени с витамини, минерали, хранителни вещества, аминокиселини и/или билки.

ES - 5
Complementos nutritivos en forma líquida.

ES - 30
Té listo para tomar, té helado y bebidas con una base de té;Té aromatizado preparado para su consumo, Té helado y bebidas a base de té.

ES - 32
Bebidas desalcoholizadas,En concreto bebidas energéticas, bebidas energéticas con sabor a té, bebidas energéticas con sabor a zumo, Bebidas para el deporte,Y bebidas de zumos de frutas con un contenido de zumo del 50% o menos por volumen;Todos los mencionados están enriquecidos con vitaminas, minerales, nutrientes, aminoácidos o hierbas.

CS - 5
Nutriční doplňky v tekuté formě.

CS - 30
Hotové čaje, ledové čaje a nápoje na bázi čaje;Ochucené čaje k přímé spotřebě, Ledový čaj a nápoje na bázi čaje.

CS - 32
Nealkoholické nápoje,Energetické nápoje, energetické nápoje s příchutí čaje, energetické nápoje s příchutí ovocné šťávy, Nápoje pro sport,A ovocné šťávy s 50% nebo nižším obsahem ovoce;Vše výše uvedené obohacené vitaminy, minerály, výživnými látkami, aminokyselinami anebo bylinami.

DA - 5
Ernæringstilskud i flydende form.

DA - 30
Drikkeklar te, iste og tebaserede drikke;Drikkeklar te med smagsstoffer, Iste og drikke fremstillet på basis af te.

DA - 32
Ikke-alkoholholdige drikke,Nemlig energidrikke, energidrikke med smag af te, energidrikke med smag af saft, Sportsdrikke,Drikke med frugtsaft, som har et frugtindhold på 50% % eller mindre i forhold til volumen;Alle førnævnte beriget med vitaminer, mineraler, næringsstoffer, aminosyrer og/eller urter.

DE - 5
Nahrungsmittelzusätze in flüssiger Form.

DE - 30
Trinkfertiger Tee, Eistee und Teegetränke;Trinkfertiger aromatisierter Tee, Eistee und Teegetränke.

DE - 32
Entalkoholisierte Getränke,Nämlich Energiegetränke, Energiegetränke mit Teegeschmack, Energiegetränke mit Saftgeschmack, Sportgetränke,Und Fruchtsaftgetränke mit einem Saftgehalt von maximal 50%;Alles vorstehend Genannte angereichert mit Vitaminen, Mineralstoffen, Nährstoffen, Aminosäuren und/oder Kräutern.

ET - 5
Toitainelisandid vedelikena.

ET - 30
Valmistee, jäätee ja jookidel põhinev tee;Kasutusvalmis maitsestatud tee, Jäätee ja teepõhised joogid.

ET - 32
Alkoholivabad joogid,Nimelt energiajoogid, teega maitsestatud energiajoogid, mahlaga maitsestatud energiajoogid, Isotoonilised joogid,Ja kuni 50% mahuprotsendise mahlasisaldusega puuviljajoogid;Kõik eelnimetatud tooted on vitamiinide, mineraalide, toitainete, aminohapete ja/või maitsetaimedega rikastatud.

EL - 5
Θρεπτικά συμπληρώματα σε υγρή μορφή.

EL - 30
Έτοιμο τσάι, παγωμένο τσάι και ροφήματα με βάση το τσάι;Έτοιμο τσάι σε διάφορες γεύσεις, Κρύο τσάι και ποτά με βάση το τσάι.

EL - 32
Ποτά χωρίς οινόπνευμα,Συγκεκριμένα ενεργειακά ποτά, ενεργειακά ποτά με γεύση τσαγιού, ενεργειακά ποτά με γεύση χυμού, Ποτά για αθλητές,Και ποτά από χυμούς φρούτων με περιεκτικότητα σε χυμό 50% ή λιγότερο κατ' όγκο·Στο σύνολό

No 010346724                                    1/3

Page 2 of 4    **COPY**    CTM 010346724    Alicante, 22/05/2012

Identification Code: C44F0FCRT2B7R6XXIX7DB67J42M

Copia Certificada / Beglaubigte Abschrift/ Certified Copy / Copie Certifiée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration
certificate of community trade mark / Certificat d'enregistrement de marque communautaire / Certificato
registrazione di marchio comunitario

OHIM – OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET
TRADE MARKS AND DESIGNS

OAMI – OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR
MARCAS, DIBUJOS Y MODELOS

τους τα προαναφερόμενα ενισχυόμενα με βιταμίνες, μεταλλικά στοιχεία, θρεπτικά στοιχεία, αμινοξέα καί/ή βότανα.

EN – 5
Nutritional supplements in liquid form.

EN – 30
Ready to drink tea, iced tea and tea based beverages; ready to drink flavoured tea, iced tea and tea based beverages.

EN – 32
Non-alcoholic beverages, namely energy drinks, energy drinks flavoured with tea, energy drinks flavoured with juice, sports drinks, and fruit juice drinks having a content of 50% or less by volume; all of the foregoing enhanced with vitamins, minerals, nutrients, amino acids and/or herbs.

FR – 5
Compléments nutritionnels sous forme liquide.

FR – 30
Thé instantané, thé glacé et boissons à base de thé;Thé aromatisé instantané, Thé glacé et boissons à base de thé.

FR – 32
Boissons désalcoolisées,À savoir boissons énergétiques, boissons énergétiques aromatisées au thé, boissons énergétiques aromatisées au jus, Boissons pour sports,Et boissons dont la teneur en jus de fruits est égale ou inférieure à 50 % par volume;Tous les produits précités enrichis en vitamines, minéraux, nutriments, acides aminés et/ou herbes.

IT – 5
Integratori nutrizionali in forma liquida.

IT – 30
Tè, tè freddo e bevande a base di tè pronti da bere;Tè aromatizzato pronto da bere, Tè freddo e bevande a base di tè.

IT – 32
Bevande prive d'alcool,Ovvero bevande energetiche, bevande energetiche aromatizzate con tè, bevande energetiche aromatizzate con frutta, Bevande per lo sport,E bevande a base di succhi di frutta con contenuto del succo del 50% o inferiore;Tutti i suddetti prodotti arricchiti di vitamine, minerali, sostanze nutrienti, amminoacidi e/o erbe.

LV – 5
Uztura bagātinātāji šķidrā veidā.

LV – 30
Dzeršanai gatava tēja, ledus tēja un no tējas pagatavojami dzērieni;Dzeršanai gatava aromatizēta tēja, Ledus tēja un no kafijas gatavoti dzērieni.

LV – 30
Bezalkoholiskie dzērieni,Proti, enerģijas dzērieni, enerģijas dzērieni ar tējas garšu, enerģijas dzērieni ar sulas garšu, izotoniskie dzērieni,Un augļu sulu dzērieni, kuras sulas saturs ir 50% vai mazāks;Viss iepriekš minētais ir bagātināts ar vitamīniem, minerālvielām, barojošām vielām, aminoskābēm un/vai augiem.

LT – 5
Skysti mitybos papildai.

LT – 30
Paruošta arbata, šalta arbata ir arbatos gėrimai;Paruošti vartoti aromatizuoti arbatos gėrimai, Arbata su ledu ir arbatos gėrimai.

LT – 32
Galvieji gėrimai,Būtent energetiniai gėrimai, aromatizuoti arbatos gėrimai, energetiniai sulčių gėrimai, izotoniniai (netonizuojantys) gėrimai,Ir vaisių sulčių gėrimai, kurių 50% ar mažiau sudaro sultys;Visi išvardinti produktai praturtinti vitaminais, mineralais, maistinėmis medžiagomis, amino rūgštimis ir (arba) vaistažolėmis.

HU – 5
Táplálékkiegészítők folyékony formában.

HU – 30
Készen kapható tea, jeges tea és teaalapú italok;Azonnal fogyasztható ízesített tea, Jeges tea és teaalapú italok.

HU – 32
Alkoholmentes italok,Nevezetesen energiaitalok, teával ízesített energiaitalok, gyümölcslével ízesített energiaitalok, izotóniás italok,És 50 vagy annál alacsonyabb térfogatszázalék gyümölcstartalmú gyümölcslevek;Az összes fent említett vitaminokkal, ásványi anyagokkal, tápanyagokkal, aminosavakkal és/vagy gyógynövényekkel dúsított.

MT – 5
Supplimenti tan-nutrizzjoni f'forma likwida.

MT – 30
Te, te kiesaħ u xarbiet ibbażati fuq it-te festi għax-xorb;Te bittogħma lest għax-xorb, Tè kiesaħ u xorb ibbażat fuq il-tè.

MT – 32
Xorb mhux alkoħoliku,Jiġifieri xarbiet tal-enerġija, xarbiet tal-enerġija bit-togħma bit-te, xarbiet tal-enerġija bit-togħma bil-meraq tal-frott, Xorb isotoniku,U xarbiet tal-meraq tal-frott b'kontenut ta' 50% jew anqas fil-volum;Dak kollu msemmi hawn qabel huwa msaħħaħ b'vitamini, minerali, nutrimenti, acidi amminiċi u/jew ħwawar.

NL – 5
Voedingssupplementen in vloeibare vorm.

NL – 30
Kant-en-klare thee, ijsthee en dranken op theebasis;Kant-en-klare thee met aroma, Gekoelde thee en dranken op theebasis.

NL – 32
Alcoholvrije dranken,Te weten energiedranken, energiedranken met theesmaak, energiedranken met sapsmaak, Sportdranken,En vruchtensapdranken met een volumegehalte van 50% of minder;Alle voornoemde waren verrijkt met vitaminen, mineralen, nutriënten, aminozuren en/of kruiden.

PL – 5
Suplementy odżywcze w formie płynnej.

PL – 30
Gotowa do picia herbata, mrożona herbata i napoje na bazie herbaty;Gotowa do picia herbata smakowa, Mrożona herbata i napoje na bazie herbaty.

PL – 32
Napoje bezalkoholowe,Mianowicie napoje energetyczne, napoje energetyczne o smaku herbaty, napoje energetyczne o smaku soku, Napoje izotoniczne,Oraz napoje z sokiem owocowym z 50% zawartością soku lub mniej;Wszystkie wyżej wymienione wzbogacone w witaminy, minerały, substancje odżywcze, aminokwasy i/lub zioła.

PT – 5
Suplementos nutritivos em estado líquido.

PT – 30
Chá, chá de beber gelado e bebidas à base de chá prontos a consumir;Chá de aromas pronto a beber, Chá gelado e bebidas à base de chá.

PT – 32
Bebidas não alcoólicas,Nomeadamente bebidas energéticas, bebidas energéticas aromatizadas com chá, bebidas energéticas aromatizadas com sumo, Bebidas isotónicas,E bebidas de sumos de fruta com teor igual ou inferior a 50% por volume;Todas as bebidas atrás referidas enriquecidas com vitaminas, minerais, nutrientes, aminoácidos e/ou ervas.

RO – 5
Suplimente nutritive în formă lichidă.

RO – 30

No 010346724                    2/3

Identification Code: C44FOFCNT2B7R6XTR7DB67J4ZM

Copia Certificada / Beglaubigte Abschrift/ Certified Copy / Copie Certifiée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration
certificate of community trade mark / Certificat d'enregistrement de marque communautaire / Certificato
registrazione di marchio comunitario

OHIM – OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET
TRADE MARKS AND DESIGNS

OAMI - OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR
MARCAS, DIBUJOS Y MODELOS

Ceai gata preparat, ceai rece şi băuturi pe bază de ceai;Ceai
aromat gata-preparat, Ceai cu gheaţă şi băuturi pe bază de
ceai.

RO - 32
Bauturi fara alcool,Respectiv băuturi energizante, băuturi
energizante cu aromă de ceai,băuturi energizante cu aromă
de fructe, Bauturi energizante,Şi băuturi pe bază de sucuri
de fructe, care au un conţinut de suc de 50% sau mai puţin
din volum;Toate cele menţionate anterior fiind îmbunătăţite
cu vitamine, minerale, substanţe nutritive, aminoacizi şi/sau
plante.

SK - 5
Výživové doplnky v tekutej podobe.

SK - 30
Hotové čaje, ľadové čaje a čajové nápoje;Hotové ochutené
čaje, Ľadový čaj a nápoje na báze čaju.

SK - 32
Nealkoholické nápoje,Menovite energetické nápoje, energe-
tické nápoje ochutené s čajom, energetické nápoje ochutené
so šťavou, Izotonické nápoje,A ovocné šťavy s obsahom
šťavy menej ako 50%;Všetky vyššie uvedené výrobky sú
obohatené o vitamíny, minerály, živiny, aminokyseliny a/alebo
bylinky.

SL - 5
Prehranska dopolnila v obliki tekočin.

SL - 30
Čaj, ledeni čaj in pijače na osnovi čaja, pripravljeni za
uživanje;Aromatiziran čaj pripravljen za pitje, Ledeni čaj in
pijače na osnovi čaja.

SL - 32
Dealkoholizirane pijače,In sicer energijski napitki, energijske
pijače, aromatizirane s čajem, energijske pijače, aromatizirane
s sokom, izotonične pijače,In napitki s sadnim sokom s 50 %
vsebnostjo soka ali manj;Vse omenjene pijače so obogatene
z vitamini, minerali, hranili, aminokislinami in/ali zelišči.

FI - 5
Nestemäiset ravintolisäaineet.

FI - 30
Juotavaksi valmiit teet, jääteet ja teepohjaiset juomat;Valmiit
maustetut teet juotavaksi, Jäätee ja teepohjaiset juomat.

FI - 32
Alkoholittomat juomat,Nimittäin energiajuomat, teellä mauste-
tut energiajuomat, mehulla maustetut energiajuomat, Urheilu-
juomat,Ja hedelmämehujuomat, joiden mehupitoisuus on
enintään 50 %;Kaikkiin edellä mainittuihin on lisätty vitamiineja,
kivennäisaineita, ravintoaineita, aminohappoja ja/tai yrttejä.

SV - 5
Näringstillskott i vätskeform.

SV - 30
Drickfärdigt te, iste och tebaserade drycker;Drickfärdigt
smaksatt te, iste och tebaserade drycker.

SV - 32
Icke-alkoholhaltiga drycker,Nämligen, energidrycker, energid-
rinkar smaksatta med te, energidrinkar smaksatta med juice,
Sportdrycker,Och fruktjuicedrycker med ett juicevolyminnehåll
om 50% eller mindre;Allt det föregående förstärkt med vitami-
ner, mineraler, näringsämnen, aminosyror och/eller örter.

No 010346724

3/3

Identification Code: C44F0FGNT2B7R6XTR7DB67J4ZM



**OAMI** OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR (MARCAS, DIBUJOS Y MODELOS)
**HABM** HARMONISIERUNGSAMT FÜR DEN BINNENMARKT (MARKEN, MUSTER UND MODELLE).
**OHIM** OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET (TRADE MARKS AND DESIGNS)
**OHMI** OFFICE DE L'HARMONISATION DANS LE MARCHÉ INTÉRIEUR (MARQUES, DESSINS ET MODÈLES)
**UAMI** UFFICIO PER L'ARMONIZZAZIONE NEL MERCATO INTERNO (MARCHI, DISEGNI E MODELLI)

D113

## Copia Certificada ⋄ Beglaubigte Abschrift ⋄ Certified Copy
## Copie Certifiée ⋄ Copia Autenticata

---

*Código de identificación ⋄ Identifizierungscode ⋄ Identification code ⋄*
*Code d'identification ⋄ Codice di identificazione: IHH6SOXO2H63BMEQLHJKUHNADY*

---

Por la presente se certifica que el documento que se adjunta es una copia conforme del certificado de registro para la marca comunitaria cuyo número y fecha de registro aparecen a continuación.
El documento original puede ser consultado en el enlace de la OAMI http://oami.europa.eu introduciendo el código de identificación indicado más arriba.

*Hiermit wird bestätigt, daß die Abschrift, die diesem Beleg beigeheftet ist, eine genaue Abschrift der Eintragungsurkunde ist, die für die Gemeinschaftsmarke mit der nachstehenden Eintragungsnummer und dem nachstehenden Eintragungstag ausgestellt wurde.*
*Das Originaldokument kann mittels Eingabe eines Identifizierungscode bei folgender Webadresse http://oami.europa.eu eingesehen werden.*

This is to certify that the attached document is an exact copy of the certificate of registration issued for the Community trade mark bearing the registration number and date indicated below.
The original document can be consulted introducing the identification code indicated above at the following OHIM web page link http://oami.europa.eu.

*Par la présente, il est certifié que le document annexé est une copie conforme du certificat d'enregistrement délivré pour la marque communautaire portant le numéro et la date d'enregistrement qui figurent ci-après.*
*Le document original peut être consulté sur le site web de l'OHMI http://oami.europa.eu en introduisant le code d'identification indiqué ci-dessus.*

Con la presente si certifica che il documento allegato è una copia conforme del certificato di registrazione per il marchio comunitario contrassegnato dal numero e dalla data di registrazione riportati sotto.
Il Documento originale può essere consultato introducendo il codice di identificazione sopra indicato, nel indirizzo http://oami.europa.eu della pagina Web della UAMI.

| Núm./Nr./No/n°/n. | Fecha/Datum/Date/Date/Data |
|---|---|
| **010346741** | **21/03/2012** |

Alicante, 22/05/2012



**Guido Fael**
Departamento de Apoyo a las Operaciones
Hauptabteilung Unterstützung des Kerngeschäfts
Operations Support Department
Département «Soutien aux opérations»
Dipartimento Supporto alle operazioni

9(o

Identification Code: 1HH68OXO2H63HMRQJLHJXHHNADY



Copia Certificada / Beglaubigte Abschrift / Certified Copy / Copie Certifiée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration certificate of community trade mark / Certificat d'enregistrement de marque communautaire / Certificato registrazione di marchio comunitario

Registered / Registrada

No 010346741

MÖNSTER Rehab
REHAB TEA + ENERGY

OHIM – OFFICE FOR HARMONIZATION IN THE
INTERNAL MARKET
TRADE MARKS AND DESIGNS

CERTIFICATE OF REGISTRATION

This Certificate of Registration is hereby issued for the
Community Trade Mark identified below. The
corresponding entries have been recorded in the
Register of Community Trade Marks.

OAMI – OFICINA DE ARMONIZACIÓN DEL
MERCADO INTERIOR
(MARCAS, DIBUJOS Y MODELOS)

CERTIFICADO DE REGISTRO

Se expide el presente Certificado de Registro para la
Marca Comunitaria que se identifica a continuación.
Las menciones y las informaciones relativas a la misma
han sido inscritas en el Registro de Marcas
Comunitarias.

COPY

The President / El Presidente

António Campinos

CTM 010346741          Alicante, 22/05/2012

Page 1 of 4

97

Copia Certificada / Beglaubigte Abschrift/ Certified Copy / Copie Certifiée / Copia Auténticata
Certificado de registro de marca comunitaria / Bintragungsurkunde der Gemeinschaftsmarke / Registration
certificate of community trade mark / Certificat d'enregistrement de marque communautaire / Certificato
registrazione di marchio comunitario

OHIM – OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET
TRADE MARKS AND DESIGNS

OAMI – OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR
MARCAS, DIBUJOS Y MODELOS

| | |
|---|---|
| 210 | 010346741 |
| 220 | 17/10/2011 |
| 400 | 13/12/2011 |
| 151 | 21/03/2012 |
| 450 | 23/03/2012 |
| 186 | 17/10/2021 |
| 541 | M MONSTER REHAB ROJO TEA + ENERGY |
| 521 | 0 |
| 546 | |





| | |
|---|---|
| 531 | 27.5.21 |
| | 27.99.13 |
| 732 | Monster Energy Company |
| | 550 Monica Circle, Suite 201 |
| | Corona, California 92880 |
| | US |
| 740 | BIRD & BIRD LLP |
| | 15 Fetter Lane |
| | London EC4A 1JP |
| | GB |
| 270 | EN ES |
| 511 | BG – 5 |

BG – 5
Хранители добавки в течна форма.

BG – 30
Готови за пиене чай, студен чай, напитки на основата на
чай;Готови за пиене ароматизирани чайове, Студени
чайове и напитки на основата на чай.

BG – 32
Безалкохолни напитки,Енергийни напитки, енергийни
напитки с чай, енергийни напитки със сок, Спортни
питиета,И плодови напитки, имащи 50% съдържание на
сок или по-малко по обем;Всички горепосочени, обогатени
с витамини, минерали, хранителни вещества,
аминокиселини и/или билки.

ES – 5
Complementos nutritivos en forma líquida.

ES – 30
Té listo para tomar, té helado y bebidas con una base de
té;Té aromatizado preparado para su consumo, Té helado y
bebidas a base de té.

ES – 32
Bebidas desalcoholizadas,En concreto bebidas energéticas,
bebidas energéticas con sabor a té, bebidas energéticas con
sabor a zumo, Bebidas para el deporte,Y bebidas de zumos
de frutas con un contenido de zumo del 50% o menos por
volumen;Todos las mencionados están enriquecidos con vi-
taminas, minerales, nutrientes, aminoácidos o hierbas.

CS – 5
Nutriční doplňky v tekuté formě.

CS – 30
Hotové čaje, ledové čaje a nápoje na bázi čaje;Ochucené
čaje k přímé spotřebě, Ledový čaj a nápoje na bázi čaje.

CS – 32
Nealkoholické nápoje,Energetické nápoje, energetické nápoje
s příchutí čaje, energetické nápoje s příchutí ovocné šťávy,
Nápoje pro sport,A ovocné šťávy s 50% nebo nižším obsahem
ovoce;Vše výše uvedené obohacené vitaminy, minerály, výži-
vnými látkami, aminokyselinami anebo bylinami.

DA – 5
Ernæringstilskud i flydende form.

DA – 30
Drikkeklar te, iste og tebaserede drikke;Drikkeklar te med
smagsstoffer, Iste og drikke fremstillet på basis af te.

DA – 32
Ikke-alkoholholdige drikke,Nemlig energidrikke, energidrikke
med smag af te, energidrikke med smag af saft, Sportsdrik-
ke,Drikke med frugtsaft, som har et frugtindhold på 50% eller
eller mindre i forhold til volumen;Alle førnævnte beriget med
vitaminer, mineraler, næringsstoffer, aminosyrer og/eller urter.

DE – 5
Nahrungsmittelzusätze in flüssiger Form.

DE – 30
Trinkfertiger Tee, Eistee und Teegetränke;Trinkfertiger aroma-
tisierter Tee, Eistee und Teegetränke.

DE – 32
Entalkoholisierte Getränke,Nämlich Energiegetränke, Energie-
getränke mit Teegeschmack, Energiegetränke mit Saftge-
schmack, Sportgetränke,Und Fruchtsaftgetränke mit einem
Saftgehalt von maximal 50%;Alles vorstehend Genannte an-
gereichert mit Vitaminen, Mineralstoffen, Nährstoffen, Amino-
säuren und/oder Kräutern.

ET – 5
Toitainelisandid vedelikuna.

ET – 30
Valmistee, jäätee ja jookidel põhinev tee;Kasutusvalmis
maitsestatud tee, Jäätee ja teepõhised joogid.

ET – 32
Alkoholivabad joogid,Nimelt energiajoogid, teega maitsestatud
energiajoogid, mahlaga maitsestatud energiajoogid, Isotooni-
lised joogid,Ja kuni 50% mahuprotsendise mahlasisaldusega
puuviljajoogid;Kõik eelnimetatud tooted on vitamiinide, mine-
raalide, toitainete, aminohapete ja/või maitsetaimedega
rikastatud.

EL – 5
Θρεπτικά συμπληρώματα σε υγρή μορφή.

EL – 30
Έτοιμο τσάι, παγωμένο τσάι και ροφήματα με βάση το
τσάι;Έτοιμο τσάι σε διάφορες γεύσεις, Κρύο τσάι και ποτά με
βάση το τσάι.

EL – 32
Ποτά χωρίς οινόπνευμα,Συγκεκριμένα ενεργειακά ποτά,
ενεργειακά ποτά με γεύση τσαγιού, ενεργειακά ποτά με γεύση
χυμού, Ποτά για αθλητές,Και ποτά από χυμούς φρούτων με
περιεκτικότητα σε χυμό 50% ή λιγότερο κατ' όγκο·Στο σύνολό

No 010346741                                        1/3

COPY

CTM 010346741

Alicante,
22/05/2012

Identification Code: IHH6SOXO2H63BMEQLHJKUENXADY

Copia Certificada / Beglaubigte Abschrift / Certified Copy / Copie Certifiée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration
certificate of community trade mark / Certificat d'enregistrement de marque communautaire / Certificato
registrazione di marchio comunitario



OHIM – OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET
TRADE MARKS AND DESIGNS

OAMI - OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR
MARCAS, DIBUJOS Y MODELOS

τους τα προαναφερόμενα εμπλουτισμένα με βιταμίνες, μεταλλικά στοιχεία, θρεπτικά στοιχεία, αμινοξέα καί/ή βότανα.

**EN - 5**
Nutritional supplements in liquid form.

**EN - 30**
Ready to drink tea, iced tea and tea based beverages; ready to drink flavoured tea, iced tea and tea based beverages.

**EN - 32**
Non-alcoholic beverages, namely energy drinks, energy drinks flavoured with tea, energy drinks flavoured with juice, sports drinks, and fruit juice drinks having a content of 50% or less by volume; all of the foregoing enhanced with vitamins, minerals, nutrients, amino acids and/or herbs.

**FR - 5**
Compléments nutritionnels sous forme liquide.

**FR - 30**
Thé instantané, thé glacé et boissons à base de thé;Thé aromatisé instantané, Thé glacé et boissons à base de thé.

**FR - 32**
Boissons désalcoolisées,À savoir boissons énergétiques, boissons énergétiques aromatisées au thé, boissons énergétiques aromatisées au jus, Boissons pour sportifs,Et boissons dont la teneur en jus de fruits est égale ou inférieure à 50 % par volume;Tous les produits précités enrichis en vitamines, minéraux, nutriments, acides aminés et/ou herbes.

**IT - 5**
Integratori nutrizionali in forma liquida.

**IT - 30**
Tè, tè freddo e bevande a base di tè pronti da bere;Tè aromatizzato pronto da bere, Tè freddo e bevande a base di tè.

**IT - 32**
Bevande prive d'alcool,Ovvero bevande energetiche, bevande energetiche aromatizzate con tè, bevande energetiche aromatizzate con frutta, Bevande per lo sport,E bevande a base di succhi di frutta con contenuto di succo del 50% o inferiore;Tutti i suddetti prodotti arricchiti di vitamine, minerali, sostanze nutrienti, amminoacidi e/o erbe.

**LV - 5**
Uztura bagātinātāji šķidrā veidā.

**LV - 30**
Dzeršanai gatava tēja, ledus tēja un no tējas pagatavojami dzērieni;Dzeršanai gatava aromatizēta tēja, Ledus tēja un no kafijas gatavoti dzērieni.

**LV - 32**
Bezalkoholiskie dzērieni,Proti, enerģijas dzērieni, enerģijas dzērieni ar tējas garšu, enerģijas dzērieni ar sulas garšu, Izotoniskie dzērieni,Un augļu sulu dzērieni, kurās sulas saturs ir 50% vai mazāks;Vis iepriekš minētais ir bagātināts ar vitamīniem, minerālvielām, barojošām vielām, aminoskābēm un/vai augiem.

**LT - 5**
Skysti mitybos papildai.

**LT - 30**
Paruošta arbata, šalta arbata ir arbatos gėrimai;Paruošti vartoti aromatizuoti arbatos gėrimai, Arbata su ledu ir arbatos gėrimai.

**LT - 32**
Gaivieji gėrimai,Būtent energetiniai gėrimai, aromatizuoti arbatos gėrimai, energetiniai sultų garšu gėrimai, Izotoniniai (netonizuojantys) gėrimai,Ir vaisių sultų gėrimai, kurių 50% ar mažiau sudaro sultys;Visi išvardinti produktai praturtinti vitaminais, mineralais, maistinėmis medžiagomis, amino rūgštimis ir (arba) valstažolėmis.

**HU - 5**
Táplálékkiegészítők folyékony formában.

**HU - 30**
Készen kapható tea, jeges tea és teaalapú italok;Azonnal fogyasztható ízesített tea, Jeges tea és teaalapú italok.

**HU - 32**
Alkoholmentes italok,Nevezetesen energiaitalok, teával ízesített energiaitalok, gyümölcslével ízesített energiaitalok, izotóniás italok,És 50 vagy annál alacsonyabb térfogatszázalék gyümölcstartalmú gyümölcslevek;Az összes fent említett vitaminokkal, ásványi anyagokkal, tápanyagokkal, aminosavakkal és/vagy gyógynövényekkel dúsított.

**MT - 5**
Supplimenti tan-nutrizzjoni f'forma likwida.

**MT - 30**
Te, te klesah u xarbiet ibbażati fuq it-te lesti ghax-xorb;Te bit-togħma lest ghax-xorb, Tè klesah u xorb ibbażat fuq it-tè.

**MT - 32**
Xorb mhux alkoholiku,Jiġifieri xarbiet tal-enerġija, xarbiet tal-enerġija bit-togħma bit-te, xarbiet tal-enerġija bit-togħma bil-meraq tal-frott, Xorb isotoniku,U xarbiet tal-meraq tal-frott b'kontenut ta' 50% jew anqas fil-volum;Dak kollu msemmi hawn qabel huwa msaħħaħ b'vitamini, minerali, nutrimenti, aċidi amminiċi u/jew ħwawar.

**NL - 5**
Voedingssupplementen in vloeibare vorm.

**NL - 30**
Kant-en-klare thee, ijsthee en dranken op theebasis;Kant-en-klare thee met aroma, Gekoelde thee en dranken op theebasis.

**NL - 32**
Alcoholvrije dranken,Te weten energiedranken, energiedranken met theesmaak, energiedranken met sapsmaak, Sportdranken,En vruchtensapdranken met een volumegehalte van 50% of minder;Alle voornoemde waren verrijkt met vitaminen, mineralen, nutriënten, aminozuren en/of kruiden.

**PL - 5**
Suplementy odżywcze w formie płynnej.

**PL - 30**
Gotowa do picia herbata, mrożona herbata i napoje na bazie herbaty;Gotowa do picia herbata smakowa, Mrożona herbata i napoje na bazie herbaty.

**PL - 32**
Napoje bezalkoholowe,Mianowicie napoje energetyczne, napoje energetyczne o smaku herbaty, napoje energetyczne o smaku soku, Napoje izotoniczne,Oraz napoje z sokiem owocowym ≤ 50% zawartości soku lub mniej;Wszystkie wyżej wymienione wzbogacone w witaminy, minerały, substancje odżywcze, aminokwasy i/lub zioła.

**PT - 5**
Suplementos nutritivos em estado líquido.

**PT - 30**
Chá, chá de beber gelado e bebidas à base de chá-prontos a consumir;Chá de aromas pronto a beber, Chá gelado e bebidas à base de chá.

**PT - 32**
Bebidas não alcoólicas,Nomeadamente bebidas energéticas, bebidas energéticas aromatizadas com chá, bebidas energéticas aromatizadas com sumo, Bebidas Isotónicas,E bebidas de sumos de fruta com teor igual ou inferior a 50% por volume;Todas as bebidas atrás referidas enriquecidas com vitaminas, minerais, nutrientes, aminoácidos e/ou ervas.

**RO - 5**
Suplimente nutritive în formă lichidă.

**RO - ..**

No 010346741

Identification Code: IXH6SOXO2H63DMSQLHJXUENRADY


Copia Certificada / Beglaubigte Abschrift/ Certified Copy / Copie Certifiée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration
certificate of community trade mark / Certificat d'enregistrement de marque communautaire / Certificato
registrazione di marchio comunitario

OHIM – OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET
TRADE MARKS AND DESIGNS

OAMI - OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR
MARCAS, DIBUJOS Y MODELOS

Ceai gata preparat, ceai rece şi băuturi pe bază de ceai;Ceai aromat gata-preparat, Ceai cu gheaţă şi băuturi pe bază de ceai.

RO - 32
Bauturi fara alcool,Respectiv băuturi energizante, băuturi energizante cu aromă de ceai,băuturi energizante cu aromă de fructe, Bauturi energizante,Şi băuturi pe bază de sucuri de fructe, care au un conţinut de suc de 50% sau mai puţin din volum;Toate cele menţionate anterior fiind îmbunătăţite cu vitamine, minerale, substanţe nutritive, aminoacizi şi/sau plante.

SK - 5
Výživové doplnky v tekutej podobe.

SK - 30
Hotové čaje, ľadové čaje a čajové nápoje;Hotové ochutené čaje, ľadový čaj a nápoje na báze čaju.

SK - 32
Nealkoholické nápoje,Menovite energetické nápoje, energetické nápoje ochutené s čajom, energetické nápoje ochutené so šťavou, izotonické nápoje,A ovocné šťavy s obsahom šťavy menej ako 50%;Všetky vyššie uvedené výrobky sú obohatené o vitamíny, minerály, živiny, aminokyseliny a/alebo bylinky.

SL - 5
Prehranska dopolnila v obliki tekočin.

SL - 30
Čaj, ledeni čaj in pijače na osnovi čaja, pripravljeni za uživanje;Aromatiziran čaj pripravljen za pitje, Ledeni čaj in pijače na osnovi čaja.

SL - 32
Dealkoholizirane pijače,In sicer energijski napitki, energijske pijače, aromatizirane s čajem, energijske pijače, aromatizirane s sokom, izotonične pijače,In napitki s sadnim sokom s 50 % vsebnostjo soka ali manj;Vse omenjene pijače so obogatene z vitamini, minerali, hranili, aminokislinami in/ali zelišči.

FI - 5
Nestemäiset ravintolisäaineet.

FI - 30
Juotavaksi valmiit teet, jääteet ja teepohjaiset juomat;Valmiit maustetut teet juotavaksi, Jäätee ja teepohjaiset juomat.

FI - 32
Alkoholittomat juomat,Nimittäin energiajuomat, teellä maustetut energiajuomat, mehulla maustetut energiajuomat, Urheilujuomat,Ja hedelmämehujuomat, joiden mehupitoisuus on enintään 50 %;Kaikkiin edellä mainituihin on lisätty vitamiineja, kivennäisaineita, ravintoaineita, aminohappoja ja/tai yrttejä.

SV - 5
Näringstillskott i vätskeform.

SV - 30
Drickfärdigt te, iste och tebaserade drycker;Drickfärdigt smaksatt te, iste och tebaserade drycker.

SV - 32
Icke-alkoholhaltiga drycker,Nämligen, energidrycker, energidrinkar smaksatta med te, energidrinkar smaksatta med juice, Sportdrycker,Och fruktjuicedrycker med att juicevolyminnehält om 50% eller mindre;Allt det föregående förstärkt med vitaminer, mineraler, näringsämnen, aminosyror och/eller örter.

No 010346741

3/3

Identification Code: IHH6SOXO2H63BMEQLHJXUHNADY



OAMI   OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR (MARCAS, DIBUJOS Y MODELOS)
HABM   HARMONISIERUNGSAMT FÜR DEN BINNENMARKT (MARKEN, MUSTER UND MODELLE)
OHIM   OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET (TRADE MARKS AND DESIGNS)
OHMI   OFFICE DE L'HARMONISATION DANS LE MARCHÉ INTÉRIEUR (MARQUES, DESSINS ET MODÈLES)
UAMI   UFFICIO PER L'ARMONIZZAZIONE NEL MERCATO INTERNO (MARCHI, DISEGNI E MODELLI)

D113

## Copia Certificada   ✦   Beglaubigte Abschrift   ✦   Certified Copy
## Copie Certifiée   ✦   Copia Autenticata

---

*Código de identificación ✦ Identifizierungscode ✦ Identification code ✦*
*Code d'identification ✦ Codice di identificazione: V3WVDF64UN7YP35NE7KBRQLDP4*

---

Por la presente se certifica que el documento que se adjunta es una copia conforme del certificado de registro para la marca comunitaria cuyo número y fecha de registro aparecen a continuación. El documento original puede ser consultado en el enlace de la OAMI. http://oami.europa.eu introduciendo el código de identificación indicado más arriba.

*Hiermit wird bestätigt, daß die Abschrift, die diesem Beleg beigeheftet ist, eine genaue Abschrift der Eintragungsurkunde ist, die für die Gemeinschaftsmarke mit der nachstehenden Eintragungsnummer und dem nachstehenden Eintragungstag ausgestellt wurde.*
*Das Originaldokument kann mittels Eingabe eines Identifizierungscode bei folgender Webadresse http://oami.europa.eu eingesehen werden.*

This is to certify that the attached document is an exact copy of the certificate of registration issued for the Community trade mark bearing the registration number and date indicated below. The original document can be consulted introducing the identification code indicated above at the following OHIM web page link http://oami.europa.eu.

*Par la présente, il est certifié que le document annexé est une copie conforme du certificat d'enregistrement délivré pour la marque communautaire portant le numéro et la date d'enregistrement qui figurent ci-après.*
*Le document original peut être consulté sur le site web de l'OHMI http://oami.europa.eu en introduisant le code d'identification indiqué ci-dessus.*

Con la presente si certifica che il documento allegato è una copia conforme del certificato di registrazione per il marchio comunitario contrassegnato dal numero e dalla data di registrazione riportati sotto.
Il Documento originale può essere consultato introducendo il codice di identificazione sopra indicato, nel indirizzo http://oami.europa.eu della pagina Web della UAMI.

| Núm./Nr./No/n°/n. | Fecha/Datum/Date/Date/Data |
|---|---|
| **010346757** | **21/03/2012** |

Alicante, 22/05/2012

Guido Fael
Departamento de Apoyo a las Operaciones
Hauptabteilung Unterstützung des Kerngeschäfts
Operations Support Department
Département «Soutien aux opérations»
Dipartimento Supporto alle operazioni

101

Identification Code: V3WVDPG4DN7YP35NET8DROLDP4



Copia Certificada / Beglaubigte Abschrift/ Certified Copy / Copie Certifée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration certificate of community trade mark / Certificat
d'enregistrement de marque communautaire / Certificato registrazione di marchio comunitario

No 010346757

**OHIM – OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET**
TRADE MARKS AND DESIGNS

**CERTIFICATE OF REGISTRATION**

This Certificate of Registration is hereby issued for the
Community Trade Mark identified below. The
corresponding entries have been recorded in the
Register of Community Trade Marks.

**OAMI – OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR**
MARCAS, DIBUJOS Y MODELOS

**CERTIFICADO DE REGISTRO**

Se expide el presente Certificado de Registro para la
Marca Comunitaria que se identifica a continuación.
Las menciones y las informaciones pertinentes
han sido inscritas en el Registro de Marcas
Comunitarias.

The President / El Presidente

*Antonio Campinos*

Alicante, 22/05/2012

**COPY**

CTM 010346757

Page 1 of 4

102

Copia Certificada / Beglaubigte Abschrift/ Certified Copy / Copie Certifiée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration
certificate of community trade mark / Certificat d'enregistrement de marque communautaire / Certificato
registrazione di marchio comunitario

OHIM—OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET
TRADE MARKS AND DESIGNS

OAMI - OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR
MARCAS, DIBUJOS Y MODELOS

210   010346757
220   17/10/2011
400   13/12/2011

151   21/03/2012
450   23/03/2012

186   17/10/2021
541   M MONSTER REHAB TEA + LEMONADE + ENERGY
521   0
546



531   27.5.21
        27.99.13
732   Monster Energy Company
        550 Monica Circle, Suite 201
        Corona, California 92880
        US

740   BIRD & BIRD LLP
        15 Fetter Lane
        London EC4A 1JP
        GB

270   EN ES
511   BG - 5
        Хранителни добавки в течна форма.
        BG - 30
        Готови за пиене чай, студен чай, напитки на основата на
        чай;Готови за пиене ароматизирани чайове, Студени
        чайове и напитки на основата на чай.
        BG - 32
        Безалкохолни напитки,Енергийни напитки, енергийни
        напитки с чай, енергийни напитки със сок, Спортни
        питиета,И плодови напитки, имащи 50% съдържание на
        сок или по-малко по обем;Всички горепосочени, обогатени
        с витамини, минерали, хранителни вещества,
        аминокиселини и/или билки.
        ES - 5
        Complementos nutritivos en forma líquida.
        ES - 30
        Té listo para tomar, té helado y bebidas con una base de
        té;Té aromatizado preparado para su consumo, Té helado y
        bebidas a base de té.

ES - 32
Bebidas desalcoholizadas,En concreto bebidas energéticas,
bebidas energéticas con sabor a té, bebidas energéticas con
sabor a zumo, Bebidas para el deporte,Y bebidas de zumos
de frutas con un contenido de zumo del 50% o menos por
volumen;Todos los mencionados están enriquecidos con vi-
taminas, minerales, nutrientes, aminoácidos o hierbas.
CS - 5
Nutriční doplňky v tekuté formě.
CS - 30
Hotové čaje, ledové čaje a nápoje na bázi čaje;Ochucené
čaje k přímé spotřebě, Ledový čaj a nápoje na bázi čaje.
CS - 32
Nealkoholické nápoje,Energetické nápoje, energetické nápoje
s příchutí čaje, energetické nápoje s příchutí ovocné šťávy,
Nápoje pro sport,A ovocné šťávy s 50% nebo nižším obsahem
ovoce;Vše výše uvedené obohacené vitaminy, minerály, výži-
vnými látkami, aminokyselinami anebo bylinami.
DA - 5
Ernæringstilskud i flydende form.
DA - 30
Drikkeklar te, iste og tebaserede drikke;Drikkeklar te med
smagsstoffer, iste og drikke fremstillet på basis af te.
DA - 32
Ikke-alkoholholdige drikke,Nemlig energidrikke, energidrikke
med smag af te, energidrikke med smag af saft, Sportsdrik-
ke,Drikke med frugtsaft, som har et frugtindhold på 50% %
eller mindre i forhold til volumen;Alle førnævnte beriget med
vitaminer, mineraler, næringsstoffer, aminosyrer og/eller urter.
DE - 5
Nahrungsmittelzusätze in flüssiger Form.
DE - 30
Trinkfertiger Tee, Eistee und Teegetränke;Trinkfertiger aroma-
tisierter Tee, Eistee und Teegetränke.
DE - 32
Entalkoholisierte Getränke,Nämlich Energiegetränke, Energie-
getränke mit Teegeschmack, Energiegetränke mit Saftge-
schmack, Sportgetränke,Und Fruchtsaftgetränke mit einem
Saftgehalt von maximal 50%;Alles vorstehend Genannte an-
gereichert mit Vitaminen, Mineralstoffen, Nährstoffen, Amino-
säuren und/oder Kräutern.
ET - 5
Toitainelisandid vedelikona.
ET - 30
Valmistee, jäätee ja jookidel põhinev tee;Kasutusvalmis
maitsestatud tee, jäätee ja teepõhised joogid.
ET - 32
Alkoholivabad joogid,Nimelt energiajoogid, teega maitsestatud
energiajoogid, mahlaga maitsestatud energiajoogid, Isotooni-
lised joogid,Ja kuni 50% mahuprotsendiga mahlasisaldusega
puuviljajoogid;Kõik eelnimetatud tooted on vitamiinide, mine-
raalide, toitainete, aminohapete ja/või maitsetaimedega
rikastatud.
EL - 5
Θρεπτικά συμπληρώματα σε υγρή μορφή.
EL - 30
Έτοιμο τσάι; παγωμένο τσάι και ροφήματα με βάση το
τσάι·Έτοιμο τσάι σε διάφορες γεύσεις, Κρύο τσάι και ποτά με
βάση το τσάι.
EL - 32
Ποτά χωρίς οινόπνευμα,Συγκεκριμένα ενεργειακά ποτά,
εργογόνα ποτά με γεύση τσαγιού, εργογόνα ποτά με γεύση
χυμού, Ποτά για αθλητές,Και ποτά από χυμούς φρούτων με
περιεκτικότητα σε χυμό 50% ή λιγότερο κατ' όγκο·Στο σύνολό

No 010346757                                                                        1/3

Identification Code: V3WVDF64UN7YP35N8Y2BRQ1DP4

Copia Certificada / Beglaubigte Abschrift / Certified Copy / Copie Certifiée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration
certificate of community trade mark / Certificat d'enregistrement de marque communautaire / Certificato
registrazione di marchio comunitario

OHIM – OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET
TRADE MARKS AND DESIGNS

OAMI – OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR
MARCAS, DIBUJOS Y MODELOS

τους τα προαναφερόμενα ενισχυμένα με βιταμίνες, μεταλλικά
στοιχεία, θρεπτικά στοιχεία, αμινοξέα καθή βότανα.

EN – 5
Nutritional supplements in liquid form.

EN – 30
Ready to drink tea, iced tea and tea based beverages; ready
to drink flavoured tea, iced tea and tea based beverages.

EN – 32
Non-alcoholic beverages, namely energy drinks, energy drinks
flavoured with tea, energy drinks flavoured with juice, sports
drinks, and fruit juice drinks having a content of 50% or less
by volume; all of the foregoing enhanced with vitamins, min-
erals, nutrients, amino acids and/or herbs.

FR – 5
Compléments nutritionnels sous forme liquide.

FR – 30
Thé instantané, thé glacé et boissons à base de thé;Thé
aromatisé instantané, Thé glacé et boissons à base de thé.

FR – 32
Boissons désalcoolisées,À savoir boissons énergétiques,
boissons énergétiques aromatisées au thé, boissons éner-
gétiques aromatisées au jus, Boissons pour sportifs,Et bois-
sons dont la teneur en jus de fruits est égale ou inférieure à
50 % par volume;Tous les produits précités enrichis en
vitamines, minéraux, nutriments, acides aminés et/ou herbes.

IT – 5
Integratori nutrizionali in forma liquida.

IT – 30
Tè, tè freddo e bevande a base di tè pronti da bere;Tè aroma-
tizzato pronto da bere, Tè freddo e bevande a base di tè.

IT – 32
Bevande prive d'alcool,Ovvero bevande energetiche, bevande
energetiche aromatizzate con tè, bevande energetiche aroma-
tizzate con frutta, Bevande per lo sport,E bevande a base di
succhi di frutta con contenuto di succo del 50% o inferiore;Tutti
i suddetti prodotti arricchiti di vitamine, minerali, sostanze
nutrienti, amminoacidi e/o erbe.

LV – 5
Uztura bagātinātāji šķidrā veidā.

LV – 30
Dzeršanai gatava tēja, ledus tēja un no tējas pagatavojami
dzērieni;Dzeršanai gatava aromatizēta tēja, Ledus tēja un no
kafijas gatavoti dzērieni.

LV – 32
Bezalkoholiskie dzērieni,Proti, enerģijas dzērieni, enerģijas
dzērieni ar tējas garšu, enerģijas dzērieni ar sulas garšu,
Izotoniskie dzērieni,Un augļu sulu dzērieni, kurās sulas saturs
ir 50% vai mazāks;Viss iepriekš-minētais ir bagātināts ar vita-
mīniem, minerālvielām, barojošām vielām, aminoskābēm
un/vai augiem.

LT – 5
Skysti mitybos papildai.

LT – 30
Paruošta arbata, šalta arbata ir arbatos gėrimai;Paruošti var-
toti aromatizuoti arbatos gėrimai, Arbata su ledu ir arbatos
gėrimai.

LT – 32
Gaivieji gėrimai,Būtent energetiniai gėrimai, aromatizuoti ar-
batos gėrimai, energetiniai sultų gėrimai, Izotoniniai (netoni-
zuojantys) gėrimai,Ir vaisų sulčių gėrimai, kurių 50% ar mažai
sudaro sultys;Visi išvardinti produktai praturtinti vitaminais,
mineralais, maistinėmis medžiagomis, amino rūgštimis ir (arba)
vaistažolėmis.

HU – 5
Táplálékkiegészítők folyékony formában.

HU – 30
Készen kapható tea, jeges tea és teaalapú italok;Azonnal fo-
gyasztható izesített tea, Jeges tea és teaalapú italok.

HU – 32
Alkoholmentes italok,Nevezetesen energiaitalok, teával ízes-
ített energiaitalok, gyümölcsével ízesített energiaitalok, Izot-
óniás italok,És 50 vagy annál alacsonyabb térfogatszázalék
gyümölcstartalmú gyümölcslevek;Az összes fent említett
vitaminokkal, ásványi anyagokkal, tápanyagokkal, aminosav-
akkal és/vagy gyógynövényekkel dúsított.

MT – 5
Supplimenti tan-nutrizzjoni f'forma likwida.

MT – 30
Te, te kiesah u xarbiet ibbażati fuq it-te lesti għax-xorb;Te bit-
togħma lest għax-xorb, Te kiesah u xorb ibbażat fuq it-te.

MT – 32
Xorb mhux alkoħoliku,Jiġifieri xarbiet tal-enerġija, xarbiet tal-
enerġija bit-togħma bit-te, xarbiet tal-enerġija bit-togħma bil-
meraq tal-frott, Xorb Isotoniku,U xarbiet tal-meraq tal-frott
b'kontenut ta' 50% jew anqas til-volum;Dak kollu msemmi
hawn qabel huwa msaħħaħ b'vitamini, minerali, nutrimenti,
aċidi amminiċi u/jew ħwawar.

NL – 5
Voedingssupplementen in vloeibare vorm.

NL – 30
Kant-en-klare thee, ijsthee en dranken op theebasis;Kant-en-
klare thee met aroma, Gekoelde thee en dranken op theeba-
sis.

NL – 32
Alcoholvrije dranken,Te weten energiedranken, energiedran-
ken met theesmaak, energiedranken met sapsmaak, Sport-
dranken,En vruchtensapdranken met een volumegehalte van
50% of minder;Alle voornoemde waren verrijkt met vitaminen,
mineralen, nutriënten, aminozuren en/of kruiden.

PL – 5
Suplementy odżywcze w formie płynnej.

PL – 30
Gotowa do picia herbata, mrożona herbata i napoje na bazie
herbaty;Gotowa do picia herbata smakowa, Mrożona herbata
i napoje na bazie herbaty.

PL – 32
Napoje bezalkoholowe,Mianowicie napoje energetyczne, na-
poje energetyczne o smaku herbaty, napoje energetyczne o
smaku soku, Napoje izotoniczne,Oraz napoje z owoców so-
cowym z 50% zawartością soku lub mniej;Wszystkie wyżej
wymienione wzbogacone w witaminy, minerały, substancje
odżywcze, aminokwasy i/lub zioła.

PT – 5
Suplementos nutritivos em estado líquido.

PT – 30
Chá, chá de beber gelado e bebidas à base de chá prontos
a consumir;Chá de aromas pronto a beber, Chá gelado e
bebidas à base de chá.

PT – 32
Bebidas não alcoólicas,Nomeadamente bebidas energéticas,
bebidas energéticas aromatizadas com chá, bebidas energé-
ticas aromatizadas com sumo, Bebidas isotónicas,E bebidas
de sumos de fruta com teor igual ou inferior a 50% por volu-
me;Todas as bebidas atrás referidas enriquecidas com vita-
minas, minerais, nutrientes, aminoácidos e/ou ervas.

RO – 5
Suplimente nutritive în formă lichidă.

RO – 30

COPY

Alicante,
22/05/2012

Identification Code: V3WVDF64UN7XF35NE7KBRQLDP4



Copia Certificada / Beglaubigte Abschrift/ Certified Copy / Copie Certifiée / Copia Autenticata
Certificado de registro de marca comunitaria / Eintragungsurkunde der Gemeinschaftsmarke / Registration
certificate of community trade mark / Certificat d'enregistrement de marque communautaire / Certificato
registrazione di marchio comunitario

OHIM -- OFFICE FOR HARMONIZATION IN THE INTERNAL MARKET
TRADE MARKS AND DESIGNS

OAMI - OFICINA DE ARMONIZACIÓN DEL MERCADO INTERIOR
MARCAS, DIBUJOS Y MODELOS

Ceal gata preparat, ceal rece şi băuturi pe bază de ceai;Ceai
aromat gata-preparat, Ceai cu gheaţă şi băuturi pe bază de
ceai.

RO - 32
Bauturi fara alcool,Respectiv băuturi energizante, băuturi
energizante cu aromă de ceai,băuturi energizante cu aromă
de fructe, Bauturi energizante,Şi băuturi pe bază de sucuri
de fructe, care au un conţinut de suc de 50% sau mai puţin
din volum;Toate cele menţionate anterior fiind îmbunătăţite
cu vitamine, minerale, substanţe nutritive, aminoacizi şi/sau
plante.

SK - 5
Výživové doplnky v tekutej podobe.

SK - 30
Hotové čaje, ľadové čaje a čajové nápoje;Hotové ochutené
čaje, Ľadový čaj a nápoje na bázo čaju.

SK - 32
Nealkoholické nápoje,Menovite energetické nápoje, energe-
tické nápoje ochutené s čajom, energetické nápoje ochutené
so šťavou, izotonické nápoje,A ovocné šťavy s obsahom
šťavy menej ako 50%;Všetky vyššie uvedené výrobky sú
obohatené o vitamíny, minerály, živiny, aminokyseliny a/alebo
bylinky.

SL - 5
Prehranska dopolnila v obliki tekočin.

SL - 30
Čaj, ledeni čaj in pijače na osnovi čaja, pripravljeni za
uživanje;Aromatiziran čaj pripravljen za pitje, Ledeni čaj in
pijače na osnovi čaja.

SL - 32
Dealkoholizirane pijače,In sicer energijski napitki, energijske
pijače, aromatizirane s čajem, energijske pijače, aromatizirane
s sokom, izotonične pijače,In napitki s sadnim sokom s 50 %
vsebnostjo soka ali manj;Vse omenjene pijače so obogatene
z vitamini, minerali, hranili, aminokislinami in/ali zelišči.

FI - 5
Nestemäiset ravintolisäaineet.

FI - 30
Juotavaksi valmiit teet, jääteet ja teepohjaiset juomat;Valmiit
maustetut teet juotavaksi, Jäätee ja teepohjaiset juomat.

FI - 32
Alkoholittomat juomat,Nimittäin energiajuomat, teellä mauste-
tut energiajuomat, mehulla maustetut energiajuomat, Urheilu-
juomat,Ja hedelmämehujuomat, joiden mehupitoisuus on
enintään 50 %;Kaikkiin edellä mainittuihin on lisätty vitamiineja,
kivennäisaineita, ravintoaineita, aminohappoja ja/tai yrttejä.

SV - 5
Näringstillskott i vätskeform.

SV - 30
Drickfärdigt te, iste och tebaserade drycker;Drickfärdigt
smaksatt te, iste och tebaserade drycker.

SV - 32
Icke-alkoholhaltiga drycker,Nämligen, energidrycker, energid-
rinkar smaksatta med te, energidrinkar smaksatta med juice,
Sportdrycker,Och fruktjuicedrycker med ett juicevolyminnehåll
om 50% eller mindre;Allt det föregående förstärkt med vitami-
ner, mineraler, näringsämnen, aminosyror och/eller örter.

No 010346757                                    3/3

Identification Code: V3WVDF64UN7YF35NE7KBRQLDP4

# EXHIBIT C

Hon. Edward A. Panelli (Ret.)
*JAMS, Inc.*
Two Embarcadero Center
Suite 1500
San Francisco, CA 94111
Telephone: 415-774-2653
Fax: 415-982-5287

Arbitrator

## JAMS ARBITRATION

| | |
|---|---|
| Monster Energy Co., | JAMS Ref. No. 1200046164 |
|     Claimant & Cross-Respondent | **FINAL AWARD** |
| vs. | |
| HRHH Hotel/Casino, LLC, et al., | |
|     Respondents & Cross-Complainant. | |

## **INTRODUCTION**

On May 22, 2012, pursuant to section 8(c) of the Binding Letter of Intent that the parties entered into on November 6, 2009, Monster Energy Company ("Monster" or "Claimant") filed a Demand for Arbitration against HRHH Hotel/Casino, LLC and HRHH IP, LLC ("HRHH" or "Hard Rock" or "Respondents"). In its Demand, Monster sought various forms of declaratory relief and brought breach of contract, intentional and negligent interference with contractual relations and prospective economic advantage and unfair business practices claims. HRHH filed its Answer to the Demand and Counterclaim on August 10, 2012. HRHH's counterclaims included breach of contract, breach of covenant of good faith and fair dealing, false advertising and declaratory relief. Section 8(c) of the LOI sets forth detailed procedures for the arbitration, which the parties mutually agreed to modify. As the parties are aware, the arbitration proceeded without strictly following each of the time limitation provisions as well as the discovery limitations set forth in 8(c).

Following the exchange of discovery and resolution of various discovery disputes, the parties submitted their Opening Arbitration Briefs on March 26, 2013. On April 1, 2013, at the Orange County office of JAMS, 500 North State College Blvd., 14th Floor, Orange, CA, the parties commenced a nine-day arbitration hearing, which concluded on April 11, 2013. At the hearing, Monster was represented by counsel, Daniel J. Callahan, Esq., Marc P. Miles, Esq. and Kristy A. Schlesinger, Esq. of Callahan & Blaine, John B. Sganga, Jr., Esq. and Lynda J. Zadra-Symes, Esq. of Knobbe Martens, and Paul J. Dechary, Esq. and Greg Hall, Esq. of Monster Energy Company. Counsel James E. Curry, Esq. and Benjamin O. Aigboboh, Esq. of Sheppard Mullin Richter & Hampton LLP, Jeremy Feigelson, Esq. of Debevoise & Plimpton LLP as well as Katie Fellows, Esq. of Hard Rock Hotel & Casino, represented HRHH.

Copious amounts of exhibits were admitted at the hearing, and the following witnesses testified:

(1)   Rodney Sacks

(2)   Dean Boswell (via videotape)

(3)   Mark Hall

(4)   Hilton Schlosberg

(5)   Keith Riley

(6)   Michael Bellas

(7)   Sanford Wolgel (via videotape)

(8)   Richard Diaz (via videotape)

(9)   Sam Pontrelli

(10)   Eva Lilja

(11)   Theresa Hoyt

(12)   Philip Shalala

(13)   Bruce Plotkin

(14)   Chad Konrad

(15)   Lance Collins

(16)   Chris Strain

(17)    John Carson (via videotape)

(18)    Diane Reed

On May 1, 2013, after agreeing to a change in the post-arbitration briefing schedule, the Parties submitted their Post-Arbitration Briefs.[1]

Having read and considered the parties' briefs, heard the testimony of the witnesses, received and considered the parties' documentary evidence, and heard the arguments of counsel; the Arbitrator hereby issues the following Final Award.[2] An Interim Award was delivered to the parties on or about June 14, 2013. The Interim Award determined that Monster was the prevailing party and entitled Monster to recover its reasonable attorney fees and costs.

## FACTS

The factual findings that follow are necessary to the Interim Award. They are derived from admissions in the pleadings and the testimony and evidentiary exhibits presented at the hearing. To the extent that any of these findings differ from any party's position, that is the result of determinations by the Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and the weighing of the evidence, both oral and written. Contentions and or arguments not expressly addressed in this Award are rejected as lacking merit or otherwise immaterial to the decision of the Arbitrator.

### *The Contracts*

#### The Letter of Intent

On November 6, 2009, the parties entered into a Binding Letter of Intent ("LOI"). The LOI was signed by Mark Hall, President of the Monster division responsible for its Monster

---

[1] HRHH also submitted a Request for Judicial Notice. HRHH sought judicial notice of (1) United States Patent and Trademark Office Registration No. 3,182,848, issued on December 12, 2006; (2) the Declaration of Thomas P. Davis, Ph.D. in Support of Preliminary Injunction, *Hansen Beverage Company v. Innovation Ventures, LLC*, Case No. 08-CV-1166 IEG (POR), Docket No. 7-3; (3) Declaration of Thomas P. Davis, Ph.D. in Support of Motion for Preliminary Injunction, *Hansen Beverage Company v. N2G Distributing, Inc.*, Case No. 08-CV-1613 IEG (POR), Docket No. 11-3; and (4) Declaration of Thomas P. Davis, PhD. In Support of Motion for Preliminary Injunction, *Hansen Beverage Company v. Vital Pharmaceuticals, Inc.*, Case No. 08-CV-1545 WQH (BLM). Monster opposed HRHH's Request. Its Request is Denied as it comes following the close of the evidentiary hearing.

[2] This is an Interim Award because the undersigned retains jurisdiction over this matter in order to resolve the parties' upcoming attorneys' fees and costs motion, which will be discussed, *infra*.

brand products, and by Dean Boswell, CFO of HRHH. The LOI provided, in relevant part, that Monster would be granted exclusive pouring rights (*e.g.*, the right to be the exclusive energy drink "carried, sold or promoted") at the Hard Rock Hotel and Casino Las Vegas ("Hard Rock Hotel & Casino"). Ex. 12, ¶2. Pursuant to the LOI, Monster agreed to pay HRHH approximately $2,250,000 for these pouring rights, with $1,250,000 to be paid up front and the remaining $1,000,000 to be paid over five years. *Id.*, ¶1.A. Monster also agreed to spend soft dollars in the amount of $700,000. As part of the soft dollar payment Monster was to host "[o]ne major MONSTER event each year for five (5) years)" at the Hard Rock Hotel & Casino to be valued at approximately $140,000 per event/per year, for a total of $700,000 for the LOI's five-year duration.

Additionally, Monster agreed to pay HRHH $750,000 up front to "acquire the Rehab Recovery Supplement brand ("Rehab")" plus a royalty fee (3% of net wholesale price) up to a total amount of $4,250,000 in the aggregate for a total purchase price of $5,000,000. *Id.*, ¶1.B. In exchange for these payments, HRHH agreed to "assign to MONSTER all right, title and interest in Rehab, including but not limited to all formulations, trademarks, tradedress and any and all other rights, including contract rights, associated with Rehab."

As part of the LOI, Monster also agreed to the following:

> • MONSTER will work with HRH to develop the Rehab in whatever form Monster determines is commercially viable for the market place;
> • MONSTER will consult with HRH regarding the direction of the Rehab brand, packages, etc.;
> • MONSTER will work within it's [*sic*] current distribution network to recommend the appropriate route to market for the brand;
> • MONSTER will produce the current Rehab brand in it's [*sic*] can form;
> • MONSTER will sell that package to HRH Vegas for their Las Vegas property;
> • MONSTER will sell this package to HRH Vegas at a preferred pricing rate that will be mutually agreed upon.

*Id.*

Notwithstanding the foregoing, the LOI provided, "HRH shall have the right to repurchase the Rehab brand (and all rights associated therewith) from MONSTER for $1.00, if, after two years following the commencement date of the repositioned Rehab brand sales by MONSTER, MONSTER has not sold at least 100,000 cases of the Rehab brand product." *Id.*

The parties also acknowledged that an additional "Supplemental Agreement" would supplement the LOI.

> Upon the acceptance of this letter of intent by HRH, the parties hereto shall identify any other supplemental transaction agreement(s) or items necessary for the Transaction and commence negotiation of the terms of any required supplemental agreements with respect to the Transaction . . . including but not limited to any agreements required in connection with acquisition of the Rehab brand by MONSTER.

*Id.*, ¶5.

The "term of the letter of intent and the Transaction" was agreed upon as "5 years from [December 31, 2009] the Effective Date." *Id*, Cover Page. The "Transaction" was defined as "certain statements and intentions of [Monster] and [HRHH] . . . relating to Monster Energy becoming the exclusive energy drink partner of [HRHH]." *Id.*

### The Supplement

On April 14, 2010, HRHH and Monster executed the Supplement to Binding Letter of Intent: Acquisition of Rights in Rehab Recovery Supplement Beverage ("Supplement"). Hilton Schlosberg, Monster's COO/CFO and Richard Szymanski, Vice President of HRHH, signed the Supplement. The Supplement was effective as of December 31, 2009.

The Supplement began by describing part of the parties' agreement pursuant to the LOI: "WHEREAS, HRH and MONSTER entered into a Binding Letter of Intent dated November 5, 2009 . . . whereby MONSTER will acquire the Rehab Recovery Supplement brand from HRH, including all trademark rights and manufacturing and distribution rights." Ex. 14, Recitals. It then set forth various definitions, including the definition of "Trademarks," which was defined as the three Rehab marks "whether in block letters or in the stylized form currently used by HRH in connection with a recovery supplement beverage, including . . .U.S. Trademark Registration No. 3353473 for the mark REHAB and any other applications or registrations for any of the Trademarks covering beverages in International Class 5 or 32." *Id.*, ¶1.b. "REHAB Product" was defined as "a recovery supplement beverage sold under any of the Trademarks." *Id.*, ¶1.c.

The Supplement then set forth the parties' agreement pursuant to the "[p]urchase and [a]ssignment of the REHAB [p]roduct."



\\\

> HRH hereby assigns and sells to MONSTER all rights, title, and interest in and to the REHAB Product, including:
>
> a)      The Trademarks, together with the goodwill symbolized by the Trademarks . . . , and including any and all trademark registrations and applications that HRH may own for the Trademarks; provided, however, that MONSTER expressly recognizes and agrees that its acquisition is limited to the Trademarks and goodwill symbolized by the Trademarks for use limited to beverages, including energy drinks, nutritional supplement beverages and recovery supplement beverages.
>
>                        \*\*\*
>
> c) all rights, including all trade dress rights and all copyrights, in the artwork and designs on the packing for the REHAB Product and in all advertising and promotional material previously developed for the REHAB Product;
>
> (d) all rights to manufacture and distribute the REHAB Product . . . .

*Id.*, ¶2.

The Supplement also contained a reservation of rights in which Monster acknowledged that HRHH would continue to use certain Rehab marks in connection with its weekly poolside event, merchandise and television series and promotion of those activities. *Id.*, ¶5. The reservation of rights also stated: "MONSTER covenants that, after the effective date of this Agreement, none of MONSTER or its owners, officers or affiliates, will use the Trademarks or trade dress in connection with goods or services other than for beverages, including energy drinks, nutritional supplement beverages and recovery supplement beverages." *Id.* The Supplement then re-stated the LOI's applicable payment and repurchase terms. *Id.*, ¶¶ 6-7. It also re-stated the term of agreement language from the LOI: "[t]he term of this Agreement begins on the Effective Date and ends on December 31, 2014." *Id.*, ¶10.

### Trademark Assignment

Shortly after signing the Supplement, the parties executed a Trademark Assignment, which also became effective on December 31, 2009. Rodney Sacks, Monster's CEO executed the Trademark Assignment on behalf of Monster, and Richard Szymanski, HRHH's Vice President executed it on behalf of HRHH. The Trademark Assignment provided:

> ASSIGNOR [HRHH] is the owner of the trademark REHAB for energy drinks and fruit beverages in International Class 32 (the "Trademark"), and all good will related thereto, and registration number 3,353,473 of

the Trademark issued by the U.S. Patent and Trademark office . . . and hereby assigns and sells to ASSIGNEE [Monster] all rights, title, and interest as ASSIGNOR may possess in and to the Trademark, the Registration and the related trade dress including [the three Rehab marks], whether in block letters or in any stylized form, in connection with a recovery supplement beverage, including . . . the Registration and any other applications or registrations for any of such trademarks covering beverages in International Class 32.

### Background to the Contract Documents

The Hard Rock Hotel & Casino is one of the premier resort properties in Las Vegas. Hall Tr. 709:4-9. In 2003, the Hard Rock Hotel & Casino created a daytime Sunday pool party that quickly became a huge hit. Shalala Tr. 1542:20-1543:13, 1545:9-1547:12, 1550:17-22, 1550:23-1551:13. Given the success of the Rehab pool party, on May 31, 2005 Hard Rock Hotel, Inc. filed an application for the Rehab trademark with the United States Patent and Trademark Office (the "USPTO"). On December 12, 2006, the USPTO issued Registration Number 3,181,848 for the Rehab mark "consist[ing] of a stylized letter R that is the first letter of the mark forming a portion of a stylized letter X" for "seasonal poolside party held weekly with food, drinks and entertainment, in Class 41." Also in 2005, the Hard Rock Hotel & Casino created a Rehab clothing line and Rehab-branded merchandise. Shalala Tr. 1554:17-20, 1556:11-1157:6, 1557:1-1559:17. In addition, a popular reality television show based on the Rehab pool party aired on cable television for three seasons. Id. at 1553:21-24.

Around this same time, HRHH began thinking about creating a beverage that would complement the pool party theme. Phillip Shalala, HRHH's Chief Marketing Officer, reached out to Lance Collins, the founder of Fuze Beverage, LLC to discuss this idea. Fuze held the Rehab trademark for certain types of beverages. Id. at 1561:21-1562:12; Strain Tr. 2090:8-18. Specifically, Collins had filed a trademark application with the USPTO for the Rehab mark on June 3, 2005. He filed the application in International Class 32, the beverage class in which energy drinks are typically classified, because the Rehab beverage "was always going to be an energy drink." Collins Tr. 2364:17-2375:2, 2394:4-2396:15; Ex. 5. The resulting trademark registration explicitly described the goods as "energy drinks" and "fruit beverages." Ex. 5. The

7

113

phrase "recovery supplement" is not mentioned in the application or in the registration documentation. *Id.*

HRHH and Fuze ultimately established a joint venture relationship whereby they would work together to market, distribute and promote a Rehab-branded beverage. Shalala Tr. 1563:6-21, 1580:9-14; Strain Tr. 2090:8-2091:12. This new beverage could not be positioned as an energy drink, however. If it were, it would run afoul of Red Bull's exclusive contract to serve energy drinks at the Hard Rock Hotel & Casino. Strain Tr. 2236:6-2239:8. The drink, therefore, evolved into a "Recovery Supplement," although, based on its ingredients, its contents were still essentially the same as other traditional energy drinks. *See* Collins Tr. 2360:8-19 (describing how main ingredients in Rehab drink were same typical stimulants and dosages as in energy drinks).

In 2009, the Red Bull pouring rights deal at the Hard Rock Hotel & Casino was set to expire. Red Bull sought to retain the pouring rights, while other major energy drink companies – Monster and Rockstar – also wanted the rights. Shalala Tr. 1596:16-21. In February and March, 2009, Keith Riley ("Riley"), Monster's Vice President of Sales-On Premise reached out to HRHH to gauge its interest, and in June, 2009, he met with the Hard Rock team and submitted Monster's exclusive pouring rights and event promotion proposal. Riley Tr. 967:25-968:15; Ex. 240. Monster offered a three-year pouring rights deal for $1,255,000, which included marketing support, room night commitments and food and beverage commitments. *Id.* 968:16-969:2; 969:16-970:16; Ex. 240.

HRHH was going in a different direction, however. In addition to the pouring rights deal, HRHH was seeking a partnership with an energy drink company to develop and sell the Rehab beverage it was selling at the hotel. Shalala Tr. 1601:15-21; Riley Tr. 2126:24-2127:3. On or around June 24, 2009, Chris Strain, a consultant for HRHH, outlined the structure of a potential deal, which included a "long term licensing deal for the Rehab" mark. Ex. 125.

Hall met with Shalala at the Hard Rock Hotel and Casino in June, 2009 to discuss the companies' mutual interests. Hall was primarily focused on the pouring rights of the deal, but he informed Shalala that Monster would be agreeable to manufacturing the Rehab Recovery

Supplement beverage for the hotel, although it would not be interested in distributing the beverage any further. Hall Tr. 721:25-722:6, 718:17-721:7; 738:18-739:25. Hall also explained to Shalala that Monster's CEO, Rodney Sacks ("Sacks"), would never allow Monster to enter into the type of licensing agreement that Shalala was suggesting. *Id*. 721:5-24.

On October 1, 2009, HRHH sent out a Request for Proposal ("RFP") to the three largest energy drink companies – Red Bull, Monster and Rockstar – to solicit bids. The RFP stated that HRHH was looking for a "long term licensing deal for the Rehab trade dress." Ex. 144. It also included the heading "HRH Deal Structure for Rights to the Rehab Beverage Trademark and Energy Drink Category to an Established Energy Drink Company." *Id*. In addition, the RFP proposed exclusive energy drink pouring rights at the hotel and sponsorship of a NASCAR garage.[3]

On October 21, 2009, Monster senior executives who were in Las Vegas for the National Association of Convenience Store convention met with senior executives from HRHH. Those in attendance at the meeting included Sacks, Hall, Nick Gagliardi (COO) and Riley for Monster and Randy Kwasniewski (CEO), Yale Rowe (Sr. Vice President/General Manager of Operations), Warner Hedrick, III (Vice President of Food & Beverage), Shalala and Chris Strain for HRHH. Shalala Tr. 1625:15-1627:10; Riley Tr.991:18-23. Sacks and Hall expressed to HRHH that Monster would not license the Rehab mark, emphasizing that it would only consider an outright purchase. Riley Tr. 992:9-15, 992:21-993:1, 995:4-5; Hall Tr. 738:3-739:18, 704:5-13, 749:25-750:6; Sacks Tr. 78:20-79:25.

Immediately following the October 21, 2009 meeting, Monster drew up a written proposal and emailed it to HRHH. Hall Tr. 749:25-750:11, 753:6-12; Ex. 145. Monster offered a five-year exclusive energy drink pouring rights deal, which included marketing support in the form of "soft dollar" marketing commitments, room night and volume incentives. Ex. 145 Monster also offered to purchase the Rehab mark and brand outright. The offer to purchase the mark was not, however, limited to a five-year period. *Id*. Specifically, the offer stated: "Rehab: Monster would buy the rehab brand from Hard Rock Hotel and Casino." After receiving the

---

[3] The NASCAR garage sponsorship was quickly taken off the table. It is therefore not discussed any further herein.

proposal, Shalala communicated to Riley that HRHH needed as much money up-front as possible and Riley relayed that message to Sacks. Sacks Tr. 127:23-127:10. Sacks then authorized Riley to increase the up-front cash proposal on the exclusive pouring rights portion of the deal by $250,000. *Id.* 126:23-127:10.

On October 30, 2009, Monster sent the revised proposal, which added the $250,000 in up-front money. Ex. 146. Other than the additional $250,000, however, the proposals were exactly the same. *Id.* On November 3, 2009, HRHH made a counter-offer whereby Shalala requested that HRHH be able to buy back the Rehab beverage trademark from Monster in the event Monster did not sell 100,000 cases of its new Rehab beverage within two years of launch. Riley Tr. 1012:24-1013:16; Ex. 147. Riley wrote an e-mail to Shalala accepting the buyback provision but articulating it slightly differently so that it was clear that the right to repurchase began to run from the launch of the new, repositioned Rehab beverage and not from the date the contract became effective. Ex. 147.

On November 4, 2009, HRHH's senior management held a meeting to discuss the differences between the two proposals that it had received (from Monster and from Rockstar). HRHH's Chief Financial Officer, Dean Boswell ("Boswell") prepared a spreadsheet following that meeting that compared the two proposals. Boswell Tr. 675:20-21; Ex. 559 p.39-40; Ex. 91. Boswell's summary indicates that HRHH knew that the Monster proposal was an outright sale of the Rehab trademark, compared to the Rockstar proposal, which was a license agreement. Ex. 91 (under Rockstar, listing "Rehab Royalty Production Gtd" but under Monster, listing "Rehab Purchase").

On November 5, 2009, Kwasniewski called Hall and spoke with him on speakerphone while Sacks and Riley were in the room. Kwasniewski was looking for more money for the Rehab trademark, and Sacks agreed to another $250,000 up-front and to increase the earn-out from $2.5 million to $4.25 million based on 3% of the net wholesale case price. Riley Tr. 1017:10-22. By the end of the conversation, the parties had a deal. Sacks Tr. 149:6-11; Riley Tr. 1020:16-22. The deal was then memorialized by the LOI, which Hall signed that same day. The LOI was then emailed to HRHH, and on November 6, 2009, it was countersigned by Boswell

and emailed back to Monster, along with HRHH's bank wiring instructions. Hall Tr. 764:4-765:20; Exs. 12, 95.

It is worth noting that at the time the LOI was signed, and even as of December 30, 2009 when Monster was about to make the $750,000 up-front payment, HRHH still did not have ownership rights to the Rehab trademark as they resided with Fuse. *Id.* 773:17-21, 774:3-11; Ex. 9. As a result, on December 30, 2009 Monster sent an email to Shalala seeking confirmation that HRHH was in fact obtaining an assignment of the Rehab mark from its true owner, Fuze Beverage and that once HRHH acquired ownership, it would execute a purchase agreement and recordable trademark assignment to "fully transfer all of the right, title and interest in and to the REHAB brand to [Monster]." Ex. 149. After consulting with, and obtaining authorization from, HRHH's in-house counsel and Boswell, Shalala provided Monster with the necessary written confirmation of the Trademark assignment. Tr. 1723:18-1725:9; Ex. 149. Based on this representation, Monster wired the $750,000 up-front payment to HRHH that same day. Ex. 149.

As noted, *supra*, on December 30, 2009, the parties also began negotiating the terms of the Supplement. The parties exchanged several revisions, and the final Supplement was signed on April 14, 2010. Exs. 187; 103; 14. A few weeks later, the Trademark Assignment was also fully executed by the parties, and on May 13, 2010, the Trademark Assignment for the Rehab registered trademark (No. 3353473) for beverages in International Class 32, including energy drinks and fruit beverages, was recorded with the USPTO. Exs. 5, 9.

### Contract Performance

#### The existing Rehab Recovery Supplement and the development of new products

Upon execution of the LOI, at the direction of Hall, Eva Lilja ("Lilja"), Monster's Vice President of New Product Development was put in charge of: (1) providing HRHH with cans of the existing Rehab Recovery Supplement for distribution at the Hard Rock Hotel & Casino in Las Vegas; and (2) communicating with HRHH about the development of any new beverages bearing the Rehab trademark. Riley Tr. 1159:23-1160:22; Exs. 261, 262. Monster was initially able to supply HRHH with the Rehab Recovery Supplement for distribution at the hotel;

however, it began to encounter problems when the suppliers of the raw materials that were needed to manufacture the beverage, such as Wild Flavors for the formula and Rexam for the cans. These suppliers began to have issues with respect to who owned the trademark and thus the right to the raw materials for the production of the beverage. Although Monster was only requesting the release of those raw materials to manufacture the old Rehab product, the suppliers did not show Monster as the registered owner of the beverage and therefore would not release the necessary materials for the Rehab Recovery Supplement beverage to be manufactured. Hall Tr. 771:10-773:11, 774:12-16.

On April 27, 2010, via e-mail, Lilja sent Wild Flavors and Rexam the Termination of License Agreement and Transfer of Rehab Rx Trademark, dated August 20, 2009, by and between Fuze and HRHH, and on May 19, 2010, Lilja sent those same documents to Wild Flavors and Rexam again. Exs. 404, 405, 406, 407, 408; Lilja Tr. 1447:25-1448:9. Lilja sent these documents to Wild Flavors and Rexam again on June 30, 2010, and by October 2010, Monster finally got all of the pieces together from the various third parties to be able to make the old Rehab recovery supplement beverage for the Hard Rock Hotel and Casino. Hall Tr. 777:10-14, 782:7-783:2, Lilja Tr. 1442:12-1444:19. While HRHH appears to have been unhappy with Monster's apparent lack of responsiveness, during these delays Monster was in fact trying to get the product made. The parties' communications remained cordial throughout this time period despite any frustrations. Shalala Tr. 1657:23-1661:12; Exs. 426; 400, 151, 459.

With regard to the development of new products, Monster presented HRHH with information about a potential new Rehab-branded "shot" in April 2010. Shalala Tr. 1661:24-1662:24; Lilja Tr. 1400:23-1401:12; Ex. 459. HRHH requested that Monster "remove the Taurine from the formula due to negative wellness and perceived anxiety, irritability issues," and to differentiate the Rehab shot from current energy shot drinks. Ex. 459. Monster apparently did not engage with HRHH on this product again, and in July 2010, Shalala requested a way out of the parties' relationship. Ex. 154. On August 13, 2010, Monster responded to HRHH in an email, explaining that Monster had been doing a substantial amount of work on both the Rehab Recovery Supplement and the Rehab shot throughout the previous months. Exs. 334, 335.

By September 2010, Monster had stopped work on the Rehab "shot" idea and had completed its development of the new Monster Rehab. On September 17, 2010, Sam Pontrelli ("Pontrelli"), Monster's Senior Vice President of Marketing, met with Shalala to share with him the brand's new developments. Shalala liked the new Monster Rehab product a lot, and in early October 2010, he told Lilja to hold off on any further work on the Rehab Recovery Supplement and to only push the new Monster Rehab beverage. Lilja Tr. 1360:6-21, Shalala Tr. 1694:10-1695:8; Ex. 343.

Monster finalized the development of its new beverage (Monster Rehab Tea + Lemonade + Energy), and in February/March, 2011, the new Monster Rehab was launched. Lilja Tr. 1444:20-23. Monster then moved to create and release new Monster Rehab flavors – Green Tea, Protean, Rojo Tea and Orangeade. Hall Tr. 792:11-22; 927:4-11. Around the time that the new Rehab beverage launched, Shalala and other Management people left HRHH.

Following the launch, every quarter, Monster made payments to HRHH of 3% of the net wholesale case price for Monster Rehab that it sold. Exs. 73-77. HRHH accepted each payment without objection, and the last payment was made to HRHH on April 27, 2012. This constituted the balance of the $4.25 million earn-out and completed the total $5 million purchase price for the Rehab trademark. Exs. 77; 554.

Ten days later, HRHH's lawyer, Bruce Plotkin ("Plotkin") sent a demand letter to Monster claiming that Monster was never authorized to use the Rehab trademark in the manner that it did. Plotkin also threatened what ultimately became this arbitration.

<u>Monster's U.S. and international Trademark applications</u>.

In July 2010, Monster began filing trademark applications in the United States for various Rehab marks. Reed Tr. 2448:20-23. In total, Monster has filed six applications, some of which were filed in multiple International Classes. Three applications were filed under International Class 5, three were filed under International Class 32 (for fruit drinks, fruit beverages, fruit juices and non-alcoholic beverages) and three were filed under International Class 30 (for tea and coffee). In addition, since July 2010, Monster has filed roughly 540 applications to register the

Rehab marks and marks deriving from and incorporating the Rehab marks in over 100 countries around the world. *Id.* 2444:21-25, 2445:20-2446:3, 2450:12-23. Monster has also filed other trademarks internationally that incorporate the Rehab marks like "REHABITUATE." Sacks Tr. 646:23-647:18.

<u>HRHH's Trademark applications</u>

On February 14, 2012, HRHH filed applications with the USPTO for the mark "REHAB." These applications were filed in International Classes 30, 32, 33 (for alcoholic beverages, except beers), 29 (for prepared meals and entrees consisting primarily of eggs and vegetables), 41 (for casino and entertainment services), and 43 (for hotel and resort services, restaurant services, bar services, and catering services). Exs. 27, 576. On that same day, HRHH also filed applications for two other Rehab marks in International Classes 30, 32, 33, 41 and 43. Ex. 576.

<u>Subsequent developments at HRHH</u>

In 2007, Brookfield Real Estate Financial Partners ("Brookfield") invested $200 million into HRHH, which was a subordinate loan to an approximate $1 billion mortgage held by the Government of Singapore. Hoyt Tr. 1471:8-15; 1472:9-19. In March 2011, Brookfield's role with HRHH changed from that of lender to that of equity holder when, after HRHH's loans had gone into default, Brookfield received a deed in lieu of foreclosure. On March 1, 2011, Brookfield essentially took the keys to the hotel. *Id.* 1480:20-1481:18; 1483:19-23. All of these changes occurred at or about the time of the launch of the new Rehab.

As part of this transaction, HRHH entered into a Fourth Amended and Restated Loan Agreement and an Intellectual Property Security Agreement. Exs. 57; 26. In doing so, HRHH pledged all of its intellectual property to the Government of Singapore, including its trademarks and trademark license agreements. Exs. 571, 26; Hoyt Tr. 1516:21-24, 1518:9-19, 1519:4-8, 1522:21-1523:16, 1525:22-25. Nowhere within any of the schedules that listed the intellectual property that HRHH owned as of March 1, 2011 was there any reference to the Rehab beverage

trademark, either as an owned trademark or as part of a trademark license agreement. Exs. 26 (p.799-800, 820-828), 5; Hoyt Tr. 1526:20-24, 1526:25-1528:19. Instead, the Fourth Amended and Restated Loan Agreement explicitly states: "Hard Rock acquired the ownership of the Rehab beverage trademark from Coca-Cola and later sold the trademark to Hansens/Monster as part of an energy drink sponsorship agreement."

## PARTIES' AGREEMENTS

According to HRHH, the unambiguous language of the governing documents fully supports a finding that the parties' entire agreement expires at the end of next year, at which point all of Monster's rights in the Rehab marks revert to HRHH. In addition, HRHH contends, the unequivocal language of the parties' agreement limits Monster's rights to the Rehab marks to rights in connection with "a recovery supplement beverage," not the "Tea + Lemonade + Energy" (and similar) drinks that Monster has been manufacturing and selling under the Rehab marks.

HRHH also maintains that while the contract documents make it clear that Monster's trademark rights end at the United States borders, Monster has filed numerous international trademark applications for derivatives of the Rehab marks and used those derivative marks abroad. HRHH argues that Monster is also required to consult with HRHH on the development of Rehab-branded beverages and on the direction of the Rehab brand; HRHH maintains that Monster has consistently disregarded HRHH's input on these issues. Finally, HRHH avers, the parties' agreement requires Monster to stage annual major events at HRH's Las Vegas property, but Monster failed to do so in 2011. Taken together, HRHH explains, Monster's conduct amounts not only to multiple breaches of contract, but also, to a pattern of disregard of HRHH's rights. According to HRHH, these conclusions are not only supported by the terms of the contracts, HRHH maintains; but also by the extrinsic evidence offered at the hearing. The Arbitrator, however, does not find that these arguments are in fact supported by the evidence.

Monster, on the other hand, contends that not a single witness supported HRHH's interpretation of the contract other than HRHH's own lawyer – Bruce Plotkin. In addition,

Monster maintains, all of the witnesses at the arbitration hearing, including those of HRHH, supported Monster's position. According to Monster, the LOI, the Supplement and the Trademark Assignment all expressly state that HRHH sold all rights, title and interest in the Rehab beverage trademark to Monster for use with any beverages, forever.  According to Monster the five-year term in the contract specifically applies only to the pouring rights and marketing support portions of the contract. Moreover, the sale of the Rehab trademark to Monster was for any beverage and not just limited to HRHH's failed "recovery supplement" beverage and had no time limitation since it was an outright purchase.

Monster also contends that its interpretation of the contracts is supported by the parties expressed intent and the course of conduct of the parties. According to Monster, the evidence presented during the Arbitration Hearing overwhelmingly establishes that HRHH and Monster intended for there to be a sale and purchase of the Rehab beverage trademark, for any beverage, forever. Finally, Monster contends, because it has made all of the required payments under the contract, including payments for the pouring rights, for the sale of the Rehab Marks and for the Monster-sponsored events, it cannot be found to have breached the parties' agreement. The Arbitrator agrees with Monster's position for the reasons hereinafter set forth.

## DISCUSSION

### Legal Framework

Pursuant to section 8(b) of the LOI, the parties' agreement and all matters related to the agreement are to be "governed by the laws of the State of California . . . ." As such, California law governs the interpretation of the LOI and the Supplement. In California, "[u]nder statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation." Cal. Civ. Code, § 1636. Such intent is to be inferred, if possible, solely from the written provisions of the contract. Id., § 1639. The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" id., § 1644, controls judicial interpretation. Id., § 1638.

Contracts "must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible. *Goodman v. Jonas* (1956) 142 Cal.App.2d 775, 791; *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1060 ("Courts must also endeavor to give effect to every part of a contract, if reasonably practicable, each clause helping to interpret the other.'" (quoting Cal. Civ. Code § 1641)). California courts, therefore, are not permitted to ignore provisions of a contract such that they become "mere surplusage." *Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550, 560. Where there are several contracts "between the same matters, between the same parties, and made as parts of substantially one transaction," these contract "are to be taken together." Cal. Civ. Code § 1642.

Extrinsic evidence may not be used to vary the terms of an unambiguous agreement. *Iglesia Evangelica Latina, Inc.* (2009) 173 Cal.App.4th 420, 433-34 (2009). Whether an agreement is ambiguous is a question of law to be decided by the court, *Id.* That said, while a contract may, on its face, appear unambiguous to the reader, "ambiguity may be exposed by extrinsic evidence that reveals more than one possible meaning." *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 40 ("The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."); *see also Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343.

> [R]ational interpretation [of a contract] requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. Such evidence includes testimony as to the circumstances surrounding the making of the agreement including the object, nature and subject matter of the writing so that the court can place itself in the same situation in which the parties found themselves at the time of contracting. If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, is fairly susceptible of either one of the two interpretations contended for, extrinsic evidence relevant to prove either of such meanings is admissible.

*Pacific Gas & Elec. Co.*, *supra*, 69 Cal.2d at 40. (internal quotations and citations omitted).

With regard to witnesses' testimony, weight and credibility may be determined based on the following factors: (1) inherent improbabilities as to the accuracy of the witness's own

statement about the transaction; (2) the manner in which the witness testifies; (3) the character of the witness' testimony; (4) the interest of the witness in the result of the case; and (5) contradictory evidence. *Travis Glass Co. v. Ibbetson* (1921) 186 Cal. 724, 728. The trier of fact may reject the testimony of any witness provided it does not do so "arbitrarily." *Am. Trust Co. v. Fitzmaurice* (1955) 131 Cal.App.2d 382, 388. The trier of fact may "base its decision on the testimony of a single credible witness." *People v. $9,632.50 U.S. Currency* (1994) 64 Cal.App.4th 163, 175.

## ANALYSIS

Did Monster purchase the Rehab mark forever or was its use of the Rehab mark only for a five-year term?

The negotiations between the parties, the contracts' plain language, and the conduct of the parties establish by a preponderance of the evidence that there was an outright sale of the Rehab trademark for beverages to Monster. *See Pacific Gas & Elec. Co., supra*, 69 Cal.2d at 40 (explaining why extrinsic evidence can be used to understand the intention of the parties when executing a contract).[4] During the parties' preliminary negotiations, they discussed two independent components of the proposed deal: (1) Monster would become the exclusive energy drink provider at Hard Rock Hotel and Casino, and (2) Monster would purchase all rights, title and interest to the Rehab beverage mark and brand. With regard to the latter, Hall unequivocally told Shalala that Monster was not interested in licensing the Rehab mark. Instead, he explained, Monster would only consider the Rehab mark if it could be purchased forever. Hall Tr. 738:3-739:18, 704:5-13; 718:17-722:17; 749:25-750:6. Sacks also relayed this information to Shalala. Sacks Tr. 61:14-62:5; 63:11-64:17; 77:12-79:25. The testimony of Sacks and Hall was fully

---

[4] HRHH cites to *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956, for the proposition that extrinsic evidence cannot be introduced to show "[t]he parties' undisclosed intent or understanding" because such undisclosed intent is "irrelevant to contract interpretation." While this may be a true statement of law, it is inapplicable here because the undersigned is relying on extrinsic evidence to show the parties' *disclosed* or *expressed* intent.

supported by Riley.[5] Riley Tr. 992:1-993:1, 994:21-995:5, 994:21-995:5.

Notably Boswell's testimony supports Monster's contract interpretation. As explained,
*supra*, Boswell was the individual at HRHH who signed the LOI. Boswell stated in his
declaration:

> I understood when executing the LOI that all rights, title and interest in
> the Rehab trademark for beverages were forever being sold to Monster.
> The only exception was the option Hard Rock had to repurchase the
> Rehab trademark in the event Monster did not sell the requisite number
> of cases of Rehab energy products within the time period provided for in
> the LOI and its Supplement. The sale of the Rehab trademark was not for
> a period of five (5) years. The five (5) year term in the LOI and the
> Supplement applied only to the exclusive pouring rights of Monster at
> Hard Rock Property.

Ex. 88, ¶7 (Boswell Declaration); Ex. 559 p.7-8. *see also* Boswell Tr. 678:17-20; 1862:23-
1863:11.

Boswell added,

> Under the Supplement, I understood that Hard Rock was forever selling
> the Rehab trademark for beverages to Monster and the only mechanism
> for Hard Rock to reacquire the Rehab trademark was if Monster did not
> sell a certain number of cases within the time period listed in the LOI and
> Supplement. The five (5) year term listed in the Supplement similarly
> related only to the duration of Monster's exclusive pouring rights at the
> Hard Rock property, and did not relate to the sale of the Rehab trademark
> to Monster.

Ex. 88, ¶8; Boswell Tr. 678:17-20; Ex. 559 p.9-10.

At the hearing, Boswell again testified to his understanding. He explained that the sale of
Rehab was "an out-and-out sale," and that only the pouring rights for Monster were controlled by
the LOI's "60-month term." Boswell Tr. 1862:23-1863:11.

Boswell represented this same understanding of the parties' deal in the spreadsheet he
prepared following the November 4, 2009 meeting with HRHH's senior management.
Comparing the Monster and Rockstar proposals, Boswell explained that the Monster proposal

---

[5] HRHH points to various inconsistencies in the testimony of these three witnesses. These inconsistencies are not
sufficiently severe to significantly challenge their otherwise persuasive and credible testimony, however. Moreover,
Monster's follow-up with HRHH after these meetings, (discussed, *infra*), is completely consistent with these
witnesses' recollections. In addition, to the extent that the testimony of HRHH's witnesses conflicts with the
testimony of Monster's, for reasons discussed herein, the undersigned finds the testimony of Monster's witnesses
more credible and persuasive.

constituted an outright sale of the Rehab trademark while the Rockstar proposal was merely a license agreement. *See* Ex. 91 (under Rockstar, listing "Rehab Royalty Production Gtd" but under Monster, listing "Rehab Purchase"). Boswell also noted, "Sell Rehab beverage; lose future equity."[6] *Id.*

This testimony and evidence is also supported by Monster's contemporaneous written proposal, which was first submitted to HRHH on October 21, 2009, the same day as the parties' meeting and revised (only as to pricing) on October 30, 2009. *See* Exs. 145, 146. Each aspect of these proposals that was associated with pouring rights expressly referenced a five-year term, whereas Monster's reference to the purchase of the Rehab trademark was not time limited. Indeed, with regard to the mark, the proposals both stated: "Rehab: Monster would buy the rehab brand from Hard Rock Hotel and Casino." Exs. 145, 146. In light of these documents, Shalala's contention that Monster never expressed a desire to purchase the Rehab trademark is therefore not credible.

The October 21 and 30, 2009 proposals ultimately morphed into the LOI, which clearly stated that HRHH was "assigning" Monster all right, title and interest in the Rehab mark, without any limitations.[7] Specifically, the LOI expressly states:

> HRHH *will assign* to MONSTER all right, title and interest in Rehab, including but not limited to all formulations, trademarks, tradedress and any and all other rights, including contract rights, associated with Rehab.

Ex. 12 (emphasis added). At paragraph 5, the LOI also states, "[u]pon the acceptance of this [LOI] by HRH, the parties hereto shall identify any other supplemental transaction agreement(s) or items necessary for the Transaction and commence negotiation on the terms of any required

---

[6] Notably, even after the parties executed the LOI, Boswell prepared an analysis of Hard Rock's sponsorships, indicating that the Rehab trademark was sold to Monster and that HRHH would not realize any future income. Ex. 104. In light of these contemporaneously created documents, which support Boswell's statements at the hearing, in his deposition and in his declaration, the undersigned finds HRHH's attempts to discredit Boswell's testimony unconvincing and unpersuasive.

[7] This language is particularly relevant in light of the fact that HRHH's original RFP stated that HRHH was looking for a "long term licensing deal for the Rehab trade dress," but this language is notably absent from the parties' actual agreement. *See* Ex. 144. Instead, the agreement uses words such as "assign," "acquisition" and "sale. This linguistic evolution supports Monster's position that the parties negotiated a change to HRHH's initial terms to include an outright sale in the final agreement.

supplemental agreements . . . including but not limited to any agreements required *in connection with acquisition of the Rehab brand by MONSTER.*" Ex. 12, ¶5 (emphasis added).

Similarly, the April 14, 2010 Supplement contains no time limiting language; instead, it expressly states that "MONSTER will *acquire* the Rehab Recovery Supplement brand from HRH" and that "HRHH hereby *assigns and sells* to MONSTER all rights, title and interest in, and to the REHAB product, including . . . ." Ex. 14, Recitals; ¶2 (emphasis added). Paragraph 2.a also specifically states that Monster "expressly recognizes and agrees that its *acquisition* is limited to the Trademarks and goodwill . . ." and paragraph 4 states that "HRH will execute and deliver to MONSTER such other documents and instruments as MONSTER may reasonably request to more effectively *vest title* to the REHAB product in MONSTER." *Id.*, ¶¶2.a, 4.

And the Trademark Assignment expressly stated, without limitation:

> ASSIGNOR is the owner of the trademark REHAB for energy drinks
> and fruits beverages . . . and hereby *assigns and sells* to ASSIGNEE all
> rights, title and interest as ASSIGNOR may possess in and to the
> Trademark, the Registration and the related trade dress including . . . .

Ex. 15 (emphasis added). Undeniably, HRHH was "assigning" and "selling," not licensing, the Rehab rights to Monster. Indeed, this is exactly what the clear language of the agreement says.

The only express language in the contracts that contemplates the "return" of the Rehab rights to HRHH is the buyback provision found at section 1.B of the LOI and also at paragraph 7 of the Supplement. There, the contracts state that "HRH shall have the right to repurchase the Rehab brand (and all rights associated therewith) from MONSTER for $1.00, if, after two years following the commencement date of the repositioned Rehab brand sales by MONSTER, MONSTER has not sold at least 100,000 cases of the Rehab brand product." HRHH has never made a claim that Monster did not sell the minimum 100,000 cases of the repositioned Rehab brand, and HRH has never exercised this option. If there had been an assignment no repurchase right would have been necessary, only a termination or reversion of the assignment.

While the LOI and Supplement do both specify a term of five years (December 31, 2009-December 31, 2014), *see* Ex. 14, Cover Page; Ex. 14, ¶10, this language specifically applies to the pouring rights and marketing support portions of the contract and not to the sale of the Rehab

trademark. HRHH attempts to refute this interpretation, mainly because, as it contends, the Supplement does not deal with Monster's pouring rights. This is evidenced, HRHH maintains, by the following language in the Supplement's Recital: "WHEREAS, HRH and MONSTER entered into a Binding Letter of Intent dated November 5, 2009 . . . whereby MONSTER will acquire the Rehab Recovery Supplement brand from HRH, including all trademark rights and manufacturing and distribution rights." *See* HRHH Post-Arb. Br., p.37 ("the *Supplement* . . . deals exclusively with the scope of Monster's rights to use the Rehab Marks in connection with recovery supplement beverages.") In light of this provision, HRHH contends, "[t]he *Supplement*'s termination clause [at paragraph 10] can only mean that the limited grant of rights in the Rehab Marks terminates on December 31, 2014 because there is nothing else in the *Supplement* to terminate on that date." HRHH Post-Arb. Br., p.39.

The provision relied upon by HRHH actually supports, rather than refutes, Monster's position. As noted, *supra*, the language unequivocally states: "MONSTER *will acquire* the Rehab Recovery Supplement brand from HRH," without any limitations. Ex. 14 (emphasis added). Moreover, contrary to HRHH's position, the Supplement's five-year term does apply to another provision in the contract – the indemnification provision in Paragraph 9. Under paragraph 9, HRHH agreed to indemnify Monster against a wide range of potential liabilities, including (1) claims relating to agreements with third parties "concerning the manufacture, promotion, distribution or sale of the Rehab Product," (2) claims by Fuze or third parties relating to "use of the Trademarks," and (3) claims of "personal injury to any third party by the use of [] Rehab Product" manufactured or sold before the date of the parties' agreement. Ex. 14, ¶9. Any of these liabilities could arise at any time after the execution of the parties' agreement. Thus, the indemnification provision creates ongoing obligations for HRHH that will be terminated after five years by Paragraph 10's five-year term.

The Arbitrator does not agree with HRHH that the testimony of Monster's witness – John Carson – bars this conclusion. In response to HRHH's question about whether, under paragraph 9, "number 1", HRHH's indemnity obligations pertaining to potential claims by Fuze would be subject to the five-year term, Carson testified that Monster would not need the indemnity

provision under such circumstances because Monster could sue HRHH for breach of the warranty provision of Paragraph 8. *See* Carson Tr. 2340:20-2344:21. Carson never testified, however, that HRHH's indemnity obligations under Paragraph 9 would not terminate, nor did Carson address HRHH's obligation to indemnify Monster against claims by third parties other than Fuze. Carson's testimony, therefore, cannot be used to undermine Monster's position that paragraph 9's indemnity obligations are ongoing obligations that are subject to the termination provision of Paragraph 10.

Moreover, the Supplement's termination date of December 31, 2014 also serves another purpose. Paragraph 10 serves to clarify that, despite the fact that the Supplement and the LOI were executed months apart, the LOI and the Supplement are actually coterminous. Without the Supplement's Paragraph 10 it would have been unclear whether both documents terminated five years after the execution of the LOI, whether both documents terminated five years after the execution of the Supplement or whether each document terminated five years after its own execution. The Supplement's term therefore clarifies for the parties that all of their *ongoing* obligations to the other party would terminate by December 31, 2014. The Arbitrator emphasizes the word "ongoing" because Monster's purchase of the Rehab mark was not a continuous and ongoing event. Rather, as with any other sale, Monster's purchase was a one-time occurrence that began and ended when the contracts were signed and when Monster made the requisite payments (which, it indisputably did).

Further, even if the Supplement's five-year term were to be seen as mere surplusage, this would not justify twisting the agreement's plain language in such a way that "assigns and sells" would take on entirely different meanings. *See* Cal.Civ.Code §§ 1644, 1638 (the "clear and explicit" meaning of the words of a contract, interpreted in their "ordinary and popular sense" control judicial interpretation unless the parties used those word "in a technical sense or a special meaning is given to them by usage."). Indeed, while both *Goodman* and *Thrifty Payless* instruct that every part of a contract must be given its effect, these cases also instruct that this be done only when "reasonably practical." *Goodman, supra,* 142 Cal.App.2d at 791; *Thrifty Payless, Inc., supra,* 185 Cal.App.4th at 1060. Here, it is not "reasonably practical" to wholly distort the plain

meaning of these terms. Thus, the plain meaning rule trumps the rule against surplusage, at least as these rules apply to the instant matter.

Moreover, surplusage is rampant throughout the Supplement as much of the language is redundant of nearly identical language in the LOI. For example, both the LOI and the Supplement set forth the payment terms for the Rehab brand. Ex. 12, pp.2-3; Ex. 14, ¶6. Both the LOI and the Supplement also contain the buy-back provision. Ex. 12, p.3; Ex. 14, ¶7. Thus, since the Supplement is a document that contains surplusage throughout, whether the five-year term is also surplusage is of no significance to this Arbitration.

Finally, HRHH's position that if ambiguous, the contracts should be construed against Monster – the drafter – is of no avail. Even if Monster was the initial drafter of the agreement, the agreement was the result of the parties' active negotiation. Courts have rejected HRHH's contention in cases where, as here, both parties were sophisticated players with equal bargaining power that together negotiated and drafted the actual agreement. *See Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 438 (stating that doctrine of construing contract against drafter typically only applies in adhesion contracts where parties have unequal bargaining power and where the stronger party drafts the contract and presents it on a "take it or leave it" basis)

HRHH's conduct and contemporaneous admissions also confirm that the agreement constitutes a sale/assignment and not a license with specific temporal limitations. Namely, in 2011, when HRHH entered into the Intellectual Property Security Agreement, pledging all of its intellectual property to the Government of Singapore, including its trademarks and trademark license agreements, HRHH listed all of the intellectual property that it owned at that time. HRHH listed the trademark license agreement that it had with the Cherokee nation to allow a Hard Rock Hotel and Casino in Tulsa. HRHH also listed the trademark license agreement that it had with the Pueblo Isleta Indian Nation to open a Hard Rock Hotel in Albuquerque. HRHH, however, did not list any trademark license agreement for the Rehab beverage trademark. Exs. 571, 26; Hoyt Tr. 1531:6-1532:4; 1516:21-24, 1518:9-19, 1519:4-8, 1522:21-1523:16, 1525:22-25. Instead, in the contemporaneously executed Fourth Amended and Restated Loan Agreement HRHH stated: "Hard Rock acquired the ownership of the Rehab beverage trademark from Coca-

Cola and later sold the trademark to Hansens/Monster as part of an energy drink sponsorship agreement." These admissions and omissions are clear evidence that HRHH knew it had sold the Rehab beverage trademark and no longer owned or had any trademark license regarding it. Moreover, HRHH's familiarity with the necessary language of trademark license agreements is exemplified by its license agreement with Fuse Beverage LLC [Ex. 13].

<u>Were Monster's rights limited to the mark for only Rehab recovery supplements or did Monster purchase broader rights to all Rehab beverages?</u>

The negotiations between the parties, the contracts' plain language and the parties' post-contract actions (or lack thereof) establish that Monster purchased the right to use Rehab for more than just recovery supplements.[8]

For example, the LOI expressly indicates that "HRH will assign to MONSTER *all* right, title and interest in Rehab, including *but not limited* to all formulations, trademarks, trade dress and any and all other rights, including contract rights, associated with Rehab." Ex. 12, ¶1.B.c (emphasis added). This grant of rights is undeniably broad. Moreover, the LOI also specifically states that Monster would develop the Rehab brand "in whatever form Monster determines is commercially viable for the market place," and states that Monster would be developing a "repositioned Rehab brand." [9]*Id.*, p.3. When these provisions are compared to the provision in the LOI stating that "MONSTER will produce the *current* Rehab brand in it's [*sic*] can form," *id.* (emphasis added), the undeniable conclusion is that the LOI contemplated Monster's production of both the *current* Rehab brand (*i.e.*, the recovery supplement beverage) to be sold "to HRH Vegas for their Las Vegas property," as well as other "commercially viable," "repositioned" Rehab beverages "in whatever form." *Id.*

---

[8] HRHH relies heavily on *Good Earth Corp. v. M.D. Horton Assoc.*, 1996 WL 556946 (N.D. Cal. 1996) to support its contention that the LOI and Supplement limit Monster's use of the Rehab Mark for all beverages. *Good Earth* is not instructive here. The court provided no analysis or rationale for its decision. Instead, it merely re-stated language from the operative agreement and set forth its conclusion. Without more to provide some insight into the decision-making, the undersigned is left with nothing upon which he can analogize the case to the instant facts, the contract language and the relevant evidence. *Good Earth* is therefore inapposite to this decision.

[9] Indeed, at page 3 the LOI also contemplates that Monster would be selling a "repositioned Rehab brand." *See* Ex. 12 ("if, after two years following the commencement date of the repositioned Rehab brand sales by MONSTER....")

In addition, paragraph 2(a) of the Supplement states that HRHH assigns and sells to Monster "all rights, title and interest in and to the Rehab product, including . . . the Trademarks and goodwill symbolized by the Trademarks for *use limited to beverages, including energy drinks*, nutritional supplement beverages and recovery supplement beverages. Ex. 14, ¶2(a) (emphasis added). Paragraph 5 of the Supplement further sets forth that Monster's use of the Rehab trademark and trade dress is "for beverages, *including energy drinks*, nutritional supplement beverages and recovery supplement beverages.[10] *Id.*, ¶5 (emphasis added). In addition, the Trademark Assignment executed by the parties states that HRHH assigned and sold "all rights, title and interest" in "the trademark REHAB for energy drinks and fruit beverages in International Class 32 . . . and registration number 3,353,473 of the Trademark issued by the [USPTO]," Ex. 15. The Supplement and the Trademark Assignment clearly contemplate that Monster purchased more than just the rights to the Rehab trademark for recovery supplement drinks. Monster's rights included, at the very least, the rights to the Rehab trademark for energy drinks, for nutritional supplement beverages, for recovery supplement beverages and for fruit drinks.

HRHH contends that the Supplement's definition of "REHAB Product" as "a recovery supplement beverage sold under any of the Trademarks" expressly limits Monster's rights to only recovery supplement drinks. As discussed, *supra*, however, when read as a whole, the Supplement is not so limiting. *See Thrifty, supra*, 185 Cal.App.4th at 1060. In two separate paragraphs, the Supplement specifically enumerates at least two other types of beverages for which Monster purchased the rights – nutritional supplement beverages and energy drinks, and the Trademark Assignment, executed just a few weeks after the Supplement and admittedly part of the same transaction, contemplates a third – fruit beverages. Clearly, based on this contractual language, "REHAB Product" is broader than just "recovery supplement beverage[s]." *See*

---

[10] HRHH makes much of the fact that paragraph 5 is a reservation of rights, not a grant of rights. While this is clearly true, it does not change the fact that, once the contract became effective, HRHH reserved the rights only to "the Trademarks or trade dress in connection with goods or services other than for beverages, *including energy drinks, nutritional supplement beverages and recovery supplement beverages*." Ex. 14, ¶5 (emphasis added). It follows that if HRHH only reserved the rights to goods or services for non-beverages, then the rights for "beverages", including energy drinks, nutritional supplement beverages and recovery supplement beverages" were sold to Monster.

*Friedman Prof. Management Co., Inc. v. Norcal Mut. Ins. Co.* (2004) 120 Cal.App.4th 17, 33 (contracts must be interpreted to give effect to every clause and to harmonize the various parts with each other).[11]

This conclusion is supported by the compelling and persuasive testimony of Collins, the creator of the original Rehab Recovery Supplement drink, who, as far as the Arbitrator could tell, has no cause to be biased one way or the other in this matter. While Collins' testimony is merely informative and not dispositive of this issue since he was not involved in the contracts' negotiations, it is worth noting that Collins testified that Rehab was never really a recovery supplement, but rather, it was conceived of and developed by him, not Shelala or Strain, as an energy drink. Collins Tr. 2364:17-2375:2; 2394:4-2396:15 Collins pointed to the fact that he filed his initial application for Rehab with the USPTO in International Class 32. Category 32 is the USPTO category in which energy drinks are typically classified. *Id.*; Ex. 5. The trademark registration that resulted from his application explicitly described the goods as "energy drinks" and "fruit beverages." The phrase "recovery supplement" is not mentioned in the application or anywhere in the registration documentation. *Id.* Collins also explained that the ingredients of the original Rehab were the same as those in other traditional energy drinks, and he described the packaging design for the drink as stating, "Refresh, Recover, Reset, Energy Supplement." *See Id.* 2360:8-19 (describing how main ingredients in Rehab drink were same typical stimulants and dosages as in energy drinks), 2371:16-21. And Collins noted that the term "recovery supplement" was created as a marketing tool and also as a way to get around Red Bull's exclusive contract to serve energy drinks at the Hard Rock Hotel and Casino. The Rehab supplement beverage was, therefore, from its beginning, merely an energy drink in disguise. Collins Tr. 2377:21-2379:9; 2378:6-20. Based on this testimony it can be reasonably inferred that the "REHAB Product" defined in the Supplement as "a recovery supplement beverage"

---

[11] HRHH relies on the testimony of its expert – Bruce Plotkin – to persuade the undersigned that this conclusion is incorrect. Plotkin's testimony is unpersuasive, however as he was not a witness to the contracts' formation, and had nothing to do with the negotiation of the deal. His present analysis appears to have been created for the sole purpose of supporting this arbitration. While the Arbitrator finds the majority of Plotkin's testimony not persuasive and not worthy of much weight, he finds Plotkin's discussion of protective assignment trademark rights particularly "unpersuasive, and a real stretch".

actually encompassed much, much more. At the very least, it encompassed an energy drink and fruit beverage, the rights to which Monster therefore obtained.

Furthermore, the rights that Monster purchased could not have been limited to only recovery supplement drinks because at the time the parties executed the agreement, no such category existed. Sacks Tr. 377:12-16; Hall Tr. 729:10-12; Riley Tr. 987:11-17; Lilja Tr. 1422:4-1423:1. Indeed, as beverage expert, Michael Bellas credibly testified:

> Nobody in 2009 and '10 was going into a grocery store and asking where the Rehab section or the recovery section was. It just didn't exist. And as I said to you, we do these panel discussions. I don't think the Rehab name or a recovery ever came up in any one of those panel discussions. And if it were a category, we would have written about it. We would have been excited to write about it, but it just didn't exist in 2009 and 2010.

Bellas Tr. 1227:15-1228:2.

HRHH also relies on the language in paragraph 2.d of the Supplement, which states that HRHH assigned and sold to Monster "all rights to manufacture and distribute the REHAB Product." The use of the defined term "REHAB Product" in this section is in no way remarkable, however, as paragraph 2.d specifically refers to "manufacturing and distribution rights." These rights include the rights to legally engage with HRHH's flavor house, its can manufacturer and its distributors with regard to the existing Rehab beverage product. As previously discussed, in the LOI, Monster agreed to "produce the current Rehab brand in it's [sic] can form." Ex. 12, p.3. In order to meet this obligation, Monster needed the authority to deal with the manufacturers and distributors of the "current Rehab brand." Paragraph 2.d provides Monster with exactly this authority.

Finally, HRHH contends that paragraph 1.b of the Supplement supports its restrictive reading. Section 1.b states that "'Trademarks' means the [3 marks] whether in block letters or in the stylized form currently used by HRH in connection with a recovery supplement beverage." Ex. 14, ¶1.b. Section 1.b's mention of "a recovery supplement beverage" is clearly not meant to serve as a restriction. Instead, "recovery supplement beverage" merely helps to identify where the "block letters" or the "stylized form" of the marks can actually be found.

Paragraph 1.b also states that "Trademarks" includes "any other applications or registrations for any of the Trademarks covering beverages in International Class 5 or 32." *Id.* HRHH contends that the inclusion of Class 5 and Class 32 in this provision means that Class 30 – tea-based drinks – was expressly precluded. Even assuming, *arguendo*, that HRHH is correct, tea-based drinks can be registered in Class 32; thus, the Rehab beverage in dispute would fall within the Supplement's "Trademark" definition. *See* Plotkin Tr. 1983:15-19.

The parties' pre- and post-contract conduct also supports Monster's interpretation. For example, in HRHH's October 1, 2009, RFP, HRHH acknowledged that it was looking to make a deal with regard to an *energy drink*. Specifically, the RFP stated, "HRH Deal Structure for Rights to the Rehab Beverage Trademark and *Energy Drink Category* to an Established Energy Drink Company." Ex. 144 (emphasis added). In addition, in the months following the contract's execution, HRHH accepted and cashed Monster's $4.25 million royalty checks for its sales of the newly developed Monster Rehab drinks; however, HRHH never challenged Monster's use rights during this time. Konrad Tr. 2048:24-2049:17. Further, HRHH featured one of the new Monster Rehab drinks in the February/March, 2011 issue of its in-room magazine, and in that feature, HRHH referred to Monster Rehab as an *energy* drink. Riley Tr. 1064:20-1071:20. Specifically, HRHH's magazine stated:

> MONSTER JOINED FORCES WITH REHAB TO CREATE A LOW
> CALORIE, NONCARBONATED, TEA-BASED ENERGY DRINK.
> ***
> SO IF YOU'RE IN THE NEED OF AN ENERGY BOOST IN THE
> A.M. OR CRAVE A MIDDAY PICK-ME-UP AT THE POOL,
> MONSTER REHAB TEA PLUS ORANGEADE PLUS ENERGY
> WILL QUENCH YOUR THIRST.
> ***
> THAT CAN ALSO GIVE A BURST OF SUSTAINED ENERGY.

*Id.* 1070:12-1071: Sacks Tr. 275:18-20.

Similarly, when HRHH and its attorneys reviewed the Monster Rehab can design to scrutinize its reference to the "Vegas Hard Rock Rehab pool party" in the can story, none of the HRHH reviewers objected to the fact that, on the face of the can, the beverage stated that it was an *energy* supplement and not a "recovery supplement" beverage. Sacks Tr. 297:13-24; Riley Tr. 1050;1-11; Exs. 199, 200 557. And even HHRH's General Counsel approved a promotional

advertisement for Monster Rehab, without objection, despite the fact that the advertisement did not list the product as a "recovery supplement" beverage. Ex. 57. All of this evidence demonstrates that HRHH representatives at all levels understood that Monster had acquired the right to use the Rehab mark for beverages other than recovery supplements, including, but not limited to, energy drinks.

Further, following execution of the three contracts and consistent with its interpretation here, Monster registered its rights to the '473 trademark with the USPTO.[12] HRHH never attempted to correct the USPTO records, which listed Monster as the assignee and owner of "the entire interest" in the '473 registration. Moreover, despite the fact that HRHH used a trademark watching service to track potentially infringing trademark applications, Plotkin Tr. 1964:2-14. HRHH never attempted to oppose or seek cancellation of Monster's numerous other trademark registrations.[13] Id. 1968:12-1970:11. While HRHH did oppose some third party applications that used the Rehab mark, it did so relying only on its pool party registrations, not on any alleged ownership in the Rehab mark for beverages. Id. 1998:19-1999:20.

In light of the above, the Arbitrator concludes, by a preponderance of the evidence, that Monster's ownership of the Rehab beverage trademark is not limited by type of beverage. Monster was granted the unconditional right to use the Rehab mark for *all* beverages, not just recovery supplement beverages. Thus, it follows that, contrary to HRHH's position, HRHH is *not* "the sole holder of the rights in the Rehab marks in connection with all products and services other than 'a recovery supplement beverage." HRHH Post-Arb. Br., p.68. HRHH   HRHH assigned to Monster all of its rights to Rehab for beverages and only reserved its rights to Rehab for use in connection with pool parties. *See* Ex. 14, ¶¶ 1.b, 2, 5. Monster, therefore, may use Rehab in connection with beverages, and HRHH may use Rehab in connection with pool parties and related goods.

///

---

[12] The Arbitrator notes that Monster's registration of the Mark merely informs his analysis but it does not control. As HRHH explains, Monster's registration is not determinative of ownership or scope of rights to the Rehab marks since only the parties' contracts can make those determinations.

[13] Again, while the Arbitrator finds these facts informative to his decision, they are not dispositive of the questions herein.

136

Did the contracts allow Monster to file applications and receive registrations for new
Rehab trademarks?

Even though the contracts do not explicitly provide for this, Monster is free to protect its
rights through additional trademark registrations because Monster is the owner of the Rehab
rights for all beverages. HRHH cites *Masters v. UHS of Delaware, Inc.* (8th Cir. 2011) 631 F.3d
464 in support of its contrary position. *Masters* is inapposite, however, because, as noted by
HRHH, it dealt with the permissive uses of *licensed* marks, not with marks that were purchased
and assigned outright, as is the case here.

With regard to international trademark rights, the contracts' broad assignment of "all
rights" encompasses international rights by its own terms. HRHH has cited no controlling statute
or case law requiring that the assignment of international trademark rights be explicitly
expressed in a contract.

Did Monster breach the parties' agreement?

HRHH accuses Monster of breaching the parties' agreement by (1) developing,
producing and selling a line of Rehab beverages that departed from the Rehab Recovery
Supplement; (2) filing applications and receiving registrations for trademarks that incorporate
and derive from the Rehab marks, particularly for Rehab teas in Class 30 and for various other
beverages; (3) failing to honor HRHH's consultation rights; and (4) failing to hold a qualifying
major Monster event at the hotel in 2011. To prevail, HRHH must prove the following elements
of a breach of contract claim: (1) the existence of a contract between the parties; (2) HRHH's
performance or excuse for non-performance; (3) Monster's material breach; and (4) damages to
HRHH as a result of the breach. *See Careau & Co. v. Security Pacific Business Credit, Inc.*
(1990) 222 Cal.App.3d 1371, 1388.

HRHH has not proven the third and fourth elements of its breach of contract claim. As
noted, *supra*, Monster did not breach the agreement by developing, producing and selling a line
of Rehab beverages that departed from the Rehab Recovery Supplement. Monster acquired the
Rehab trademark for all beverages, not just for recovery supplements. Thus, Monster has the

right to use the Rehab mark in connection with any and all beverages, including Monster's Rehab Tea + Lemonade + Energy. Beverages. Exs. 73-77. The record indicates that Monster's contractual obligation was paid in full when Monster paid HRHH the $4,250,000. Moreover, in light of the fact that Monster is herein found to be the owner of the beverage rights, the issue of damages claimed by HRHH is moot and is denied.

Monster also did not breach the agreement by filing applications and receiving registrations for trademarks that incorporate and derive from the Rehab marks, particularly for Rehab teas in Class 30 and for various other beverages.[14] As discussed, *supra*, as the owner of Rehab for all beverages, Monster is free to file trademark applications for any beverage, including beverages containing tea, sports drinks and fruit drinks. Further, no covenant in the agreement states that Monster may not file trademark applications for the Rehab mark that it acquired and owns. HRHH's argument is based on the erroneous premise that Monster does not own the Rehab mark for beverages. The Arbitrator has found that Monster is the owner and thus this argument fails.

Monster also did not breach the agreement by failing to honor HRHH's consultation rights pursuant to paragraph 1.B of the LOI. Paragraph 1.B states that "MONSTER will work with HRH to develop the Rehab in whatever form Monster determines is commercially viable for the market place." Ex. 12, ¶1.B. It also states "MONSTER will consult with HRH regarding the direction of the Rehab brand packages, etc." *Id.* According to HRHH, Monster never attempted to fulfill this contractual requirement, and it never intended to provide HRHH with any meaningful opportunity to consult with Monster on the development of products under the Rehab-brand. Instead, HRHH contends, Monster simply took the Rehab marks and ran with them — rarely providing HRHH with any information and only doing so after HRHH repeatedly requested it and once the Rehab-branded beverages were nearing completion.

The Arbitrator does not agree with HRHH's position. The LOI merely states that "MONSTER will work with" and "consult with" HRH," *id.* (emphasis added), and the record

---

[14] HRHH specifically challenges Monster's applications for "REHAB THE BEAST!", MONSTER REHAB and REHAB THE BEAST! WWW.MONSTERENERGY.COM in a combination of International Classes, including 5, 30 and 32.

reflects that this is exactly what Monster did. For example, in April, 2010, Lilja flew to Las Vegas and met with members of the HRHH team to discuss the new beverage and show them a bottle prototype for the original shot concept. Lilja Tr. 1397:1-11. Monster also shared formula samples and can designs with Shalala and Strain and listened to their comments. *Id.* 1415:14-14-:17, 1445:8-17; Exs. 156, 157, 159, 335, 337, 341, 384. In addition, in September, 2010, Lilja traveled to the hotel again to provide HRHH with a tasting of the tea-based formula. This was the formula that would ultimately become the original Monster Rehab blend. *See* Ex. 341.

These consultations were sufficient to satisfy Monster's minimal consultation burden under the LOI. Indeed, the LOI does not provide that HRHH have approval rights or that they have quality control. Moreover, even if Monster did not sufficiently "work with" or "consult with" the HRHH team during its new product development, HRHH has failed to show that it suffered any damages as a result of this alleged breach. In fact, all that HRHH can show is that it was paid in full under the parties' agreement.

Finally, Monster has not breached its obligation to pay HRHH $140,000 in marketing support for the year 2011. The LOI specifically required that Monster host "[o]ne (1) major . . . event each year for five (5) years . . . (approximately $140,000 per event/per year)," for a total amount spent of $700,000. Ex. 12, ¶1.A. Technically, Monster did not, in fact, hold a single event in 2011 valued at approximately $140,000. It is undisputed, however, that Monster did in fact spend $253,171.39 at the Hard Rock Hotel in 2011.[15] The fact that Monster fell short by roughly $40,000 for one event when it spent more than $140,000 in 2011 is hardly a material breach of Monster's obligation. Moreover, HRHH has not shown that it suffered any damages by this small shortfall in 2011. It is also undisputed that Monster has spent a total of $1,692,642.12 in events and hotel room nights at the Hard Rock Hotel within the agreement's first three years. Exs. 574, 555, 590. Thus, rather than breaching the parties' agreement as HRHH claims, Monster has instead paid HRHH nearly $1 million more in soft money marketing support than the LOI requires for the full five years. HRHH has received far more than the benefit that it actually bargained for; thus, it has failed to show any damages or material breach.

---

[15] The largest "single" event in 2011 totaled $100,337.51.

Monster has paid HRHH all monies due under the contract. Ex. 554. It has paid HRHH the $1.25 million for the pouring rights, the $750,000 up-front payment for the purchase of the Rehab mark, and the remaining $4.25 million for the purchase price of the Rehab mark from the sales of Monster Rehab. Monster has also sold more than 100,000 cases of the repositioned Monster Rehab within two years of its launch, and it has spent the required $700,000 in marketing support at HRHH, plus $1 million extra. Exs. 574, 590. Monster, therefore, has not materially breached the parties' agreement.

Has Monster violated the Lanham Act, section 43(A)

HRHH contends that Monster's use of the trademarks incorporating the Rehab marks goes beyond the scope of the parties' agreement. As such, HRHH maintains, Monster's expanded use of the Rehab marks is inherently likely to cause confusion as to the source of the expanded use, thereby violating the Lanham Act, section 43(A). HRHH also asserts that Monster committed false advertising in violation of Section 43(a). Counterclaims ¶¶ 45, 46.

In light of the discussion and analysis above and because HRHH has failed to adduce any evidence in support of its Lanham Act claims (i.e., not a single witness testified as to any likelihood of confusion or false advertising), HRHH's cause of action under the Lanham Act fails and is dismissed.

Did HRHH breach the contract and the implied covenant of good faith and fair dealing?

According to Monster, HRHH breached the contract between the parties, including the covenant of good faith and fair dealing, by selling all of its rights in the Rehab trademark for beverages, and then, after receiving payment on the sale, attempting to reacquire the rights to the Rehab mark for beverages by filing trademark application in the United States and abroad.[16] To date, Monster contends, it has suffered damages in the amount of $30,000 in having to oppose HRHH's improper trademark applications. It maintains that this amount is due to HRHH's breach.

---

[16] HRHH's applications each received an initial rejection due to Monster's prior rights, and thus far, none of the applications has resulted in a registration. See Plotkin Tr. 1955-62; Ex. 576.

HRHH maintains that nothing in the agreement prohibits HRHH from using the Rehab marks in connection with beverages that are not the subject of the parties' agreement. It is wrong. Because the Arbitrator has concluded that *all* beverages are encompassed within the parties' agreement, HRHH's argument must be rejected. Monster is therefore entitled to recover on its $30,000 damage claim for the amount it has spent having to oppose HRHH's improper trademark applications.

Is HRHH liable for Monster's claims for (1) intentional interference with contractual relations, (2) negligent interference with contractual relations, (3) intentional interference with prospective economic advantage, (4) negligent interference with prospective economic advance and/or (5) unfair business practices?

As HRHH points out, while Monster asserted these tort claims in its May 22, 2012 Arbitration Statement of Claim, it did not address them at the arbitration hearing nor did it address them in its post-arbitration briefs. Monster, therefore, has waived these claims, and any relief under these claims is therefore denied and these claims are dismissed.

HRHH Counter Claim

For the reasons stated in this Interim Award, the Arbitrator concludes that HRHH has not proven its entitlement to recover under any of its counterclaims. HRHH's counterclaims are denied and dismissed.

Prevailing Party - Attorneys' Fees

The Arbitrator finds that Monster is the overall prevailing party in this arbitration. HRHH has argued that it is the prevailing party because of the dismissal of the Monster tort claims. However, it is very clear that the entire thrust of the arbitration had to do with the parties' rights to the Rehab trademark and whether they were terminable. Monster clearly prevailed on all of these substantive issues. Paragraph 8(c) of the LOI provides that "[in] addition to all other relief, the Arbitrator shall have the power to award reasonable attorney fees

35

and costs to the prevailing party." Ex. 12, ¶ 8(c). The Arbitrator exercised his discretion and determined that Monster is entitled to recover its reasonable attorney fees and costs incurred in this Arbitration.

Pursuant to the direction in the Interim Award, Monster has filed a Motion for Fees and Costs in which it seeks $1,879,945.61 in attorney fees and $508,549.58 in costs. Monster's Motion is supported by documentation and declarations.

HRHH has similarly filed extensive documentation and declarations in opposition to the Motion. HRHH opposes the Motion and the fees and costs as unreasonable in that the rates charged, the number of hours billed, and that in some cases the billing is unsupported or details redacted. HRHH also challenges what it terms "over-staffing" or inappropriate staffing and duplication of work. HRHH also challenges the items of costs claimed, including expert witness fees, investigation fees, postage charges, photocopying charges, reporter transcripts, travel costs, arbitrator fees and other miscellaneous charges.

The Arbitrator has read and considered all of the materials submitted by the parties. In reviewing these materials the Arbitrator has relied, in part, on his experience with trials of similar matters. The Arbitrator concludes that an adjustment to the claimed fees and costs is warranted. There appears to be elements of un-necessary duplication of effort with the "lawyering" in this case. Nonetheless, contrary to HRHH's contention, the matters at issue had significant implications for the parties and warranted substantial efforts in both the prosecution of the claim and in defense of HRHH's claim.

The Arbitrator has made adjustments to the fees claimed and has determined that an award of fees in the amount of $1,210,721 is reasonable, inclusion in this fee award are the fees related to and incurred in the Motion for Fees. The Arbitrator has also determined that costs in the amount of $259,348.41 are reasonable and are awarded. With respect to the arbitration fees incurred on the Motion for Fees, HRHH is ordered to pay to JAMS these costs.

**FINAL AWARD**

142

Subject to the aforementioned discussion, analysis and rationale, the Arbitrator issues the following Final Award and Orders for declaratory relief:

(1) Monster acquired by assignment all rights, title and interest that HRHH possessed in the trademark Rehab for all beverages;

(2) Monster is the unequivocal and unconditional owner of the Rehab beverage trademark (Reg. No. 3353473) having acquired by assignment all rights, title and interest that HRHH possessed in the trademark Rehab;

(3) HRHH's assignment of the trademark Rehab for all beverages, including the registered trademark (Reg. No. 3353473), was in perpetuity and is not limited by time;

(4) Monster's ownership of the Rehab beverage trademark (Reg. No. 3353473) is not limited by type of beverage;

(5) Monster may use its Rehab beverage trademarks alone and/or in connection with its other trademarks or any other marks;

(6) Monster has complied with all of its contractual obligations to Hard Rock Hotel & Casino;

(7) Monster has fully performed all obligations for the assignment and purchase of the Rehab trademark, and any dispute concerning other components of the LOI and Supplement has no effect on, and is independent and separate from, the binding, separate and fully performed and completed sale of the Rehab trademark.

(8) HRHH is precluded from using Rehab trademarks for beverages.

In addition, the Arbitrator makes this Final Award:

(1)     HRHH breached the contract between the parties, including the covenant of good faith and fair dealing, by selling all of its rights in the Rehab trademark for beverages, and then after receiving payment on the sale, attempting to reacquire the rights to the Rehab mark for beverages by filing trademark application in the United States and abroad. Monster is entitled to $30,000 in damages for having to oppose HRHH's improper trademark applications.

(2)     The Counterclaims asserted by HRHH in this matter are hereby DENIED.

(3)      HRHH shall pay to Monster for fees and costs in the amount of $1,470,069.41

(4)      HRHH shall pay to JAMS arbitration fees incurred in connection with the Motion for Costs.

This Final Award addresses all issues presented for determination in this proceeding.

Dated: August 16, 2013

_Edward A. Panelli_
Justice Edward A. Panelli, Ret.
Arbitrator

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Monster Energy Co. vs. HRHH Hotel/Casino, LLC, et al.
Reference No. 1200046164

I, Charron Johnson, not a party to the within action, hereby declare that on August 16, 2013 I served the attached FINAL AWARD on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Francisco, CALIFORNIA, addressed as follows:

Marc P. Miles Esq.
Daniel J. Callahan Esq.
Kristy A. Schlesinger Esq.
Callahan & Blaine
3 Hutton Centre Dr.
Suite 900
Santa Ana, CA   92707
Phone: 714-241-4444
mmiles@callahan-law.com
daniel@callahan-law.com
kschlesinger@callahan-law.com
    Parties Represented:
    Monster Energy Company

Lynda J. Zadra-Symes Esq.
John B. Sganga Jr. Esq.
Knobbe Martens Olson & Bear
2040 Main St.
14th Floor
Irvine, CA   92614
Phone: 949-760-0404
ljs@kmob.com
jsganga@kmob.com
    Parties Represented:
    Monster Energy Company

145

Benjamin O. Aigboboh Esq.
James E. Curry Esq.
Sheppard Mullin Richter et al.
1901 Ave. of the Stars
16th Fl.
Los Angeles, CA   90067
Phone: 310-228-3700
baigboboh@sheppardmullin.com
jcurry@sheppardmullin.com
   Parties Represented:
   HRHH Hotel Casino, LLC
   HRHH IP, LLC

Jeremy Feigelson Esq.
Matthew B. Harris Esq.
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY   10022
Phone: 212-909-6000
jfeigels@debevoise.com
mbharris@debevoise.com
   Parties Represented:
   HRHH Hotel Casino, LLC
   HRHH IP, LLC

     I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco,

CALIFORNIA on  August 16, 2013.

_Charron Johnson_
Charron Johnson
cjohnson@jamsadr.com

146

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Manuel L. Real _____ and the assigned Magistrate Judge is _____ David T. Bristow _____ .

The case number on all documents filed with the Court should read as follows:

## EDCV13-01888 R (DTBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____ October 16, 2013 _____
Date

By _L. Murray_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

[x] **Western Division**
312 N. Spring Street, G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

[ ] **Eastern Division**
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

Name & Address:
Marc P. Miles (SBN: 197741)
Kristy A. Schlesinger (SBN: 221850)
CALLAHAN & BLAINE, APLC
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA  92707

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

MONSTER ENERGY COMPANY, *and Monster Beverage Corporation*

PLAINTIFF(S)

v.

HRHH HOTEL/CASINO, LLC, a Delaware Limited Liability company, HRHH IP, LLC, a Delaware Limited Liability Company; and DOES 1-50, Inclusive

DEFENDANT(S).

CASE NUMBER

ED CV 13 - 01888 R- (DTBx)

**SUMMONS**

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within 2 0_____ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☐_____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Callahan & Blaine, APLC_____ , whose address is _3 Hutton Centre Drive, Ninth Floor, Santa Ana, CA 92707_____ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

TERRY NAFISI

Clerk, U.S. District Court

OCT 16 2013

Dated: _____

By: _____

Deputy Clerk

L. MURRAY

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11

**SUMMONS**

CCD-1A

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

MONSTER ENERGY COMPANY

**DEFENDANTS**

HRHH HOTEL/CASINO, LLC, a Delaware Limited Liability company, HRHH IP, LLC, a Delaware Limited Liability Company; and DOES 1-50, Inclusive

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Daniel J. Callahan (SBN: 91490)
Marc P. Miles (SBN: 197741)
Kristy A. Schlesinger (SBN: 221850)
CALLAHAN & BLAINE, APLC
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA  92707, Tel: 714-241-4444

Attorneys (If Known)

**II.   BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III.   CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.   ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V.   REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes   ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☐ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** 1,500,069.41+ fees & costs

**VI.   CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Petition to Confirm Arbitration Award and Enter Judgment, 19 U.S.C. section 9.

**VII.   NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 441 Voting | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☒ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 442 Employment | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

ED CV 13 - 01888

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

OCT 16 2013

CCD-JS44

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No [ ] Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [X] No [ ] Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  [ ]  A. Arise from the same or closely related transactions, happenings, or events; or

[ ]  B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ]  C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ]  D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[ ]  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Riverside | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[ ]  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Delaware |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Riverside | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____  Date  10-16-13

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |